**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**

| |
|---|
| LEAGUE OF WOMEN VOTERS OF TENNESSEE, LEAGUE OF WOMEN VOTERS OF TENNESSEE EDUCATION FUND, AMERICAN MUSLIM ADVISORY COUNCIL, MID-SOUTH PEACE & JUSTICE CENTER, ROCK THE VOTE, and SPREAD THE VOTE, |

        *Plaintiffs*,

v.

TRE HARGETT, in his official capacity as Secretary of State of the State of Tennessee, MARK GOINS, in his official capacity as Coordinator of Elections for the State of Tennessee, HERBERT H. SLATERY III, in his official capacity as Attorney General of the State of Tennessee, the STATE ELECTION COMMISSION, and DONNA BARRETT, JUDY BLACKBURN, GREG DUCKETT, MIKE MCDONALD, JIMMY WALLACE, TOM WHEELER, and KENT YOUNCE, in their official capacities as members of the State Election Commission,

        *Defendants*.

**COMPLAINT**

Civil No. _____

Plaintiffs League of Women Voters of Tennessee, League of Women Voters of Tennessee Education Fund, American Muslim Advisory Council, Mid-South Peace & Justice Center, Rock the Vote, and Spread the Vote ("Plaintiffs"), bring this action against Tre Hargett, in his official capacity as Secretary of State of the State of Tennessee; Mark Goins, in his official capacity as Coordinator of Elections for the State of Tennessee; Herbert H. Slatery III, in his official capacity as Attorney General of the State of Tennessee; the State Election Commission; and Donna Barrett, Judy Blackburn, Greg Duckett, Mike McDonald, Jimmy Wallace, Tom

Wheeler, and Kent Younce, in their official capacities as members of the State Election Commission, ("Defendants"), and allege the following:

### INTRODUCTION

1.      This is a lawsuit challenging strict, unnecessary, and irrational restrictions on community-based voter registration speech and activity, in violation of the First and Fourteenth Amendments.

2.      Plaintiffs bring this action to prevent enforcement of a new Tennessee law that unconstitutionally burdens and chills their core political speech and associational rights, diminishing their efforts—and the efforts of other individuals and community-based groups—to encourage civic engagement and democratic participation by assisting Tennessee citizens in registering and exercising their fundamental right to vote.  Plaintiffs' voter registration efforts are "core political speech" involving "interactive communication concerning political change." *Meyer v. Grant*, 486 U.S. 414, 422 (1988).  Indeed, Plaintiffs' endeavors to assist others in registering to vote are themselves political and philosophical statements, signaling that they value the democratic process and believe in the capacity of the popular will to shape the composition and direction of the government.  This poorly tailored, vague, and overbroad law cannot possibly survive the exacting scrutiny applied to such restrictions on political speech.

3.      The right to vote is "a fundamental political right, because [it is] preservative of all rights."  *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886).  And "discriminatory and unfair registration laws and procedures can have a direct and damaging effect on voter participation in elections."  House Rep. 103-9 (1993).  Such registration laws "disproportionately harm voter participation by various groups, including the disabled and racial minorities."  *Id.*

4.      Civic organizations have routinely taken steps to assist individuals in registering to vote in order to ensure broad participation in elections.  These community-based voter

registration efforts are particularly important in Tennessee. With 37 percent of its eligible citizens not registered to vote, Tennessee has the 44th lowest registration rate in the country.

5. Instead of enacting sensible regulations regarding voter registration and encouraging the registration of all eligible Tennessee voters, on May 2, 2019, Governor Bill Lee signed House Bill 1079 / Senate Bill 971 into law (the "Law"), imposing a host of burdens on organizations and individuals that assist their fellow citizens in registering to vote, including provisions that make Tennessee a standalone amongst the states.

6. This Law restricting voter registration activity, which adds new sections to Title 2 of the Tennessee Code Annotated, namely §§ 2-2-142, 2-2-143, and 2-19-145,[1] imposes substantial, unnecessary, irrational, and unconstitutional burdens on individuals and organizations who endeavor to communicate democratic values and assist others in registering to vote. In doing so, the Law violates the First and Fourteenth Amendments of the United States Constitution.

7. The Law imposes criminal penalties upon civic organizations and civic-minded individuals who encourage political participation through voter registration drives if they fail to comply strictly with numerous burdensome regulations. Among other requirements, the Law requires the pre-registration of every voter registration activity. It also requires state training not only of those organizing a voter registration drive but of every volunteer that chooses to participate, and places responsibility for the state-imposed training of all volunteers on the organization coordinating the effort. It further requires the submission of sworn statements prior to conducting voter registration activity. And it forbids civic organizations from retaining the contact information of those who they try to help register without separately obtaining their

---

[1] Plaintiff Rock the Vote is only challenging the disclaimer and disclosure requirements under Section 2-19-145. To the extent the term "Plaintiffs" is used throughout to refer to the other challenges brought in this action, it excludes Rock the Vote in those contexts.

consent, preventing follow-up with individuals who decide to submit the forms through them and hindering attempts to convince these individuals to vote in the election.

8. The Law also requires civic organizations and those who carry out their work conducting voter registration—upon threat of criminal sanction—to make a specified disclaimer statement anytime any organization makes any "public communication regarding voter registration status." This broad restriction on all public communications concerning voter registration is imposed despite a lack of any meaningful evidence of confusion necessitating this disclaimer.

9. The Law further imposes substantial civil fines for the submission of "incomplete" forms while at the same time requiring those conducting voter registration to submit each application they collect within 10 days, thus limiting opportunities for follow-up on "incomplete" forms. As a result, the Law leaves Plaintiffs with no ability to conduct voter registration activity without risk of civil sanction if some participants do not fully complete their registration forms. The Law provides no exceptions to the 10-day deadline for extenuating circumstances.

10. Because some number of "incomplete" forms is inevitable even following good training and best practices, the penalties for "incomplete" forms under the Law put Plaintiffs in an impossible position by penalizing them for submission of "incomplete" forms while also penalizing them criminally for *not* submitting them, with the sole exception of those that only contain a name or initial.

11. Moreover, each of the requirements of the Law are impermissibly vague and overbroad, such that the regulated individuals and organizations do not know which provisions apply to them and what steps to take in order to be in proper compliance with the Law. The Law's vague and overbroad provisions will diminish the participatory message of Plaintiffs,

4

other civic organizations, and civic-minded individuals and chill constitutionally protected core political speech.

12.     On their own, and in the aggregate, these regulations are inordinately burdensome and will render Plaintiffs' voter registration activities far more costly and resource-intensive. Coupled with criminal liability and civil penalties that could consume large portions of some of these civic organizations' budgets, they carry devastating consequences and violate Plaintiffs' constitutional rights.

13.     As a whole, the Law transforms a core civic expression and constitutionally protected activity into an extraordinarily risky enterprise.  In light of the significant criminal and financial exposure created by engaging in voter registration activity, Plaintiffs anticipate a sharp decline in their ability to recruit volunteers and paid workers to convey the value of participation in the democratic process and conduct their voter registration drives.

14.     Because Plaintiffs' voter registration efforts will be deterred or scaled back as a result of these requirements, the Law will result in an overall reduction in the total quantum of speech and expression.

15.     These onerous, overbroad, and vague requirements do not serve, and cannot be justified by, any compelling or even legitimate interest.  Indeed, the Law's own terms are conflicting, overly broad, and yet simultaneously underinclusive, demonstrating that the Law is not necessary to advance any state interest.

16.     Unless the challenged provisions of the Law are enjoined, Plaintiffs' constitutionally protected political speech and activity will continue to be chilled.  Plaintiffs, as well as many other individuals and groups, will be forced to communicate fewer civic and nonpartisan political messages and to refrain from engaging in associational activity important to advancing their missions and beliefs.  The public will receive less information about how to

participate in the democratic process, will have fewer options to register to vote, and fewer opportunities to associate with Plaintiffs in meaningful civic activities.

17. For these reasons, and those specifically alleged herein, Plaintiffs seek declaratory judgment and an injunction prohibiting Defendants from enforcing the challenged provisions of the Law, and permitting Plaintiffs' constitutionally protected community-based voter registration speech and activities to continue.

## JURISDICTION AND VENUE

18. This action is brought under the United States Constitution. The Court, therefore, has jurisdiction to hear this case pursuant to 28 U.S.C. §§ 1331, 1343, 1357, and 42 U.S.C. § 1983. It also has jurisdiction under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, to grant the declaratory relief requested.

19. This Court has personal jurisdiction over each Defendant because each is a citizen of Tennessee and their principal places of business are in Nashville.

20. Venue in this district is proper pursuant to 28 U.S.C. § 1391(b) because some Defendants reside in this District and all Defendants reside in Tennessee, and because a substantial portion of the events giving rise to these claims occurred in the Middle District of Tennessee.

## PARTIES

21. The League of Women Voters of Tennessee (the "League" or "LWVTN") is a non-partisan, non-profit corporation organized under laws of Tennessee, and a tax-exempt entity pursuant to sections 501(c)(3) and 501(c)(4) of the Internal Revenue Code. The League seeks to promote civic engagement through informed and active participation in government. It accomplishes this mission in part by helping Tennessee citizens register to vote. The LWVTN is

6

a non-partisan organization and never supports or endorses political parties or candidates. The LWVTN is part of the League of Women Voters of the United States.

22.     The LWVTN currently has 775 dues paying members. The LWVTN also often works with volunteers who are not members. The LWVTN has two arms—a 501(c)(3) organization called the League of Women Voters of Tennessee Education Fund and a 501(c)(4) arm, the former of which conducts most of its voter registration activities. The LWVTN's annual budget for the last fiscal year was approximately $36,853 dollars, and the LWVTN anticipates that its budget for the next few years would be similar. The budget for the LWVTN in modern times has always been less than $50,000. The League of Women Voters of Tennessee Education Fund does not maintain any separate budget. It receives specific grants for voter registration activities as well as other donations and provides grants for or funds some of the voter registration activities of the state and local Leagues.

23.     The LWVTN is a volunteer organization, relying both on dues-paying members and other volunteers to conduct almost all its activities, other than two temporary consultants hired on a limited basis to help with advocacy during the legislative session and limited administrative support.

24.     The LWVTN currently has nine local Leagues, including Blount County, Chattanooga, Hendersonville, Jefferson County, Knoxville-Knox County, Memphis-Shelby County, Murfreesboro/Rutherford County, Nashville, and Oak Ridge (collectively "local Leagues"). The average annual budget for these local Leagues varies, but the average budget for the largest local League, the Nashville League, is only approximately $35,000 per year.

25.     These local Leagues regularly conduct voter registration drives throughout Tennessee. For example, in the last year, they have conducted approximately 122 voter registration events and engaged 277 volunteers in these efforts. These activities include regular

registration drives at local high schools and community colleges, sometimes in connection with county election officials and sometimes not; local libraries; public housing offices; the YMCA; local utility offices (NES); USCIS naturalization ceremonies; and events like the Nashville Art Crawl. Additionally, each year the local Leagues also conduct a number of different voter registration events on National Voter Registration Day.

26. Before the passage of the Law, the LWVTN originally planned to continue all this voter registration work in the future. Additionally, the LWVTN was planning to expand its voter registration work in the next few years. The local Chattanooga League is new and is in the process of expanding and developing more partnerships in their area for the purpose of expanding their voter registration work. The LWVTN has plans to increase and expand its efforts to engage and include more diverse communities in its voter registration activities, and to participate in the League of Women Voters of the United States diversity initiatives.

27. During voter registration events, League members and other volunteers always collect at least some voter registration forms, which they then deliver to local election officials. The League always aims to collect as many voter registration applications as possible, and as a whole collects a significant number of voter registration applications. Over the course of a given year, the League usually collects and submits several thousand voter registration forms, collecting nearly 3,000 in 2018. Most of these voter registration applications are collected in the counties where the local Leagues are located, but they often collect voter registration applications at events in counties where they do not have a local League. For example, the League is currently conducting regular voter registration drives in Williamson County, where there is no local League, for the Franklin Housing Authority. The League also collects voter registrations at events like the Nashville Art Crawl, where they collect voter registrations from

people from all over the area. In a given year, the League ordinarily collects voter registrations from eligible citizens living in approximately one-third of all the counties in Tennessee.

28.     The LWVTN also regularly engages in other activities, including community outreach, education, and direct advocacy on local and statewide ballot initiatives. As part of its work to educate voters, the LWVTN regularly conducts candidate forums.

29.     The LWVTN encourages all its members and any other interested volunteers to participate and provide assistance during these voter registration drives, and does not require any pre-registration for such individuals to help with any given event. Encouraging volunteers to participate in voter registration activity is an important part of the League's associational activity and their organizational mission. In the League's experience, the more volunteers present to help with a voter registration drive, the more effective the drive.

30.     The League is a volunteer organization, with no full-time staff in Tennessee. But the League regularly receives grants to help fund its work, including its voter registration activity. For example, this past year the Chattanooga League received a Youth Voter Grant to encourage participation in the electoral process through voter registration and voter education in high schools, community colleges, and vocational schools, resulting in the registration of 316 individuals in the last year. This was just one of the Chattanooga League's many voter registration programs. As another example, in recent years, the Oak Ridge League has received grants to conduct voter registration at naturalization ceremonies. And the Hendersonville League has been paid by the local county election commission to conduct voter registration at the local high schools, earning an average revenue of $350 a year.

31.     Local Leagues conducted voter registration drives at local high schools in Tennessee in cooperation with county election officials. However, neither the LWVTN nor any of its local Leagues has been "designated" or "deputized" to conduct voter registration by the

local county election commissions.  This is true despite numerous requests in recent years from the League for such a designation.  The LWVTN, therefore, is paid to collect voter registration applications and has not been "designated" to conduct these activities.

32.     When conducting voter registration, the LWVTN is beginning to retain information collected from voter registration applications.  This information allows civic organizations like the League to engage in follow-up communications with voters after they are registered in order to provide these voters with additional information about voting and to encourage them to vote.  These follow-up communications further the League's overall mission to promote democracy and civic participation.

33.     The LWVTN has plans to expand its work to retain voter registration from the voter registration applications it collects and use them to expand its Get Out the Vote activities.  The LWVTN has plans to increase its efforts in particular to contact individuals it assists in registering to vote at high schools and community colleges by text to encourage those voters to vote and to provide them with information about voting, such as polling place locations.

34.     The LWVTN and the local Leagues plan to continue to conduct similar voter registration in the future, with the aim of collecting as many voter registration applications as possible, and to continue to seek and collect grants to support this voter registration work.  Based on its past experiences conducting voter registration drives in Tennessee, the LWVTN expects that through these future activities, it would collect well over 100 voter registration applications in a voter registration drive.

35.     LWVTN volunteers and members also regularly engage in communications with members of the Tennessee public using a variety of media on issues related to elections, voting, voter registration, and a voter's registration status.  In the coming year, LWNTN plans on rolling out a text-messaging campaign to communicate with individuals about voter registration—a

process that the Law would regulate by requiring a lengthy disclaimer with each text message. These disclaimers may make such a text message campaign unfeasible and would, at minimum, add significantly to its cost. LWVTN volunteers and members also regularly communicate with the public about voter registration, voter registration status, and polling place locations at their regular public events, such as candidate forums, public events registration events, and when engaged as poll watchers.

36. The League of Women Voters Educational Fund runs the website, VOTE411.org. This website provides individuals with access to polling place information and information about voter registration, including an opportunity to register to vote (or at least initiate a voter registration application). It is also designed to collect information from voters who use the system, including information provided during voter registration. This information is collected so that potential voters can be contacted in the future to provide them with information about voting and to encourage them to vote. The system does not retain social security numbers. There is information on the website about the retention policy but it is unclear whether it would be considered "conspicuously and prominently placed" as required by Section 2-2-145(d) of the Law. The LWVTN and the local Leagues actively work to promote this website within Tennessee. In the past, this has included handing out materials providing information about the website, such as on literature handed out during voter registration drives and other events, and palm cards. Additionally, the League paid for a billboard in the Knoxville/Oak Ridge area in 2018, promoted the VOTE411.org website on the LWVTN's own website, and has provided Table Tents with information about the VOTE411.org website to restaurants in Chattanooga. In 2018, the LWVTN, with assistance from the League of Women Voters Education Fund, was able to expand the coverage of VOTE411.org to the entire state.

37.     The American Muslim Advisory Council ("AMAC") is a 501(c)(3) tax-exempt organization based in Nashville, Tennessee, which seeks to empower Muslims across Tennessee through civic engagement and community building in order to protect all Tennesseans from prejudice and targeted violence.  AMAC works within the Muslim community across the state to facilitate collaboration across mosques to increase civic engagement, and collaborates with government entities, allied nonprofits, and other communities for events and actions that advance justice.

38.     Voter engagement, and particularly voter registration activities, form an important part of AMAC's mission to empower Muslims in Tennessee and to better the political and social climate in the state for not only Muslims, but all Tennesseans.  For example, in 2018 alone, AMAC reached over 2,000 Muslim Tennesseans through voter registration drives, get-out-the-vote events, meet the candidate forums, and outreach through texting, phone banking, and rides to the polls.  During these events and through this outreach, AMAC communicates with the Tennessee public, and in particular, members of the Tennessee Muslim community, on issues concerning elections, voting, voter registration, and a voter's registration status.

39.     In terms of voter registration specifically, AMAC has conducted and plans to continue conducting voter registrations drives across the state, both this year and in 2020, with the aim of collecting as many voter registration applications as possible for the purpose of facilitating as many new voters to participate as they can.  In 2018, AMAC registered a significant number of voters at mosques in Nashville, Antioch, Murfreesboro, Memphis, and Knoxville, as well as at events co-hosted by groups like the Vanderbilt Muslim Student Association.  To help these voters register, AMAC depends on employing college interns and paying those interns a flat stipend for their work each week.

40.     AMAC volunteers and employees also regularly engage in communications with members of the Tennessee public using a variety of media on issues related to elections, voting, and voter registration, and has helped voters ascertain their registration status and polling location in the weeks leading to an election.

41.     Because AMAC is a small, nonprofit organization with only one full-time and one part-time staff member, it relies on paying college students a small stipend to conduct voter registration activities. Its budget for voter registration activities in 2018, for example, was approximately $1,000. While AMAC intends to expand its voter registration efforts in 2020, its budget for these activities will remain limited—its total budget for all activities in 2018 was approximately $100,000. That figure includes costs such as paying its staff members. Even a small fine would impose substantial hardship on AMAC's ability to operate.

42.     Mid-South Peace and Justice Center ("MSPJC"), based in Memphis, Tennessee, is a multi-issue, multi-race organization whose mission is to engage, organize, and mobilize communities to realize social justice through nonviolent action. For over 37 years, it has educated and trained new community leaders to lead campaigns for racial, economic, environmental, and social justice in Tennessee and beyond. MSPJC works with and is led by grassroots leaders from the low-income communities of color most impacted by the issues with which it engages. While it has about 90 monthly dues-paying members, it also works with a number of volunteers and student interns who assist with speech-related activities including tabling and voter registration.

43.     Voter registration activities are an important part of MSPJC's strategy to engage local communities in pursuing social justice. In the past, MSPJC has received grants to conduct voter registration drives and it plans to continue pursuing and expects to receive such grants to support its voter registration work. MSPJC participates in voter-registration efforts in multiple

different ways.  For one, it engages community members to help voters register in their neighborhoods by encouraging applicants to fill out forms and then submitting them on their behalf.  For example, in 2018, MSPJC assisted low-income youth and adults in completing community service hours by distributing ballot information and helping voters in Binghamptom, a low-income neighborhood that has historically had low voter turnout, to register to vote.  Additionally, MSPJC volunteers, including students, and its own staff members also conduct voter registration activities.  MSPJC plans on continuing such voter registration activities in the future with the aim of facilitating as many voters registering as possible by collecting and submitting their applications.

44.     When conducting voter registration, MSPJC regularly retains information collected from voter registration applications.  This information allows MSPJC to engage in follow-up communications with voters after they are registered in order to provide these voters with additional information about voting and to encourage them to vote.  These follow-up communications are a vital component of MSPJC's overall mission to promote democracy and civic participation.

45.     MSPJC staff members and volunteers also regularly engage in communications with members of the Tennessee public, and particularly those in the low-income communities of color most impacted by the issues with which it engages, using a variety of media on issues related to elections, voting, registration, and a voter's registration status.

46.     MSPJC is a small, nonprofit organization with only three full-time and three part-time staff members, and it relies in part on both grants and volunteers to conduct voter registration activities.  With an annual operating budget of approximately $235,000—a substantial portion of which pays staff salaries—even one $2,000 fine would likely lead it to suspend all voter registration activities.

47.     Rock the Vote is a national, nonpartisan 501(c)(3) tax exempt organization based in Washington, D.C., that is dedicated to building long-term youth political power.  Since 1990, Rock the Vote has pioneered innovative ways to mobilize young voters, revolutionizing the use of culture, music, art, and technology to engage youth in the political process.

48.     Voter registration and engagement is at the core of Rock the Vote's mission. During the last seven presidential elections, Rock the Vote and its partners coordinated the largest voter registration efforts for young people in the country, adding nearly 8 million new voters to the rolls.  Rock the Vote prioritizes proactively reaching out to and mobilizing young voters, whose voices are often left out of the political process.  To effectively register and turn out voters, Rock the Vote utilizes and maintains its own online voter registration platform that is used for free by partners across the country and in Tennessee.  The tool, which is available in 13 languages, helps a voter determine whether they are eligible for online voter registration, and then directs the voter to the appropriate state website as available, or alternatively, assists the voter with completing the federal voter registration form.  Rock the Vote also offers a voter lookup tool, which allows voters to confirm their registration status or prompts them to register to vote through Rock the Vote's online tool.

49.     Rock the Vote currently employees five, full-time individuals, plus one part-time paid intern.  Rock the Vote also leverages its volunteer network to boost youth voter registration across the country using its online tool.

50.     Rock the Vote relies heavily on its website and digital communications methods, such as social media, email, text messages, and digital advertising to reach and mobilize young people across the country and encourage them to register to vote.  Rock the Vote's online registration tool also allows voters to opt into targeted, nonpartisan election reminders via email and text messaging to ensure they are prepared to vote.  As a result, Rock the Vote's registrants

Case 3:19-cv-00385   Document 1   Filed 05/09/19   Page 15 of 52 PageID #: 15

turn out at much higher rates than the national youth average.  Rock the Vote expects that the disclaimer and disclosure requirements for communications related to voter registration and turnout are likely to confuse individuals attempting to register to vote in Tennessee through Rock the Vote's website and dissuade them from using the online tool.

51.     Rock the Vote is only challenging the disclaimer and disclosure requirements under Section 2-19-145.  These requirements will impose a substantial burden on Rock the Vote's ability to help voters register to vote using its online tools and communications. Although the specific language required to be displayed has not yet been determined, Rock the Vote will need to make enhancements to its existing online voter registration tool to comply, including translating the provided text into all 13 languages Rock the Vote currently supports, updating its user-flow and interface, updating its website, and evaluating potential changes to its digital voter registration communications strategy and program.  All changes to Rock the Vote's registration platform will need to be reviewed and thoroughly tested on both desktop and mobile devices, including a review of all partner tools that use Rock the Vote's tools.  These changes will be significant and will cause Rock the Vote to incur significant costs.  Simply determining the full scope of the changes necessary to Rock the Vote's online tools and public communications for Rock the Vote to comply with the Law imposes a substantial burden on Rock the Vote given its limited staff capacity and resources.

52.     Spread the Vote is a nonpartisan 501(c)(3) tax-exempt organization that empowers members of communities in Tennessee and across the country to vote by helping individuals obtain government-issued photo ID, helping eligible citizens to register to vote, and educating and mobilizing eligible voters.

53.     Spread the Vote Tennessee receives referrals for individuals in need of ID from partnering social service organizations, as well as through tabling at homeless shelters, housing

complexes, local community events, and the like. In the process of helping individuals obtain identification, the organization helps them register to vote. Spread the Vote ensures their clients are able to get to the polls on Election Day and creates and distributes nonpartisan voter guides. The organization also launched a year-round voter education program this year, enabling it to reach an even wider swath of the electorate. Spread the Vote plans on continuing all of these activities into the foreseeable future and plans to expand its presence in Tennessee.

54. In Spread the Vote's experience, voter registration drives are particularly important for providing historically disenfranchised and marginalized communities with access to voter registration. Spread the Vote meets people where they are, literally and figuratively. Many of the people they help to register otherwise would not otherwise have a chance to do so, as they lack internet access and/or means to get to an agency or office that provides voter registration applications. These individuals are largely indigent or homeless and have expressed how meaningful it is to them to be able to exercise their rights and take part in the political process.

55. Spread the Vote currently has a paid staff of 41, four of whom are in Tennessee. More than 600 people have trained to volunteer with Spread the Vote, though the number of active volunteers is fewer and fluctuates throughout the year.

56. Spread the Vote currently works in two counties in Tennessee, Shelby and Davidson. In addition to its Tennessee State Director, Spread the Vote has two paid full-time staff, one paid part-time intern, and three active volunteers in the state, though more have signed up. To date, Spread the Vote has helped 404 Tennesseans obtain IDs. Their budget for their work in Tennessee is $259,356. Even a small fine would impose a substantial hardship on Spread the Vote's ability to operate.

57. Everyone who works with Spread the Vote, whether as an employee or a volunteer, must complete mandatory internal training. The additional training requirement imposed by the Law, especially given that it is unclear how often or in what manner it will be held, will be burdensome and dissuasive to present and potential Spread the Vote staff and volunteers. Coupled with the fact that the legislature has chosen to impose civil and criminal penalties on those who fail to comply with the onerous requirements of this bill, individuals affiliated with the organization may become hesitant to help voters register. Spread the Vote's clients entrust the organization with their most personal and sensitive information and this legislation would negatively impact their comfort in doing so.

58. Tre Hargett is the Secretary of State of the State of Tennessee and is sued in his official capacity. The Secretary appoints the Coordinator of Elections who serves "at the pleasure of the secretary of state" and may only make regulations necessary to carry out the election code with "the concurrence of the secretary of state." Tenn. Code Ann. § 2-11-201(a), (c).

59. Mark Goins is the Coordinator of Elections for the State of Tennessee and is sued in his official capacity. The Coordinator is "the chief administrative election officer of the state" charged with "obtain[ing] and maintain[ing] uniformity in the application, operation and interpretation of the election code." Tenn. Code Ann. § 2-11-201(b); *see also id.* §§ 2-11-202, 2-2-115. As Coordinator, Goins is also authorized to investigate or direct local authorities to investigate "the administration of the election laws." *Id.* § 2-11-202(a)(5).

60. Herbert H. Slatery III is the Attorney General of the State of Tennessee and is sued in his official capacity. The Attorney General is authorized to investigate or prosecute violations of the election code and to request that the Coordinator conduct investigations. *Id.* § 2-11-202(a)(5)(A)-(C).

61.     The State Election Commission ("Commission") is charged with all duties of the board of elections of the state. *Id.* § 2-11-101(b).  Under the Law, the Commission is authorized to impose civil fines upon individuals and organizations who submit incomplete voter registration forms. *Id.* § 2-2-143(c).  The Commission is authorized to review "incomplete" forms, make a finding of the number of incomplete forms submitted, combine the number of incomplete forms across counties in order to impose penalties, and fine individuals and organizations up to $10,000. *Id.*

62.     Donna Barrett, Judy Blackburn, Greg Duckett, Mike McDonald, Jimmy Wallace, Tom Wheeler, and Kent Younce are the members of the State Election Commission and are sued in their official capacities.

## FACTS

63.     Tennesseans need more, not fewer voter registration opportunities.  According to U.S. Census Bureau *Current Population Survey* ("CPS") data*,* approximately 3,183,000 Tennessee citizens were registered to vote as of November 2018, out of a citizen voting age population of 4,872,000.  Therefore, as of November 2018, approximately 37 percent of eligible citizens in Tennessee were not registered to vote.  And Tennessee's voter registration rate is decreasing rather than increasing.  In 2016, according to the CPS, 33% of eligible citizens in Tennessee were not registered to vote.  Another federal survey, from the U.S. Election Assistance Commission ("EAC"), establishes that Tennessee's voter registration numbers are among the worst in the country when compared to other states.  In 2016, according to EAC data, Tennessee ranked 44th in the percentage of its citizen population registered to vote out of all 50 states and the District of Columbia.

64.     Voter registration drives play an important role in facilitating voter registration of eligible citizens.  Community-based voter registration drives are a particularly important tool for

marginalized communities to register to vote, especially racial minority voters and those with lower incomes. According to the CPS, voters of color are more likely to identify as having registered at a registration drive or at a school, hospital, or campus compared with White voters. For example, in the 2018 election cycle, while 3.1 percent of Whites reported registering through a drive, the percentage increased to 5.3 for African Americans and 5.5 percent for those identifying as Hispanic. Similarly, in 2018, 4.1 percent of White registrants reported registering at on a school, hospital, or campus, compared with 7.5 percent of those identifying as Black and 7.1 percent of those identifying as Hispanic.

65.     Plaintiffs all conduct voter registration drives throughout Tennessee during which they interact with potential voters face-to-face to encourage them to participate in the political process and to register to vote. These conversations take place at schools and universities, community events, religious services, workplaces, malls, conferences, and public gatherings, as well as in parking lots, transportation hubs, and on city streets. These initial interactions culminate when Plaintiffs collect voter registration applications from potential voters and submit them on their behalf. Plaintiffs sometimes continue to communicate with the individuals identified through their voter registration activity to promote civic engagement, for example through get-out-the-vote drives. Plaintiffs intend to continue these activities in the future but the Law has placed those important plans in jeopardy.

66.     Voter registration volunteers educate non-voters not only about how political participation can lead to social change and make democratic institutions more responsive to community needs, but also how the mere act of becoming eligible to vote helps underrepresented persons and communities establish their political worth, standing, and right to speak at the polls—thus creating political respect for the citizen's community and making elected officials

and candidates for elective office attentive to the community. Fostering political and civic engagement in this manner is a central part of Plaintiffs' voter registration activity.

67. Numerous Tennessee citizens who register to vote each year do so through interaction with their fellow citizens at voter registration drives, including those conducted by Plaintiffs.

68. In addition to the important service rendered to other citizens through these voter registration drives, these drives are critical to Plaintiffs' core political speech and associational rights.

69. Voting and even registering to vote is far from universally exercised. Plaintiffs' assistance to others in registering to vote is therefore a political statement in and of itself: that they value the democratic process and the rights of all eligible citizens to access the franchise. These statements encompass not only Plaintiffs' expression of the importance of political participation and their efforts to convince individuals to register, but also their actions in ensuring that they properly submit these individuals' registrations and thus strengthen their community's voice on issues of importance such as government responsiveness, racial justice, and policies that promote religious tolerance and acceptance.

70. By engaging in voter registration activities, Plaintiffs express their faith in democracy, in the importance of civic engagement, and their belief that politically underrepresented groups should be empowered. Their voter registration activities are among the most effective and credible means of expressing these views.

71. As non-profit organizations with limited resources, the Law's restrictions constitute a substantial burden on Plaintiffs' expressive activities. The Law's substantial civil and criminal penalties will chill Plaintiffs' speech, expression, and associational activities as described above, including by leading them to cut back or entirely cease their voter registration

efforts, depending on the Plaintiff and the ultimate meaning of the Law's vague provisions. In turn, this will harm the organizational mission of each Plaintiff by minimizing its ability to rally its community and use the franchise to weigh in on issues of importance.

**Enactment of the Challenged Law**

72.     Going into the 2018 election cycle, civic organizations across Tennessee, including Plaintiffs, made a concerted push to register thousands of eligible Tennessee citizens who were not registered to vote. Much of this community-based voter registration activity took place among communities of color and other underserved populations.

73.     It was against this backdrop of increased voter registration that Tennessee enacted the Law.

74.     Although the state has suggested that House Bill 1079 was necessary to prevent fraudulent voter registration, on information and belief, this justification merely serves as pretext for a different, more insidious purpose: to inhibit successful voter registration efforts by community-based organizations. Statements made during the legislative proceedings support this conclusion. For example, during the March 27, 2019 before the House Elections & Campaign Finance Subcommittee, Representative Tim Rudd said that the problem the bill sought to address arose in the last election cycle in Shelby County where "we had a lot of outsiders, contractors and other people coming in and flooding the local election commission and the state with ballots [sic] right before the election." On April 9, 2019, during a hearing before the Senate State and Local Committee, Senator Ed Jackson stated, without offering any evidence to support his claim, that "groups that seek to register large numbers of voters"—which the bill targets— "potentially put legitimate registrations at risk." Indeed, further statements from the House floor indicate that the true purpose of the bill was to retaliate against a single organization whose mission was focused on increasing the turnout of African-American voters in the state. And in

an op-ed supporting Senate Bill 971 and House Bill 1079, Secretary of State Tre Hargett described how the bills would address the scenario created in the 2018 election by one voter "activist" group that submitted a large number of voter registration forms.

75. And despite complaints of a deluge of incomplete or erroneous registration forms, Tennessee certified to the EAC in 2016 that it received "zero" registration forms from voter registration drives held by third-party groups or parties in the 2016 election cycle. While Tennessee's statement to the EAC was plainly false, this fact underscores that it has no concept of how many voter registration applications it receives from civic groups, let alone any high rate of error that needs fixing through draconian measures.

76. Further, although there was some testimony that there was an uptick in incomplete or invalid forms submitted during the 2018 election, there was no evidence to indicate that the rate of error was any higher for registrations submitted through voter registration drives than from any other source. Nor was there any evidence of intentional or knowing voter registration fraud.

77. Nonetheless, in the run up to passing the Law, the Speaker of the Tennessee House posted the following statement on Twitter: "Last election cycle there was an attempt from outside groups to flood the ballot box with fraudulent votes to try & prevent @VoteMarsha from becoming our next U.S. Senator. Proud of the House for passing a new bill to prevent this. Thanks to Rep. @TimRudd34 for running it! #TNleg," contemporaneously illustrating that the impetus behind the Law was not any legitimate government interest, but rather an explicit attempt to fence out certain eligible Tennessee voters.

78. On May 2, 2019, Governor Bill Lee signed House Bill 1079 / Senate Bill 971 into law, imposing a host of burdens on organizations and individuals that conduct voter registration drives, including provisions that are unique to Tennessee alone.

23

**Challenged Provisions and Their Impacts**

79.     The Law imposes numerous severe and new burdens on the voter registration

activities and communications engaged in by Plaintiffs and similar groups and individuals.

These requirements are each individually burdensome and add up to a high aggregate burden that

will limit Plaintiffs' effectiveness in promoting democratic participation and conducting voter

registration, making it more costly and resource-intensive to conduct, and will chill speech

because they impose more risk than many individuals are reasonably willing to take.

80.     These restrictions include, most notably:

   a.   Large civil penalties for turning in 100 or more "incomplete" registration
        application forms, even though the Law also requires covered organizations to
        turn in all forms they receive with the exception of those that contain only a name
        or initial;

   b.   The requirement to turn forms in within 10 days without any exception or regard
        for the need for organizations to scrutinize the completeness of each form and
        conduct potential follow up to limit the number of "incomplete" forms they must
        submit or face civil penalties;

   c.   Requirements that each individual participating in voter registration activities,
        even on a volunteer basis, receive training directly from the state, and that
        organizations, like Plaintiffs, assume responsibility for their volunteers or paid
        canvassers doing so;

   d.   Requiring a sworn statement of compliance with all state registration laws despite
        this Law containing vague and ambiguous requirements as well as conflicting
        provisions with its own and other requirements;

   e.   Preventing the retention of basic voter information to ensure that the individual
        has been properly registered and can be provided additional voting information
        prior to elections; and

   f.   Burdensome disclaimer requirements for each registration-related communication
        in almost all forms, and criminal penalties for noncompliance.

81.     As an initial matter, it is not clear when or to whom these restrictions apply.

82.     Sections 2-2-142 and 2-2-143, without defining its terms, apply to any "person or

organization who has not been designated by the county election commission under § 2-2-111

and who conducts a supplemental voter registration drive in which the person or organization attempts to collect voter registration applications of one hundred (100) or more people."

83.     It is unclear whether a person or organization designated under § 2-2-111 is exempt from these Sections for all otherwise-covered supplemental voter registration drives conducted by that person or organization or for only those supplemental voter registration drives for which that person or organization serves as the county election commission's designee. *See* Tenn. Code Ann. § 2-2-111(b), (d).

84.     In addition, the statute defines neither what activity constitutes a voter registration drive nor what it means to "conduct[]" such a drive. It also does not define what activity constitutes an "attempt[] to collect" 100 or more voter registration applications, and there is no time period to guide whether the "attempt to conduct" a drive collecting 100 applications must be made within a day, a month, a year or subject to any other constraint.

85.     Sections 2-2-142 and 2-2-143 also exempt certain otherwise covered persons or organization from their requirements. Specifically, the requirements of Section 2-2-142 and 2-2-143 do not apply "to individuals who are not paid to collect voter registration applications or to organizations that are not paid to collect voter registration applications and that use only unpaid volunteers to collect voter registration applications." However, the law does not define what it means to be "paid" or "unpaid." As a result, it is unclear who is exempt from the requirements of Sections 2-2-142 and 2-2-143, and whether those requirements apply, for example, to organizations that receive grants to conduct voter registration activities; organizations that provide stipends to interns or volunteers to conduct voter registration activities; and organizations that use only unpaid volunteers to engage directly with prospective voters but rely on paid staff or a mix of paid and unpaid staff to supervise, coordinate, or direct voter

registration activities, including collecting applications. It may even apply to organizations that use a small part of general, non-targeted grant funds to support voter-registration activities.

86.     Coordinator of Elections Goins's testimony on the bill during the committee process underscores this lack of clarity. During his testimony, Coordinator Goins was unable to articulate clear answers as to what constitutes "paid" and "unpaid" activities. However, his testimony indicated that the exemption for Sections 2-2-142 and 2-2-143 did not extend to a paid staff member whose job description include duties related to a registration drive, or a nonprofit organization that received a financial grant for registration even if conducted entirely by unpaid volunteers.[2]

87.     In any event, this exemption for organizations and individuals who are "unpaid" shows that the Law on its face advances no state interest as there is no evidence that organizations, like some Plaintiffs that receive grants to conduct voter registration activity, need to be more regulated than other organizations that do not receive said funding. Nor is there any evidence that paid voter registration workers need to be regulated to a greater degree than unpaid voter registration workers when, like the individuals some Plaintiffs rely upon, they are paid flat or hourly rates and not per registration form. If these regulations were actually necessary to ensure orderly voter registration, there is no rational reason why only those paid to conduct voter registration would need to be regulated.

88.     These distinctions underscore that the regulations are irrational and not necessary to advance any state interest. If they were, both paid and unpaid workers, and organizations that

---

[2] Tenn. Senate State and Local Govt. Comm. Hearing on SB0971 (Apr. 9, 2019), *available at* http://tnga.granicus.com/MediaPlayer.php?view_id=414&clip_id=17123. This testimony was given in relation to an earlier version of the exemption, but the interpretation given by Mr. Goins does not appear to be affected by the change because the testimony related to whether an organization used only unpaid volunteers. *Compare* HB 1079 (2019) (enacted) *with* Amd. 2 to HB 1079, *available at* http://www.capitol.tn.gov/Bills/111/Amend/HA0285.pdf.

receive grants and those that rely upon their own funds or volunteers, would be equally subject to their terms.

<u>Requirements of Section 2-2-143</u>

89.     Section 2-2-143 imposes civil monetary penalties on any individual or organization that submits 100 or more "incomplete voter registration applications" within a calendar year.

90.     Under the Law, an incomplete registration is "any application that lacks the applicant's name, residential address, date of birth, declaration of eligibility, or signature." Tenn. Code Ann. § 2-2-143(b).  The Law does not indicate whether incorrect, inaccurate, or illegible information in any of these categories provided by an individual who is registering to vote renders the form "incomplete" under its terms.  *Id.* § 2-2-143.

91.     The Law also does not indicate whether the omission of part of one of the required elements will render a registration "incomplete."  For example, it is not clear whether the exclusion of one element of an address—such as an apartment number, city or county name, state (which is an included field on the Tennessee state form), or zip code—would render the residential address "incomplete."  Likewise, it is not clear whether the inclusion of month and year but not day would render the date of birth "incomplete."

92.     An overbroad and strict interpretation of this statute's requirement is not far-fetched.  In the name section of the National Mail-In Voter Registration Application, a voter can indicate their personal title—Mr., Miss, Mrs., or Ms.—as well as their first, last, and middle names and any suffix.  According to news reports in 2018, the Election Commission considered an application incomplete if it excluded the citizen's title.

93.     The Law further provides that a "person or individual who collects an application that only contains a name or initial is not required to file the application with the election

commission." *Id.* Presumably, all other forms—even if "incomplete"—must be submitted. Thus, this penalty punishes civic organizations and others engaged in community-based voter registration activity for the errors of applicants, over which they have little control.

94. The combination of this penalty with the 10-day return requirement further burdens Plaintiffs by limiting their ability to conduct a review of registration forms and attempt to conduct follow-up with applicants to "cure" their registration forms.

95. The State Election Commission will review the forms identified by the county election commissions as deficient and impose civil penalties of up to $10,000 based on the number of "incomplete" forms identified. *Id.* § 2-2-143(c)(3)-(4).

96. The Law provides that the State Election Commission "may combine the number of incomplete forms filed by a person or organization in multiple counties when determining the total number of incomplete forms," *id.* § 2-2-143(c)(3), and that civil penalties may be assessed "in each county where the violation occurred," *id.* § 2-2-143(c)(4). Taken together, these provisions appear to indicate that individuals and organizations who reach the threshold of 100 "incomplete" voter registration forms statewide could be subject to fines from multiple counties and could be subjected to a fine from a county in which they submitted only one incomplete form.

97. The fines imposed by the Law threaten the Plaintiffs, their members, their volunteers, and their employees with substantial monetary liability, which will chill their voter registration speech and activities once the law goes into effect in October 2019.

98. Under the Law, if an organization presents to election officials between 100 and 500 incomplete voter registration forms, the organization is subject to a fine of $150 dollars up to a maximum of two thousand dollars. The Law allows implementation of that fine for *each* county where a violation occurs within a calendar year. Tenn. Code Ann. § 2-2-143(c)(4)(A) ("in

each county"). Additionally, if an individual or an organization submits more than 500 voter registration forms that are deemed "incomplete," they face a fine of up to $10,000; a fine they may face in each county where a violation has occurred. *Id.* § 2-2-143(c)(4)(B).

99. Because there are 95 counties in Tennessee, each of these fines could be imposed as many as 95 times against one individual or organization within each calendar year. The Law, therefore, creates a risk of financial penalties of up to a million dollars. This is a substantial amount of money that would create a chilling effect on any individual or organizations. But even if the likelihood of facing such high fines is limited, *any* financial penalty is substantial for non-profit organizations like the Plaintiffs.

100. And there is a real threat of significant financial penalties. The Law allows for a penalty of up to $2,000 dollars in each county for the offense of more than 100 "incomplete" forms. The LWVTN, therefore, faces a significant threat of incurring such a penalty in each of the approximately 14 counties where the local Leagues regularly conduct voter registration drives. That would result in fines totaling $28,000 in any given year, which is almost the LWVTN's entire annual budget.

101. For small organizations like AMAC, whose voter registration budget is only $1,000, even the small financial penalty of $150 is substantial.

102. AMAC believes that it will additionally face risks from the fines because, based on its experience working in immigrant communities, new citizens are more likely to leave fields incomplete on voter registration forms, thus creating a greater risk of AMAC collecting forms that will be deemed incomplete.

103. Individuals such as the League's members and its volunteers, as well as students hired by AMAC to conduct voter registration drives, could also potentially be fined under Section 2-2-143(a), which states that "any person . . . is subject to civil penalty." Many of the

League's members and volunteers are senior citizens, and the students working for AMAC are on limited budgets. A fine of any amount would be devastating to such individuals, not to mention the potential threat of fines of $2,000 or more.

104.    If this Law takes effect, MSPJC will at least significantly curtail if not completely disband its voter registration activities, and will discontinue seeking grants to conduct any voter registration activities. The Law will have this effect because MSPJC depends on grant funding to conduct significant voter registration drives, yet using such funding will expose it to criminal penalties, as well as substantial fines if it turns in more than 100 forms deemed incomplete under the law—a situation MSPJC believes may occur based on its experience working with individuals in low-income communities who have often never registered to vote before. Even the Law's lowest financial penalty ($150) would significantly harm MSPJC as a small organization and impede its activities.

105.    In response to threats created by the Law of both financial risks and risks of criminal prosecution, certain Plaintiff organizations are considering imposing a moratorium on all of their voter registration activities after October 1, 2019.

106.    Even if these Plaintiff organizations do not impose a complete moratorium on all voter registration activities, they are likely to significantly scale back the volume of voter registration drives they conduct. This scaling back of voter registration activity will be necessary because certain Plaintiffs feel that they will be compelled to collect fewer voter registration applications in order to face less risk of potential financial fines for turning in voter registration applications that are deemed incomplete.

107.    Additionally, the League also believes that it will have to further scale back its priority voter registration drive work focused on some of the communities with the greatest need, like more transitional communities with lower incomes or students, because it believes there

would be challenges that increase the likelihood of incomplete forms and thus increase its risk of penalties.

Requirements of Section 2-19-145

108. Section 2-19-145 compels organizations that make any "public communication regarding voter registration status" to "display a disclaimer that such communication is not made in conjunction with or authorized by the secretary of state." Tenn. Code Ann. § 2-19-145(a)(1). Under the Law, a "public communication" includes, but does not limit its terms to, "communications made using newspapers or magazines, mass mailings, phone bank or text messages, electronic mail systems, or websites." *Id*. § 2-19-145(a)(2). The Law does not define the contours of content that constitutes "voter registration status."

109. Section 2-19-145 also compels individuals or organizations that establish "a website for voter registration purposes" to "display on such website a disclaimer that the voter registration is not made in conjunction with or authorized by the secretary of state." *Id*. § 2-19-145(b)(1). Section 2-19-145 further compels individuals or organizations that establish "a voter registration website and captures or collects the voter's information or data" to "disclose on the website the person's or organization's name and the purpose for which the voter information is captured or collected." *Id*. § 2-19-145(b)(2).

110. Section 2-19-145 also compels individuals or organizations that establish "a voter lookup website" to "display on such website a disclaimer that the voter lookup is not made in conjunction with or authorized by the secretary of state." *Id*. § 2-19-145(c)(1). Section 2-19-145 further compels individuals or organizations that establish "a voter lookup website and captures or collects the voter's information or data" to "disclose on the website the person's or organization's name and the purpose for which the voter information is captured or collected." *Id*. § 2-19-145(c)(2).

111. For all of these compelled "disclaimer[s]," the Law requires that they "must be clear and conspicuous and prominently placed." *Id*. § 2-19-145(d).

112. Section 2-19-145 criminalizes a "person . . . intentionally or knowingly" violating any part of the Section and each violation constitutes a separate offense. *Id.* § 2-19-145(e). The Law does not indicate who faces the criminal penalty if an organization undertakes a covered "public communication" or establishes a covered website.

113. Section 2-19-145 is a solution looking for a problem. There is no evidence that there has been confusion among Tennessee citizens about the nature of community-based voter registration activity. There is no suggestion that Plaintiffs have implied that they conduct their community-based activity in coordination with the Secretary of State or that Plaintiffs have misled anyone regarding the nature of their efforts.

114. Plaintiffs undertake substantial efforts to help eligible Tennesseans register to vote, to educate such individuals on voter registration, and to provide resources to check on voter registration status, including through mailings, websites, printed materials, e-mails, and other electronic communications. Moreover, certain methods by which Plaintiffs undertake public communications, including text messages and social media, contain limited space in which to disseminate messages, which would be entirely overrun by the disclaimers of § 2-19-145.

115. The overly broad language regarding "public communications" is likely to affect all voter registration activities undertaken by Plaintiffs: even asking someone if they are registered to vote would compel Plaintiffs to provide the required disclaimer.

116. Additionally, for Plaintiffs that have already printed materials that provide information about voter registration and polling place locations, these materials would have to be re-printed at considerable costs.

117.    That Section 2-19-145 criminalizes each violation as a separate offense for organizations like Plaintiffs creates a particular chill because the organizations cannot be sure that every volunteer in every interaction provides the disclaimer.  For example, if a volunteer asks a citizen if they are registered to vote and the person walks away before the volunteer states the disclaimer or if someone hung up the phone before the disclaimer was complete, the terms of the Law appear to apply.  By their nature, Plaintiffs' communications are often dynamic and interactive, and Plaintiffs cannot be expected to regulate every interaction or communication they have with the public during their voter registration activities.

118.    Compliance with the Law is particularly burdensome for organizations that use national websites providing voter registration and other voter education for all states.  For example, the LWVTN uses and promotes in its communications with potential voters the Vote411.org website, a vital source of voter information for Americans across the country, which is managed by the League of Women Voters Education Fund.  The Law would arguably require the inclusion of this Tennessee-specific disclaimer on every page of its website that could communicate voter registration and polling place information with Tennessee voters.

119.    Given the League's concerns about whether the VOTE411.org website complies with the Statute, the League would stop all its efforts to support, promote, and encourage use of the website in the state of Tennessee.

120.    Moreover, even if it was possible to make changes to the VOTE411.org website to include the Tennessee-specific disclaimer and ensure that the retention of information disclaimer is more "prominently" displayed, the League believes these disclaimers would unnecessarily confuse potential voters and cause a chilling effect, discouraging use of the website.

33

121. Similarly, Rock the Vote will need to make substantial changes to its website and online tools in order to comply with the disclaimer requirements. In addition, Rock the Vote expects that the disclaimer requirements for communications related to voter registration and turnout are likely to confuse individuals attempting to register to vote in Tennessee through Rock the Vote's website and dissuade them from using the online tool.

122. The LWVTN also plans to participate in the national Get Out the Vote Program of the League of Women Voters Education Fund, which will include a texting program for Tennessee citizens to encourage voter registration and provide information about participating in elections, including information about how to register to vote and to local a polling place. The League believes that it would not possible or effective to send such texts and also comply with the provision about providing the required disclaimer. Unless this law is enjoined, the League will not pursue these plans any further.

123. Additionally, MSPJC often uses social media and other electronic media to communicate about finding one's voter registration status and polling place, and sometimes helps individuals identify their polling place during in-person interactions. The Law's disclaimer and disclosure provisions would significantly hamper their ability to engage in these types of services to the community.

<u>Requirements of Section 2-2-142</u>

124. Section 2-2-142 requires that any covered "person or organization" must comply with a number of burdensome and vaguely defined conditions. Tenn. Code Ann. § 2-2-142(a)(1).

125. First, any "person or organization" covered by that Section "must . . . [p]rior to conducting a voter registration drive" provide the name and contact information for "the person conducting the voter registration drive or . . . the officers of the organization conducting the voter

registration drive." Tenn. Code Ann. § 2-2-142(a)(1)(A). The Law does not define what constitutes a "voter registration drive," and whether the individual or organization must pre-register before conducting any voter registration, thereby prohibiting all impromptu or ad hoc registration efforts that attempt to collect 100 or more applications.

126. Second, any "person or organization" covered by that Section "must . . . [p]rior to conducting a voter registration drive . . . [c]omplete training, which is administered by the coordinator of elections, on the laws and procedures governing the voter registration process," *id*. § 2-2-142(a)(1)(C), and "[e]nsure that individuals, whether volunteer or paid, who conduct voter registration for an organization have completed the training," *id.* § 2-2-142(a)(1)(E). The Law does not further define when and how frequently training must be completed. It is thus ambiguous whether, for example, an individual must complete a training each time that individual participates in any kind of voter registration activity, even if only hours or days apart. The Law is also unclear as to whether the form contemplated by § 2-2-142(e) must be completed prior to each voter registration drive in which an individual participates.

127. Third, any "person or organization" covered by that Section "must . . . [p]rior to conducting a voter registration drive . . . [f]ile a sworn statement stating that the person or organization shall obey all state laws and procedures regarding the registration of voters." *Id*. § 2-2-142(a)(1)(D). The statute does not further delineate when, how frequently, and by whom such a sworn statement must be signed. It is thus not clear whether, for example, every volunteer who participates in a covered voter registration drive coordinated by an organization must sign the sworn statement or only the agent of the organization. It is also unclear as to with whom this sworn statement must be filed.

128. Fourth, the "person or organization" covered by that Section "shall deliver or mail completed voter registration forms within ten (10) days of the date of voter registration drive."

*Id*. § 2-2-142(a)(2).  But there are no exceptions provided for extenuating circumstances and no recognition of the Catch 22-regime created by the confluence of this requirement with the incomplete-forms penalty under which organizations, through no fault of their own, could be left with abandoned forms they must promptly turn in and which count toward a potentially significant fine.  These conflicting duties create another paradoxical situation for Plaintiffs under Tenn. Code Ann. § 2-19-103, which makes it a Class A misdemeanor if "[a] person who knowingly does any act for the purpose of preventing any person's performance of such person's duties under this title or exercise of such person's rights under this title."

129.    Fifth, the Law prohibits the "person or organization" from retaining *any* "voter information and data collected on the voter registration application, unless the applicant consents."  *Id*. § 2-2-142(b).  The statute does not delineate if such consent must be written and, if so, in what form.

130.    Intentional and knowing violations of the provisions of Section 2-2-142 are a Class A misdemeanor, and each violation constitutes a separate offense.  *Id*. § 2-2-142(f).

131.    The LWVTN does not have full time permanent staff and relies on volunteers.  AMAC has only one staff person.  MSPJC is also a small non-profit with limited staff.  These organizations do not have the staff resources to effectively comply with the reporting, training, and affirmation requirements of Section 2-2-142(a) and continue their current levels of voter registration activities.  These requirements would significantly and unnecessarily burden Plaintiffs' scarce organizational resources that would otherwise be spent helping voters register, following-up with voters, and undertaking other activities to advance their missions.  Additionally, the League would only be able to even attempt to comply with these requirements if it has funds available to pay for additional time of its consultant who provides limited temporary administrative support.

132.    The requirement to pre-register a voter registration drive with specific contact information and location of voter registration drives will make it significantly harder to conduct voter registration drives and will severely chill the volunteerism that is essential for Plaintiffs' activities.  This requirement will impede the LWVTN's ability to respond positively to late requests for voter registration tables at community events.

133.    Plaintiffs believe that a substantial number of their members, volunteers, and temporary employees would be unlikely to sign the required sworn statement due to the broad nature of the requirement (to obey all state laws), the vagueness of the Law's requirements, and threatened criminal penalties.  This requirement therefore will severely chill the volunteerism that is essential for Plaintiffs' activities.

134.    Plaintiffs are concerned that if they do not turn in "incomplete" voter registration forms, the lack of follow-up by county election commissions who do not receive the forms will prevent the community members from exercise of their right to vote.  *See* Tenn. Code § 2-19-10 (crime to knowingly do any act for the purpose of preventing the exercise of someone's rights under Tennessee election law); *id*. § 2-2-120 (requiring coordinator of elections to audit at least ten (10) county election commissions annually to ensure among other things that voters with deficient registrations are being given the opportunity to correct incorrect or omitted information); *id*. § 2-2-142(a)(2) (requiring the return of voter registration applications in 10 days); 52 U.S.C. § 20507(a)(2) (requiring election officials to notify applicants of the disposition of their application).

135.    LWVTN, AMAC, and MSPJC are all highly reluctant to sign an affidavit of compliance with state law when they believe that the Law is vague and conflicts with other law that requires them to turn in even incomplete registrations.  *See* Tenn. Code Ann. § 2-19-10.  The provision also makes Plaintiffs potentially responsible for things beyond their control—for

Case 3:19-cv-00385   Document 1   Filed 05/09/19   Page 37 of 52 PageID #: 37

example, when a voter hands back a voter registration application to their staff or volunteer that is already sealed and closed, or when an individual leaves a mostly complete voter registration application on the table at a voter registration event and then walks away.

136.    In order to ensure compliance with the reporting, training, and affirmation requirements of Section 2-2-142(a), Plaintiffs will be forced to significantly scale back the number of voter registration drives they conduct and the number of volunteers or employees who can participate in such voter registration drives.  Indeed, certain Plaintiffs are not sure that full compliance—including the return of all voter registration forms collected within ten days and the submission of less than 100 "incomplete" applications—can ever be assured except on a very small scale of voter registration.  Thus, Plaintiffs LWVTN and MSPJC are not sure they will be able to continue their planned voter registration activities, and all Plaintiffs are likely to cut back on their planned voter registration activities.  Plaintiffs are not sure they will be able to continue with all their planned voter registration activities because they believe that full compliance with these provisions will be difficult if not impossible under any circumstances and this is why they are considering imposing a complete moratorium on all voter registration drive activities (LWVTN and MSPJC) or cutting back on such activities (AMAC).  At the very least, Plaintiffs plan to conduct fewer voter registration drives, employing less volunteers and employees in the process.  And in the case of League, they will likely impose a moratorium on seeking or accepting any grant funding for voter registration, which will greatly limit the volume of voter registration drives they can perform, impacting their ability to fulfill their mission.

137.    If this Law takes effect, it will harm AMAC in several significant ways.  Most significantly, the law will likely force AMAC to significantly curtail its voter registration activities.  The Law will have this effect because AMAC does not have the staff resources to carry out voter registration activities on its own without using college students and believes the

stipends it pays those students are necessary to find and retain individuals to reach out to potential voters and help them register.

138.    Depending on the ultimate meaning of the vague provisions regarding training and voter registration drives, and because of the burdensome affirmation and pre-registration requirements, AMAC will struggle to convince even paid interns to participate in voter registration activities.  Therefore, AMAC will be forced to divert more organizational time and resources from other organizational priorities to identify and convince individuals to help with its voter registration activities, while still likely finding fewer individuals to participate.

139.    Depending on the ultimate meaning of the vague provisions regarding training and voter registration drives, MSPJC will struggle to find students and other community members to participate in voter registration activities if those individuals must participate in training before each voter registration drive and staff members will be unable to continue conducting ad hoc voter registration drives because of the burdensome pre-registration requirements of the law.

140.    Plaintiffs believe that to retain any information from the voter registration applications they collect under Section 2-2-142(b) they will likely have to obtain consent in writing in order to protect themselves from criminal liability, adding to the administrative tasks that have to be completed during the interaction with the potential voter, as well as their own recordkeeping costs and requirements.  The extra time to fill out additional paperwork will discourage potential voters from participating in the voter registration drive and slow down the entire registration process which will impair the effectiveness of the efforts.  This consent requirement is particularly unnecessary and irrational because much of the information provided on a voter registration application is available publicly.  *See* 52 U.S.C. § 20507(i)(1); *Project*

39

*Vote/Voting for America v. Long*, 682 F.3d 331 (4th Cir. 2012) (rejected voter registration applications must be made publicly available with Social Security numbers redacted).

141.    Plaintiffs who currently retain voter registration information from voter registrations applications they collect, therefore, also may likely stop collecting such information, which means that they would not be able to conduct any of their regular follow-up with voters to provide additional election information and encourage participation.

## Claim I: Free Speech and Association
### (Violation of Plaintiffs' First Amendment Rights Pursuant to 42 U.S.C. § 1983)

142.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1-141 as if fully set forth herein.

143.    The First Amendment to the United States Constitution prohibits abridgment of freedom of speech.

144.    The First Amendment is applied to the states through the Fourteenth Amendment. In the following paragraphs, references to the First Amendment include the First Amendment as applied to the states through the Fourteenth Amendment.

145.    The Law directly restricts Plaintiffs' core political speech and expressive conduct in communicating their belief in the capacity of the popular will to shape the composition and direction of the government.  Advocating for that belief through their endeavors to assist others in registering to vote is in itself a political and philosophical statement.  Moreover, the Law implicates Plaintiffs' associational rights in banding together to engage in voter registration activity and in assisting community members to join the civic community by registering to vote.

146.    Like the circulation of an initiative petition for signatures, voter registration activity is "the type of interactive communication concerning political change that is appropriately described as 'core political speech.'" *Meyer v. Grant*, 486 U.S. 414, 422–23 (1988). Whether a voter should register and ultimately participate in an election is a "matter of

societal concern that [Plaintiffs] have a right to discuss publicly without risking criminal sanctions." *Id*. at 421; *see also Buckley v. Am. Constitutional Law Found*., 525 US 182, 186–87 (1999) (quoting *Meyer*, 486 U.S. at 422).

147. The onerous requirements of Sections 2-2-142, 2-2-143, and 2-19-145, coupled with substantial civil and criminal penalties, burden Plaintiffs' political expression, diminishing their ability to convey their message and further it by engaging more individuals in the political process.

148. The threat of criminal penalties for failure to pre-register each and every voter registration drive in which Plaintiffs merely attempt to collect 100 or more voter registration applications, *id.* § 2-2-142(a)(1)(A); (f), is a severe burden on Plaintiffs' First Amendment rights.

149. The threat of criminal penalties for failure to ensure that each and every individual, both paid and volunteer, conducting a voter registration drive has undergone training by the State prior to the drive, *id.* § 2-2-142(a)(1)(C), (E); (f), is a severe burden on Plaintiffs' First Amendment rights. These provisions prevent Plaintiffs from recruiting volunteers immediately before a drive begins or from having volunteers join in their work once a drive is underway. Moreover, requiring training before each voter registration drive puts stress on the limited resources of the Plaintiff organizations, particularly their volunteer hours.

150. The threat of criminal penalties for failure of each individual and organization completing and then filing sworn statements that they will follow all state laws prior to each and every voter registration drive in which Plaintiffs merely attempt to collect 100 or more voter registration applications, *id.* § 2-2-142(a)(1)(D); (f), is a severe burden on Plaintiffs' First Amendment rights.

151. The imposition of substantial financial penalties for the submission of 100 or more "incomplete" voter registration forms, including a financial penalty "in each county where

the violation occurred," *id*. § 2-2-143(c)(4), severely burdens Plaintiffs' First Amendment rights. These financial penalties constitute a large percentage of Plaintiffs' budgets and when imposed would decimate their ability to conduct any of their civic work.

152.    Moreover, Section 2-2-143 in conjunction with Section 2-2-142(2) places Plaintiffs in an untenable position. They will suffer criminal penalties for not submitting "completed" voter registration forms within 10 days on the one hand, while simultaneously risk incurring substantial civil penalties if they submit too many "incomplete" voter registration applications on the other.

153.    These conflicting duties place Plaintiffs in yet another catch-22 under Tenn. Code Ann. § 2-19-103, which makes it a Class A misdemeanor if "[a] person . . . knowingly does any act for the purpose of preventing any person's performance of such person's duties under this title or exercise of such person's rights under this title."

154.    Therefore, Plaintiffs will not be able to simultaneously comply with all provisions of Tennessee law.

155.    The threat of criminal penalties for failure to include disclaimers on any public communications or websites regarding voter registration, *id.* § 2-19-145(a)-(e), is a severe burden on Plaintiffs' First Amendment rights.

156.    Criminal prosecution contemplated by statutes that governs expression, as do Sections 2-2-142 and 2-19-145, inhibit the full exercise of First Amendment freedoms. Punitive civil sanctions, such as those imposed by Section 2-2-143, also inhibit the exercise of First Amendment freedoms.

157.    Because of the chilling effect of the risk of criminal prosecution or punitive civil sanction, Sections 2-2-142, 2-2-143, and 2-19-145 unconstitutionally infringe upon the First Amendment rights of Plaintiffs. By chilling Plaintiffs' voter registration activities, Sections 2-2-

142, 2-2-143, and 2-19-145 will each "reduce[] the voices available to convey political messages." *Buckley*, 525 U.S. at 210 (Thomas, J., concurring).  Restrictions on voter registration drives in Sections 2-2-142, 2-2-143 and 2-19-145 will reduce the total voices available to speak in favor of political participation and voter registration and therefore run afoul of the First Amendment.

158.    Moreover, the risk of criminal prosecution not just on the organization itself, but on the individuals who conduct voter registration or make public communications regarding voter registration, unconstitutionally infringes on the associational rights of Plaintiffs.  The risk of criminal prosecution makes it less likely that individuals will be willing to undertake voter registration activities and advocate for political participation during and through these activities, thus impeding Plaintiffs' associational rights and expressive conduct.

159.    These requirements are not narrowly tailored to serve any compelling state interest.  Indeed, these requirements serve little purpose other than to dissuade civic organizations and individuals from engaging in voter registration activity.  Under the exacting scrutiny applied in *Meyer* or any other level of judicial scrutiny, these requirements fail.

**Claim II: Compelled Speech**
**(Violation of Plaintiffs' First Amendment Rights Pursuant to 42 U.S.C. § 1983)**

160.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1-141 as if fully set forth herein.

161.    The First Amendment is applied to the states through the Fourteenth Amendment. In the following paragraphs, references to the First Amendment include the First Amendment as applied to the states through the Fourteenth Amendment.

162.    Section 2-19-145 compels government speech by Plaintiffs and other individuals or organizations that make public communications or establish websites and look-ups related to voter registration and thus undermine Plaintiffs' core political speech.

43

163.    The disclaimers required by Section 2-19-145 pejoratively emphasize that the Plaintiffs' speech is "not made in conjunction with or authorized by the secretary of state."  Such a disclaimer—prominently displayed—suggests that filling out a voter registration application is an activity that should be done only in conjunction with the Secretary of State and undermines a voter's confidence that their voter registration will be official and effective.

164.    Thus, these disclaimers—which would have to be repeated in all covered materials and communications—will undermine the creditability of Plaintiffs, which are legitimate civic organizations that provide important services to other Tennesseans.  These disclaimers, moreover, will not be entirely accurate since under the Law, Plaintiffs will have to coordinate their voter registration activities with the State by undergoing state-mandated training and reporting on their activities in order for them to be authorized under the Law.  Plaintiffs offering voter registration also do so using forms authorized by state law, *see* Tenn. Code Ann. § 2-2-115, or required to be accepted and used by the state under the National Voter Registration Act, 52 U.S.C. § 20505.

165.    These disclaimers serve no legitimate governmental function since there is no evidence that Tennesseans have been confused about the nature of community-based voter registration activity.  There is no suggestion that Plaintiffs have suggested that their community-based activity is done in coordination with the Secretary of State or that Plaintiffs have misled anyone regarding the nature of their efforts.

166.    To the extent the government thinks that the message required by Section 2-19-145 is needed, the government must speak for itself.  Defendants must not co-opt Plaintiffs' and other civic organizations speech to further their own government message.

167.    The Law unconstitutionally forces Plaintiffs, at the risk of criminal penalty, to speak for the government, making disclaimers that Plaintiffs would not otherwise recite.

44

168.     Laws compelling speech are subject to strict scrutiny, and this remains the case in the election context.

169.     Section 2-19-145 is not narrowly tailored to serve any compelling government interest and is thus unconstitutional.

## Claim III: Substantial Overbreadth
### (Violation of Plaintiffs' First Amendment Rights Pursuant to 42 U.S.C. § 1983)

170.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1-141 as if fully set forth herein.

171.     The First Amendment to the United States Constitution prohibits abridgment of freedom of speech.

172.     The First Amendment is applied to the states through the Fourteenth Amendment. In the following paragraphs, references to the First Amendment include the First Amendment as applied to the states through the Fourteenth Amendment.

173.     The Law directly restricts Plaintiffs' core political speech and expressive conduct in communicating their belief in the capacity of the popular will to shape the composition and direction of the government.  Advocating for that belief through their endeavors to assist others in registering to vote is in itself a political and philosophical statement.  Moreover, the Law implicates Plaintiffs' associational rights in banding together to engage in voter registration activity and in assisting community members to join the civic community by registering to vote.

174.     Like the circulation of an initiative petition for signatures, voter registration activity is "the type of interactive communication concerning political change that is appropriately described as 'core political speech.'" *Meyer*, 486 U.S. at 422–23.  Whether a voter should register and ultimately participate in an election is a "matter of societal concern that [Plaintiffs] have a right to discuss publicly without risking criminal sanctions." *Id*. at 421; *see also Buckley*, 525 U.S. at 186–87 (quoting Meyer, 486 U.S. at 422).

45

175.    Sections 2-2-142 and 2-19-145 are unconstitutionally overbroad, as they regulate a substantial amount of constitutionally protected expression.

176.    Criminal prosecution contemplated by statutes that governs expression, as do Sections 2-2-142 and 2-19-145, inhibit the full exercise of First Amendment freedoms.

**Claim IV: Due Process**
**(Violation of Plaintiffs' Fourteenth Amendment Due Process**
**Rights Pursuant to 42 U.S.C. § 1983)**

177.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1-141 as if fully set forth herein.

178.    The Due Process Clause of the Fourteenth Amendment to the U.S. Constitution requires that a law that imposes penalties gives ordinary people reasonable notice of what conduct it prohibits and guard against arbitrary and discriminatory enforcement.

179.    The applicability of the void for vagueness doctrine is heightened both when criminal sanctions are attached to a vague law and whenever the First Amendment is implicated. Here, the Law does both.

180.    The application of Sections 2-2-142 and 2-2-143 to a "person or organization who . . . conducts a supplemental voter registration drive in which the person or organization attempts to collect voter registration applications of one hundred (100) or more people" is vague because it fails to define what activity constitutes a voter registration drive and what it means to "conduct[]" such a drive, and because it fails to define what activity constitutes an "attempt."

181.    In addition, the application of Sections 2-2-142 and 2-2-143 to a "person or organization who has not been designated by the county election commission under § 2-2-111" is vague because it is not clear whether a person or organization designated under Section 2-2-111 is exempt from the Law's provisions for all otherwise covered supplemental voter registration drives conducted by that person or organization or for only those supplemental voter registration

46

drives for which that person or organization serves as the county election commission's designee. *See* Tenn. Code Ann. § 2-2-111(b), (d).

182.    Sections 2-2-142 and 2-2-143's exemption for "individuals who are not paid" and "organizations that are not paid . . . and that use only unpaid volunteers" is confusing and ambiguous because it fails to define what it means to be "paid" or "unpaid."

183.    Due to these vague provisions, the Law fails to give civic organizations and persons that participate in covered voter registration activities fair notice of who must comply with the Law's requirements and under what circumstances. That the Coordinator of Elections could not articulate what constitutes "paid" or "unpaid" activities exacerbates the vagueness of the text of the Law.

184.    Section 2-2-142's requirement that any "person or organization" covered by that Section "must . . . [p]rior to conducting a voter registration drive . . . [c]omplete training" is vague because it fails to make clear when and how frequently training must be completed.

185.    Section 2-2-142's requirement that any "person or organization" covered by that Section "must . . . [p]rior to conducting a voter registration drive . . . [f]ile a sworn statement stating that the person or organization shall obey all state laws and procedures regarding the registration of voters" is vague because it fails to make clear when, how frequently, and by whom such a sworn statement must be signed.

186.    Section 2-2-143's imposition of civil penalties on "any person or organization" who "conducts voter registration drives under § 2-2-142 and . . . files one hundred (100) or more incomplete voter registration applications," defined as "any application that lacks the applicant's name, residential address, date of birth, declaration of eligibility, or signature," is vague because the terms "incomplete" and "lacks" are ambiguous. The ambiguity in these phrases is exacerbated by the fact that Section 2-2-143 also provides that a "person or individual who

collects an application that only contains a name or initial is not required to file the application with the election commission." This provision, along with the Section 2-2-142(a)(2)'s requirement to "deliver or mail completed registration forms within ten (10) days of the date of the voter registration drive," suggests that the Law mandates the filing of any form that contains any other information in addition to a name or initial, regardless of the completeness of the application in other respects—despite simultaneously contemplating that some of these forms would be incomplete and subject to the Law's civil penalties.

187.    Section 2-19-145's disclaimer requirement for any "public communication regarding voter registration status" is vague because it is unclear what the terms "public communication" and "regarding voter registration status" mean.  In addition, while the section states that a "'public communication' includes communications made using newspapers or magazines, mass mailings, phone bank or text messages, electronic mail systems, or websites," the use of "includes" indicates that this list is not exhaustive, and that there is therefore additional unknown conduct that may be prohibited.

188.    Section 2-19-145(d)'s requirement that compelled "disclaimer[s]" "must be clear and conspicuous and prominently placed" is ambiguous and indeterminate because it is unclear what qualifies as "conspicuous and prominent[]" placement, an eminently subjective determination subject to arbitrary and discriminatory enforcement.

189.    Due to these vague provisions, the Law also fails to give civic organizations and persons that participate in covered voter registration activities reasonable notice of what constitutes prohibited conduct.

190.    Violations of Section 2-2-142 and 2-19-145 are subject to criminal penalties.

191.    Violations of Section 2-2-143 are subject to civil penalties.  However, it is not clear how to ascertain the extent of that monetary liability because the Law is ambiguous as to

whether civil penalties for the submission of 100 or more incomplete forms may be assessed once or multiple times if the 100 or more incomplete forms are comprised of forms submitted in more than one county. *Id.* § 2-2-143(c)(4).

192. As a result of this ambiguity, the Law also fails to provide civic organizations and persons that participate in covered voter registration activities with reasonable notice of the extent of their potential penalties, and thus provides no guard against arbitrary enforcement of the Law.

193. Because of the burdens that the Law will put on the voter registration activities of Plaintiffs, Plaintiffs will have to expend additional resources to conduct voter registration, including for Plaintiff LWVTN additional volunteer time and time beyond that provided by its outside administrative consultant to achieve its core mission of voter registration. But for the burdens imposed by the Law, these resources otherwise could be spent on other activities of Plaintiffs including, for the LWVTN, its voter education and candidate forums.

194. As a result of burdens created by the Law, Plaintiffs will be required to divert resources, including for LVWTN volunteer time and the time of its outside consultant who provides administrative assistance, away from their other activities to conduct voter registration activities. And even with additional diverted resources, Plaintiffs believe their voter registration efforts will be less effective because of the burdens the Law will impose. For the LWVTN, this will frustrate its core mission to help as many voters as possible register and it will harm the organizational missions of the other Plaintiffs as well, who leverage voter registration to increase the political power of their communities.

**Claim V: Burden on Political Speech and Association in Connection with the Fundamental Right to Vote**
**(Violation of Plaintiffs' First and Fourteenth Amendment Rights**
**Pursuant to 42 U.S.C. § 1983)**

195.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1-141 as if fully set forth herein.

196.    Voter registration is a pre-requisite to exercising the fundamental right to vote in Tennessee.

197.    The Law directly interferes with the fundamental right to vote by frustrating efforts to help individuals register who are otherwise often left out of government-run registration processes.

198.    The Law directly restricts Plaintiffs' voter registration activity, which likewise implicates the right to vote.

199.    The burdens placed upon Plaintiffs—and the fundamental voting rights of the individuals in the communities they serve—by the challenged provisions of the Law are substantial.

200.    Compliance with the Law, to the extent it could even be achieved, would require the expenditure of substantial additional resources by Plaintiffs, diverting resources from other core organizational activities.  Plaintiffs would have to expend substantial additional staff and volunteer time and additional person and financial resources, much of which they simply do not have.

201.    The State does not have interests that make these substantial burdens on Plaintiffs' rights necessary.  In addition to their being no state interests that make the particular regulations of the Law necessary regardless of their reach, that Sections 2-2-142 and 2-2-143 do not apply to individuals not paid to collect voter registration applications demonstrates that these regulations are not necessary to advance any interests of the state.  At a minimum, were the

50

regulations actually necessary, they would apply to all those collecting voter registration applications.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and:

A. Declare that Sections 2-2-142(a)-(b), (e)-(g), 2-2-143, and 2-19-145 violate the First and Fourteenth Amendments;

B. Preliminarily and permanently enjoin Defendants from enforcing Sections 2-2-142(a)-(b), (e)-(g), 2-2-143, and 2-19-145, particularly the civil and criminal penalties contained therein;

C. Retain jurisdiction to render any and all further orders that this Court may deem necessary;

D. Award Plaintiffs their attorneys' costs and fees pursuant to statute; and

E. Grant any and all other relief this Court deems just and proper.

Dated: May 9, 2019                          Respectfully submitted,

Sophia Lin Lakin*                           */s/ Thomas H. Castelli*
Theresa J. Lee*                             Thomas H. Castelli, BPR#024849
Dale E. Ho*                                 Legal Director
American Civil Liberties Union Foundation   Mandy Floyd, BPR#031123
125 Broad Street, 18th Floor                ACLU Foundation of Tennessee
New York, NY 10004                          P.O. Box 120160
Tel.: (212) 549-2500                        Nashville, TN 37212
slakin@aclu.org                             Tel.: 615-320-7142
tlee@aclu.org                               tcastelli@aclu-tn.org
dho@aclu.org                                mfloyd@aclu-tn.org

Sarah Brannon*, **                          Danielle Lang*
Davin Rosborough*                           Urja Mittal*
American Civil Liberties Union Foundation   Campaign Legal Center
915 15th Street, 6th Floor                  1101 14th Street NW, Suite 400
Washington, DC 20005                        Washington, DC 20005
Tel.: (202) 544-1681                        Tel.: (202) 736-2200
sbrannon@aclu.org                           dlang@campaignlegal.org

drosborough@aclu.org
** not admitted in DC; DC practice limited to federal court only

William H. Harbison, BPR#7012
C. Dewey Branstetter, Jr. BPR#9367
Hunter C. Branstetter, BPR#32004
Sherrard Roe Voigt & Harbison
150 3rd Avenue South, Suite 1100
Nashville, TN 37301
Tel.: (615) 742-4200
bharbison@srvhlaw.com
dbranstetter@srvhlaw.com
hbranstetter@srvhlaw.com

umittal@campaignlegal.org

Michelle Kanter Cohen*
Jon Sherman*
Fair Elections Center
1825 K Street NW, Suite 450
Washington, DC 20006
Tel.: (202) 331-0114
mkantercohen@fairelectionscenter.org
jsherman@fairelectionscenter.org


*Attorneys for Plaintiffs*
*pro hac vice forthcoming