**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**

LEAGUE OF WOMEN VOTERS OF
TENNESSEE, *et al.*,

       *Plaintiffs*,

v.

TRE HARGETT, in his official capacity as
Secretary of State of the State of Tennessee,
*et al.*,

       *Defendants*.

No. 3:19-cv-385
Hon. Aleta A. Trauger

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION**
**FOR A PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................... ii

I.     PRELIMINARY STATEMENT ....................................................................... 1

II.    STATEMENT OF FACTS ............................................................................... 3

  A.  Plaintiffs' Engagement in Voter Registration Activities .................................. 3

    1.  Plaintiffs' Voter Registration Efforts ................................................... 3

    2.  Plaintiffs' Public Communications ...................................................... 6

  B.  The Challenged Law's Burdensome, Confusing Provisions ............................ 8

    1.  Section 2-2-142: Criminal Penalties Tied to Voter Registration Drive Regulations ....... 8

    2.  Section 2-2-143: Substantial Fines for Submission of "Incomplete" Forms ................ 10

    3.  The Unpaid Exception .......................................................................... 10

    4.  Section 2-19-145: Compelled Statements Coupled with Criminal Penalties ................ 11

  C.  The Law's Severe Impact on Plaintiffs and their Voter Registration Efforts ................. 11

    1.  Burdens and Harms Caused by Sections 2-2-142 and 2-2-143: Criminal Penalties Tied to Voter Registration Drive Regulations; Substantial Fines for Submission of "Incomplete" Forms ................ 11

    2.  Burdens and Harms Caused by Section 2-19-145: Compelled Statements Coupled with Criminal Penalties ................ 13

III.   ARGUMENT ................................................................................................. 15

  A.  Standard of Review ......................................................................................... 15

  B.  Plaintiffs Have Several Independent Bases for Standing. ................................ 16

  C.  Plaintiffs Have a Strong Likelihood of Success on the Merits. ...................... 18

    1.  Plaintiffs Are Likely To Succeed on Their First Amendment Speech and Association Claim ................ 18

    2.  Plaintiffs Are Likely To Succeed on Their First Amendment Compelled Speech Claim ................ 26

    3.  Plaintiffs Are Likely To Succeed on Their First Amendment Overbreadth Claim. ...... 28

    4.  Plaintiffs Are Likely To Succeed on Their Due Process Vagueness Claim. ................ 30

    5.  Plaintiffs Are Likely To Succeed on Their First and Fourteenth Amendment Claims that the Law Unduly Burdens the Right To Vote. ................ 34

  D.  Plaintiffs Will Suffer Irreparable Harm Absent an Injunction ......................... 37

  E.  Issuance of the Injunction Will Not Cause Substantial Harm to Others ......................... 39

  F.  The Public Interest Is Served by the Issuance of an Injunction. ..................... 40

IV.   CONCLUSION ............................................................................................... 40

# TABLE OF AUTHORITIES

**Cases**

*Action NC v. Strach,*
216 F. Supp. 3d 597 (M.D.N.C. 2016) ................................................................. 38

*American Association of People with Disabilities v. Herrera,*
690 F. Supp. 2d 1183 (D.N.M. 2010) ............................................................ 20, 36

*American Civil Liberties Union of Ohio Foundation, Inc. v. Ashbrook,*
375 F.3d 484 (6th Cir. 2004) ........................................................................... 18

*Anderson v. Celebrezze,*
460 U.S. 780 (1983) ......................................................................................... 34

*Arizona Free Enterprise Club's Freedom Club PAC v. Bennett,*
564 U.S. 721 (2011) ......................................................................................... 22

*Baker v. Adams County/Ohio Valley School Board,*
310 F.3d 927 (6th Cir. 2002) ........................................................................... 37

*Blaylock v. Cheker Oil Co.,*
547 F.2d 962 (6th Cir. 1976) ..................................................................... 16, 39

*Bonnell v. Lorenzo,*
241 F.3d 800 (6th Cir. 2001) ........................................................................... 16

*Brinkman v. Budish,*
692 F. Supp. 2d 855 (S.D. Ohio 2010) ........................................................... 37

*Buckley v. American Constitutional Law Foundation,*
525 U.S. 182 (1999) ..................................................................... 19, 22, 26, 36

*Burdick v. Takushi,*
504 U.S. 428 (1992) ......................................................................................... 34

*Carey v. Wolnitzek,*
614 F.3d 189 (6th Cir. 2010) ........................................................................... 29

*Chabad of S. Ohio & Congregation Lubavitch v. City of Cincinnati,*
363 F.3d 427 (6th Cir. 2004) ........................................................................... 37

*Charles H. Wesley Education Foundation, Inc. v. Cox,*
324 F. Supp. 2d 1358 (N.D. Ga. 2004) ........................................................... 38

*Citizens for Tax Reform v. Deters,*
518 F.3d 375 (6th Cir. 2008) ........................................................................... 21

*Citizens United v. Federal Election Commission,*
558 U.S. 310 (2010) ......................................................................................... 22

*City of Chicago v. Morales,*
527 U.S. 41 (1999) ........................................................................................... 28

*Common Cause Indiana v. Lawson,*
No. 18-2491 (7th Cir. Aug. 27, 2019) ............................................................. 17

Case 3:19-cv-00385   Document 54-1   Filed 08/30/19   Page 3 of 48 PageID #: 380

*Deja Vu of Nashville, Inc. v. Metropolitan Government of Nashville & Davidson County*,
    274 F.3d 377 (6th Cir. 2001) ............................................................................ 29

*Elrod v. Burns*,
    427 U.S. 347 (1976) ....................................................................................... 16

*Eu v. San Francisco County Democratic Central Committee*,
    489 U.S. 214 (1989) ....................................................................................... 36

*Fish v. Kobach*,
    840 F.3d 710 (10th Cir. 2016) ....................................................................... 38

*G & V Lounge, Inc. v. Michigan Liquor Control Commission*,
    23 F.3d 1071 (6th Cir. 1994) ......................................................................... 40

*Havens Realty Corp. v. Coleman*,
    455 U.S. 363 (1982) ....................................................................................... 17

*Housing Opportunities Made Equal, Inc. v. Cincinnati Enquirer, Inc.*,
    943 F.2d 644 (6th Cir. 1991) ......................................................................... 17

*Indiana State Conference of the NAACP v. Lawson*,
    326 F. Supp. 3d 646 (S.D. Ind. 2018) ........................................................... 37

*Johnson v. United States*,
    135 S. Ct. 2551 (2015) .......................................................................... 30, 33, 34

*Kusper v. Pontikes*,
    414 U.S. 51 (1973) ......................................................................................... 21

*League of Women Voters of Florida v. Browning*,
    575 F. Supp. 2d 1298 (S.D. Fla. 2008) .......................................................... 19

*League of Women Voters of Florida v. Browning*,
    863 F. Supp. 2d 1155 (N.D. Fla. 2012) .......................................... 18, 32, 35, 37

*League of Women Voters of Florida v. Cobb*,
    447 F. Supp. 2d 1314 (S.D. Fla. 2006) ............................................ 19, 20, 24, 35

*League of Women Voters of North Carolina v. North Carolina*,
    769 F.3d 224 (4th Cir. 2014) ......................................................................... 37

*League of Women Voters of United States v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016) ........................................................................... 38

*Libertarian Party of Ohio v. Blackwell*,
    462 F.3d 579 (6th Cir. 2006) ......................................................................... 35

*Libertarian Party of Ohio v. Husted*,
    No. 2:13-cv-953, 2015 WL 12967768 (S.D. Ohio Mar. 16, 2015) ................ 35

*Liberty Coins, LLC v. Goodman*,
    748 F.3d 682 (6th Cir. 2014) ......................................................................... 16

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ....................................................................................... 16

*Meyer v. Grant*,
486 U.S. 414 (1988).................................................................................. *passim*

*National Council of La Raza v. Cegavske*,
800 F.3d 1032 (9th Cir. 2015) .................................................. 17

*National Rifle Association of America v. Magaw*,
132 F.3d 272 (6th Cir. 1997) .................................................... 17

*Newsom v. Norris*,
888 F.2d 371 (6th Cir. 1989) .................................................... 37

*North Carolina State Conference of the NAACP v. North Carolina State Board of Elections*,
No. 16-cv-1274, 2016 WL 6581284 (M.D.N.C. Nov. 4, 2016) .............................. 38

*Northeast Ohio Coalition for the Homeless v. Husted*,
837 F.3d 612 (6th Cir. 2016) .................................................... 17

*Obama for America v. Husted*,
697 F. 3d 423 (6th Cir. 2012) ...................................... 34, 36, 38, 40

*Pennell v. City of San Jose*,
485 U.S. 1 (1988).................................................................. 17

*Performance Unlimited v. Questar Publishers, Inc.*,
52 F.3d 1373 (6th Cir. 1995) .................................................... 16

*Planned Parenthood Association of Cincinnati, Inc. v. City of Cincinnati*,
822 F.2d 1390 (6th Cir. 1987) ................................................... 39

*Project Vote v. Blackwell*,
455 F. Supp. 2d 694 (N.D. Ohio 2006).................................. 18, 24, 35

*Project Vote, Inc. v. Kemp*,
208 F. Supp. 3d 1320 (N.D. Ga. 2016)....................................... 38

*Reno v. American Civil Liberties Union*,
521 U.S. 844 (1997).............................................................. 33

*Riley v. National Federation of the Blind of North Carolina Inc.*,
487 U.S. 781 (1988)........................................................ 26, 28

*Scott v. Schedler*,
771 F.3d 831 (5th Cir. 2014) .................................................... 17

*Secretary of State of Maryland v. Joseph H. Munson Co.*,
467 U.S. 947 (1984)............................................................. 29

*See National Institute of Family & Life Advocates v. Becerra*,
138 S. Ct. 2361 (2018) ......................................................... 28

*Summers v. Smart*,
65 F. Supp. 3d 556 (N.D. Ill. 2014) ........................................... 36

*United States v. Stevens*,
559 U.S. 460 (2010)........................................................ 29, 33

iv

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
   455 U.S. 489 (1982) ..................................................................................... 28

*Virginia v. American Booksellers Association, Inc.*,
   484 U.S. 383 (1988) ..................................................................................... 17

*Whitman v. American Trucking Associations, Inc.*,
   531 U.S. 457 (2001) ..................................................................................... 33

*Williams v. Rhodes*,
   393 U.S. 23 (1968) ....................................................................................... 22

**Statutes**

52 U.S.C. § 20501 ............................................................................................... 2

52 U.S.C. § 20505 ............................................................................................... 2

52 U.S.C. § 20507 ......................................................................................... 13, 25

Tenn. Code § 2-2-109 ........................................................................................ 23

Tenn. Code § 2-2-142 .................................................................................. *passim*

Tenn. Code § 2-2-143 ............................................................................... 9, 10, 32

Tenn. Code § 2-2-203 .................................................................................... 25, 39

Tenn. Code § 2-19-107 .................................................................................. 25, 39

Tenn. Code § 2-19-109 .................................................................................. 25, 39

Tenn. Code § 2-19-117 .................................................................................. 25, 39

Tenn. Code § 2-19-145 .................................................................................. 11, 34

Tenn. Code § 4-5-207 ........................................................................................ 34

Tenn. Code § 4-5-208 ........................................................................................ 34

**Other Authorities**

2018 Current Population Survey ("CPS"), U.S. Census Bureau, Voting and Registration in
   the Election of 2018, Table 4A, www.census.gov/data/tables/time-series/demo/voting-
   and-registration/p20-583.html ..................................................................... 1

2019 Elections by Date, Tenn. Sec'y of State, https://sos-tn-gov-files.tnsosfiles.com/
   2019%20Local%20Elections%20by%20Date.pdf ....................................... 38

2020 Election Calendar, Tenn. Sec'y of State, https://sos.tn.gov/products/elections/2020-
   election-calendar ........................................................................................... 38

Hearing on S.B. 971 Before the S. State and Local Gov't Comm., 111th Gen. Assemb.,
   Reg. Sess. (Tenn. 2019), *available at* http://tnga.granicus.com/MediaPlayer.php?
   view_id=439&clip_id=17123 .................................................................... 3, 35

Katherine Burgess, *Shelby Election Commission is 'chilling voting activity,' say NAACP,
   Black Voter Project*, Memphis Commercial Appeal, Oct. 23, 2018,

v

https://www.commercialappeal.com/story/news/2018/10/23/lawsuit-shelby-election-commission-voting-black-voter-project/1744954002/ ............................................................ 33

Nat'l Conf. of State Legs, *Online Voter Registration*, www.ncsl.org/research/elections-and-campaigns/electronic-or-online-voter-registration.aspx ............................................................ 7

S. Rep. No. 103–6 (1993) ............................................................................................................ 2

U.S. Election Assistance Comm'n, The Election Admin. & Voting Surv.: 2016 Comprehensive Rep., https://www.eac.gov/assets/1/6/2016_EAVS_Comprehensive_Report.pdf ........................................................................... 40

Case 3:19-cv-00385   Document 54-1   Filed 08/30/19   Page 7 of 48 PageID #: 384

Plaintiffs respectfully submit this memorandum of law in support of their motion.

## I.    PRELIMINARY STATEMENT

This case presents the issue of whether a state can, consistent with the Constitution, substantially interfere with the right of private organizations to associate with, encourage, communicate with, and assist eligible citizens to register to vote.  It cannot.  Plaintiffs challenge provisions of the Tennessee Code §§ 2-2-142, 2-2-143, 2-19-145 (the "Law").  The purpose and effect of the Law is to suppress the protected speech and association of voter engagement organizations, including Plaintiffs, restrict access to voter registration, and so, reduce access to the franchise.  The Law has already negatively affected Plaintiffs' critical work.  It should be preliminarily enjoined before it further undermines democratic principles in Tennessee.

Plaintiffs are civic organizations who, along with civic-minded individuals including their staff, volunteers, and members, encourage political participation through voter registration activities and provide critical access to voter registration for communities that are underrepresented on the voter rolls.  These activities are critical to Plaintiffs' missions as they provide the opportunity to communicate with the public about the importance of voter registration and voter participation.  Just as critically, during such events, Plaintiffs collect filled-out voter registration applications from the public and take on the responsibility of delivering the forms to election officials.  This collection and delivery is the best way to ensure that members of the public are actually getting registered to vote.  Without groups like Plaintiffs, many fewer individuals end up registered to vote.  Especially in Tennessee—where nearly forty percent of eligible citizens are unregistered[1]—Plaintiffs and other similar groups provide necessary support

---

[1] 2018 Current Population Survey ("CPS"), U.S. Census Bureau, Voting and Registration in the Election of 2018, Table 4A, www.census.gov/data/tables/time-series/demo/voting-and-registration/p20-583.html (last visited Aug. 29, 2019).

to our democracy.  Congress has recognized that "unfair registration laws and procedures can

have a direct and damaging effect on voter participation" and sought to lower barriers to

participation by, among other things, "permit[ting] organizations to go to the voter with

organized registration drives."  S. Rep. No. 103–6, at 2, 12 (1993); *see also* 52 U.S.C.

§§ 20501(a)(3), 20505(b).

Despite this, the Law turns Plaintiffs' core First Amendment activity into a highly

restricted and risky enterprise, in at least three respects.  First, the Law threatens to criminally

prosecute Plaintiffs if they fail to comply strictly—and ensure strict compliance of every

volunteer, staff person, or member—with a host of confusing and burdensome regulations.  At

the same time, it fails to give proper notice of when Plaintiffs are violating these provisions—

failing, for example, to define what constitutes a "voter registration drive" or an organization that

is "paid" to conduct voter registration, while still imposing onerous training, preregistration, and

form completion requirements for each such "drive" for each such organization.  Second, under

the Law, every public communication "regarding voter registration status" that Plaintiffs make—

in any medium—must be accompanied by a compelled statement about the Secretary of State's

non-involvement in the communication.  But there is no evidence that voters believe Plaintiffs

are speaking on behalf of the Secretary of State.  Given the breadth of the requirement, this

mandated speech will become a substantial portion of Plaintiffs' total civic engagement speech,

particularly in media with limited space, and improperly impair their credibility when

communicating with their communities.  Third, the Law levies substantial civil fines for the

submission of "incomplete" forms, penalizing Plaintiffs and others for errors or omissions

outside their control.  These penalties are particularly absurd in light of the Law's additional

requirement that those conducting voter registration events submit each application they collect

within 10 days, hindering Plaintiffs from conducting the follow-up that could lower the rate of incomplete forms.

Plaintiffs' voter registration activities constitute core political speech and association that are critical to American democracy and live at the core of the First Amendment's protections. The challenged provisions—on their own, and in the aggregate—will render Plaintiffs' voter registration activities more costly, more resource-intensive, and less effective. Indeed, the Law will leave Plaintiffs unable to conduct voter registration activities at any significant scale without risking civil and criminal sanctions. As such, the Law effectively "go[es] after" Plaintiffs and their ability to help voters register, just as Defendant Goins testified it was designed to do.[2]

## II.    STATEMENT OF FACTS

### A.    Plaintiffs' Engagement in Voter Registration Activities[3]

#### 1.    Plaintiffs' Voter Registration Efforts

Voter registration is an important part of each Plaintiff's organizational purpose and strategy—both as an end in itself and as a means to mobilize its members and community in support of its goals. Plaintiffs League of Women Voters of Tennessee and League of Women Voters of Tennessee Education Fund (collectively, the "League") seek to promote civic engagement through informed and active participation in government, in part, by helping Tennessee citizens register to vote. Ott Decl. ¶ 8. The League aims to increase the number of

---

[2] *See* Hearing on S.B. 971 Before the S. State and Local Gov't Comm., 111th Gen. Assemb., Reg. Sess. (Tenn. 2019) (testimony of Coordinator of Elections Mark Goins, at 1:17:57 to 1:18:19)("Goins Testimony"), *available at* http://tnga.granicus.com/MediaPlayer.php?view_id=439&clip_id=17123.

[3] Plaintiffs here summarize the facts most relevant to their preliminary injunction motion; the facts are presented more fully in the Declarations of Marian Ott ("Ott Decl.") on behalf of League of Women Voters of Tennessee; Sabina Mohyuddin ("Mohyuddin Decl.") on behalf of American Muslim Advisory Council; Paul Garner ("Garner Decl.") on behalf of Mid-South Peace and Justice Center; Jeffrey Lichtenstein ("Lichtenstein Decl.") on behalf of Memphis Central Labor Council; Tappan Vickery ("Vickery Decl.") on behalf of HeadCount; and Carolyn DeWitt ("DeWitt Decl.") on behalf of Rock the Vote, attached hereto as Exhibits A–F.

eligible registered voters in Tennessee. *Id.* ¶ 20. There are nine local Leagues throughout

Tennessee, which regularly conduct voter registration outreach and encourage all members and

any other interested volunteers to participate. *Id.* ¶ 15–16. In the year preceding this action, the

League's local chapters organized 122 voter registration events and engaged 277 volunteers in

these efforts. *Id.* ¶ 16. In 2018, these efforts involved conversations about voter registration

with thousands of individuals and resulted in the League submitting nearly 3,000 voter

registration forms to election officials. *Id.* ¶ 20. The League has continued its voter registration

work so far, including a number of events in the summer of 2019, and has a number of future

events planned before the Law goes into effect, including for National Voter Registration Day on

September 24, 2019. *Id*. ¶ 17–18. Some of the League's voter registration work is funded by

grants, including some grants specifically designated to local Leagues to conduct voter

registration events involving the collection of filled-out voter registration forms. *Id.* ¶¶ 23, 25.

Plaintiff American Muslim Advisory Council ("AMAC") uses voter engagement and

voter registration events as part of its mission to empower Muslims in Tennessee and to improve

the political and social climate in the state for all Tennesseans. Mohyuddin Decl. ¶ 4. In 2018,

AMAC reached over 2,000 Muslim Tennesseans through voter registration events, get-out-the-

vote events, meet-the-candidate forums, and outreach through text messaging, phone banking,

and rides to the polls. *Id.* ¶ 5. AMAC has conducted and plans to continue its voter registration

efforts across the state this year and in 2020, with the aim of engaging as many people and

collecting as many voter registration applications as possible. *Id.* ¶ 7. AMAC aims to increase

the number of eligible registered voters in Tennessee. *Id*. AMAC uses its voter registration

outreach both to encourage participation of new voters in the political process, and to

communicate with members of the Tennessee Muslim community on issues concerning

4

upcoming elections. *Id.* ¶ 4.

For Plaintiff Mid-South Peace and Justice Center ("MSPJC"), voter registration activities provide a way to engage, organize, and mobilize communities to realize social justice through nonviolent action. Garner Decl. ¶ 8. MSPJC aims to increase the number of eligible registered voters in Tennessee. *Id.* ¶ 20. In the past, some of MSPJC's voter registration work has been funded by grants, and MSPJC needs to continue seeking grants in the future to continue such work at or above its current scale. *Id.* ¶¶ 17, 21. In conducting voter registration, MSPJC relies on paid staff members and on volunteers both to directly help voters register, as well as to organize local residents to help register their community members. *Id.* ¶¶ 7, 10, 17, 19. When conducting voter registration activities, MPSJC regularly retains information from applications in order to follow-up with members of the communities in which it works. *Id.* ¶ 22.

Plaintiff Memphis Central Labor Council ("MCLC")—which acts as an umbrella organization for 44 affiliate unions based in western Tennessee and encompasses approximately 16,000 union members—helps union members and their household members register to vote through extensive canvassing and voter turnout efforts. Lichtenstein Decl. ¶¶ 2–3. MCLC has a target universe of approximately 40,000 unregistered but eligible union members and householders in Tennessee, and intends to help register more than 1,000 of these union members and householders in the next election cycle, and in so doing, increase the number of eligible registered voters in Tennessee. *Id.* ¶ 5. For its voter registration activities, MCLC hires paid field organizers and union staff on "release" time to perform door-to-door canvassing of its unions' members and setting up voter registration tables at union halls. *Id.* ¶¶ 6–8. MCLC uses its voter registration efforts not only to increase the political voice of union members, but also to communicate about important election-related issues. *Id.* ¶¶ 11–12.

Plaintiff HeadCount conducts voter registration activities at concerts and music festivals nationwide as part of its message that the popularity and power of music should be connected with action. Vickery Decl. ¶ 5. Since 2014, HeadCount has helped over 3,000 Tennesseans register through their work in the field, and it plans to continue such work at music events throughout the state. *Id.* ¶ 9. Indeed, one of HeadCount's premiere national events is Bonnaroo, a music festival based in Tennessee. *Id.* ¶¶ 9–10. In addition, HeadCount supports and provides resources for voter registration efforts at community-based events and is working to expand the reach of such events to new potential voters. *Id.* ¶¶ 7, 15. In order to conduct these voter registration-related activities, HeadCount receives grant money, direct donations, and sponsorships. *Id.* ¶ 8. While its small staff has a critical role, HeadCount relies primarily on volunteer team leaders and volunteers for its on-the-ground field efforts to help voters register. *Id.* ¶ 13–14.

2. <u>Plaintiffs' Public Communications</u>

Plaintiffs publicly communicate about voter registration—and thus about "voter registration status" under the Law—using a variety of methods. For example, Plaintiff Rock the Vote ("RTV")[4] primarily functions to communicate with potential voters nationwide about how to register to vote, check their voter registration status, and vote. The Law could cover nearly every communication RTV makes. RTV uses and maintains its own online voter registration platform for use by its partners across the country and in Tennessee. DeWitt Decl. ¶ 5. Both the League and HeadCount use the RTV tool. Ott Decl. ¶ 74; Vickery Decl. ¶ 36. The RTV tool, available in 13 languages, helps users determine whether they are able to use their state's online

---

[4] Rock the Vote challenges only the disclaimer and disclosure requirements of Tennessee Code § 2-19-145. Due to the nature of its activities, it would not be impacted by the other challenged provisions. To the extent the term "Plaintiffs" is used throughout to refer to the other challenges brought in this action, it excludes Rock the Vote in those contexts.

voter registration system,[5] and then, as appropriate, either directs the person to the appropriate

state website or assists the person with completing the federal mail-in voter registration form.

DeWitt Decl. ¶ 5. In 2018, RTV helped approximately 10,000 individuals register to vote in

Tennessee. *Id.* ¶ 4. Using the RTV tool through the League's Vote 411.org website, 1,520

individuals in Tennessee registered to vote in 2018, and thus far in 2019, 138 individuals in

Tennessee have registered to vote. Ott Decl. ¶ 75.

RTV also offers a voter lookup tool, which allows voters to check their registration status

before prompting them to register to vote through RTV's online tool. DeWitt Decl. ¶ 6. RTV

relies heavily on its website and digital communication methods, such as social media, email,

text messages, and digital advertising to reach and mobilize young people across the country and

to encourage them to register to vote, check their voter registration status, or update their voter

registration to reflect their current personal information. *Id.* ¶ 9. Its online registration tool also

allows voters to opt into targeted, non-partisan election reminders via email and text messaging

to ensure they are prepared to vote. *Id*.

The League also regularly communicates with members of the public concerning voter

registration status. Ott Decl. ¶ 62. In addition to its regular communications with the public, the

League also had plans to roll out a text messaging campaign to communicate with individuals

about voter registration in advance of the 2020 elections. *Id.* ¶ 69. Additionally, the League

relies upon the website Vote411.org, run by the national League of Women Voters Education

Fund, to provide people with information on voter registration and registration status. *Id.* ¶ 71.

In 2018, 47,825 individuals in Tennessee accessed this website. *Id*. ¶ 72. Vote411.org collects

---

[5] In most states, online voter registration systems work only for those potential eligible voters
who have a driver's license or state ID card. Nat'l Conf. of State Legs, *Online Voter
Registration*, www.ncsl.org/research/elections-and-campaigns/electronic-or-online-voter-
registration.aspx (last visited Aug. 27, 2019).

information from individuals using that system, and the League had plans to use this information for further communication with these individuals about voting, voter registration, and other voting information. *Id.* ¶¶ 74, 78. HeadCount uses an array of digital tools and social media to promote and facilitate voter registration. Vickery Decl. ¶ 35. It also communicates with members of the public concerning voter registration status. *Id.* ¶ 36. These efforts include using the RTV tools in its digital voter registration efforts. *Id.*

AMAC, MSPJC, and MCLC also each regularly engage in public communications concerning voter registration status and polling locations. Mohyuddin Decl. ¶ 4 Garner Decl. ¶ 47; Lichtenstein Decl. ¶¶ 9, 11. For example, while conducting voter registration activities, whether through canvassing or at events, MCLC collects information from the people that it helps register. Collecting this information lets MCLC connect with its members and convey to them its political endorsements and other communications. It lets MCLC provide the updated information back to the affiliate and national unions to which the members belong, enabling future communications between its affiliates and their members. Finally, it allows MCLC to contact members and householders it has helped register, in order to communicate with them about upcoming elections, including by notifying them of their polling locations and sending reminders and encouragement to go to the polls. Lichtenstein Decl. ¶ 11.

### B. The Challenged Law's Burdensome, Confusing Provisions

Plaintiffs challenge three newly enacted sections of the Tennessee Code, in whole or part[6]: Sections 2-2-142, 2-2-143, and 2-19-145.

#### 1. Section 2-2-142: Criminal Penalties Tied to Voter Registration Drive Regulations

Section 2-2-142 (the "Drives Provision") of the Law requires, under threat of criminal

---

[6] Plaintiffs do not challenge or seek to enjoin Tennessee Code § 2-2-142(c)–(d), which prevent payment based on the number of voter registration forms collected and prohibit setting quotas or minimum number of voter registration forms that must be collected.

prosecution, that "prior to conducting" any "voter registration drive" in which an organization or individual "attempts to collect" more than 100 voter registration applications, organizations such as Plaintiffs must: (a) pre-register with the state, indicating the county or counties where the registration drives will take place, the name and contact information of the person "conducting the voter registration drive," and the contact information for the officers of the organization conducting the drive; (b) complete a specific training administered by the state's Coordinator of Elections; (c) ensure that each and every individual participating in the drive also complete this training; and (d) file a sworn statement promising to obey all state laws and procedures. Tenn. Code § 2-2-142(a). It also requires submission of all "completed voter registration forms" within 10 days of "the voter registration drive" without exception. *Id.*; *see also id.* § 2-2-143.

The Law does not define what constitutes a "voter registration drive" in terms of length or continuousness, and thus it does not specify how frequently organizational agents must pre-register, attend training, and ensure completion of training—*e.g.*, before each election cycle; annually; or even before each individual day of voter registration activity.

This Section also prohibits organizations from copying or retaining voter information unless the applicant explicitly consents. *Id.* § 2-2-142(b). This prevents organizations from following up to ensure successful registration and election participation absent explicit advance agreement by each individual. Due to the risk of criminal sanction created by the Law, this consent must be obtained in writing, creating an additional hurdle to engaging citizens about voter registration. *See* Mohyuddin Decl. ¶ 24; Garner Decl. ¶ 23; Lichtenstein Decl. ¶ 12.

This Section provides that the Coordinator of Elections "*may* adopt policies or procedures" to implement this section but does not require implementing regulations or provide any timeline. *Id.* § 2-2-142(e) (emphasis added). To date, he has not done so.

9

2.  Section 2-2-143: Substantial Fines for Submission of "Incomplete" Forms

In a provision that is unique to Tennessee, Section 2-2-143 (the "Incomplete Forms Provision") subjects any organization that files 100 or more "incomplete voter registration applications with one (1) or more county election commissions . . . to a civil penalty." *Id.* § 2-2-143(a). It defines "incomplete voter registration application" as one that "*lacks* an applicant's name, residential address, date of birth, declaration of eligibility, or signature." *Id.* § 2-2-143(b) (emphasis added). The Law is silent as to whether incorrect information in any of these categories renders an application "incomplete." The required fields also have multiple sub-fields: *e.g.*, first name, middle name, last name, street number, street name, apartment or suite number, city, county, zip code, month, day, and year of birth, and so forth. But, again, the Law is silent as to whether a missing subfield renders an application "incomplete."

Organizations that turn in 100 or more "incomplete voter registration applications" within one year are subject to significant civil penalties, ranging up to $10,000 per offense per county. *Id.* § 2-2-143(c). Despite these penalties, the Law requires an organization to file every form it collects within 10 days, excepting only forms that contain solely an individual's name or initial. *Id.* § 2-2-143(b); *see also id.* § 2-2-142(a).

While this Section provides that the State Election Commission "may promulgate rules and procedures to implement the provisions of this section," the Law does not require it or provide any timeline by which it must, *id.* § 2-2-143(f), and the Commission has not done so.

3.  The Unpaid Exception

Only "individuals who are not paid to collect voter registrations" and organizations that "are not paid to collect voter registrations applications *and* that *only* use unpaid volunteers to collect voter registration applications" are not covered by the Drives Provision or the Incomplete Forms Provision. *Id.* § 2-2-142(g) (emphasis added); § 2-2-143(a). The Law does not specify

10

whether it applies to organizations that receive grants to conduct their voter registration work, or organizations that use paid employees to train, manage, or supervise volunteers who conduct voter registration events.  A plain reading of the Law suggests these organizations will be swept into the Law's restrictions.  As a practical matter, no voter registration activity of significant scale—even if it relies heavily on volunteers—can be conducted without *some* funding.  Thus, the Law appears to cover all but the very smallest voter registration efforts.

4.  Section 2-19-145: Compelled Statements Coupled with Criminal Penalties

The final challenged Section, which is also singular to Tennessee, Section 2-19-145 (the "Compelled Statement Provision") provides, subject to criminal penalties, that any "public communication regarding voter status"—which explicitly includes, but is not limited to, phone calls, emails, text messages, web content, and mailings—must include a "disclaimer" that the "communication is not made in conjunction with or authorized by the secretary of state."  *Id.* § 2-19-145(a).  Additionally, the Compelled Statement Provision mandates that any voter-registration or voter-lookup website include such a compelled statement and explain the collection of any voter information or data along with the organization's name and the purpose for which the information is collected.  *Id.* § 2-19-145(b), (c).  The Section further requires that the compelled statement be "clear and conspicuous and prominently placed" but provides no parameters for these requirements.  *Id.* § 2-19-145(d).

**C.  The Law's Severe Impact on Plaintiffs and their Voter Registration Efforts**

The challenged provisions—individually and collectively—impose severe burdens on Plaintiffs, their staff, volunteers, and members, as well as similarly situated organizations.

1.  Burdens and Harms Caused by Sections 2-2-142 and 2-2-143: Criminal Penalties Tied to Voter Registration Drive Regulations; Substantial Fines for Submission of "Incomplete" Forms

If the Law goes into effect, the risk of financial penalties and criminal prosecution under

the Drives Provision and the Incomplete Forms Provision will likely cause Plaintiffs to abandon or significantly curtail their voter registration activities, *see* Ott Decl. ¶ 58; Mohyuddin Decl. ¶¶ 9–10; Garner Decl. ¶¶ 40–41; Lichtenstein Decl. ¶ 19; Vickery Decl. ¶ 42, for several reasons. First, due to the risk of fines for submission of incomplete forms, Plaintiffs will be forced to scale back the amount of registration activity they conduct. *See* Ott Decl. ¶ 59; Mohyuddin Decl. ¶¶ 10, 12; Garner Decl. ¶¶ 25, 37; Lichtenstein Decl. ¶¶ 13, 20; Vickery Decl. ¶ 42. Even a small fine would cause Plaintiffs severe hardship given their limited staff and financial resources. *See* Ott Decl. ¶ 57; Mohyuddin Decl. ¶ 8; Garner Decl. ¶¶ 17, 43; Lichtenstein Decl. ¶ 16. This risk is all the more heightened because Plaintiffs are unsure whether the state will deem forms to be incomplete based on incorrect, rather than missing information—or whether missing information in a particular subfield (e.g., "middle name") will render a form "incomplete." *See* Ott Decl. ¶ 49; Lichtenstein Decl. ¶ 16; Vickery Decl. ¶ 52.

Second, compliance with the Law's onerous training and pre-registration requirements will put Plaintiffs' voter registration activity in a straightjacket. Effective voter registration events require maximum flexibility: Plaintiffs and other similar organizations need to be able to adjust plans to community needs or opportunities, accommodate shifting and limited volunteer availability, be flexible in interactions with registrants, and modify strategies based on lessons learned. But the Law will impede Plaintiffs' need to be flexible in its deployment of staff, volunteers, and members in their voter registration activities, and will depress the number of individuals able to participate. *See* Ott Decl. ¶¶ 34–35, 43; Garner Decl. ¶ 32; Lichtenstein Decl. ¶ 22; Vickery Decl. ¶¶ 43–44, 46, 79–80. It will restrict the amount of speech engaged in by Plaintiffs as part of their voter registration efforts, depress the spirit of volunteerism that is a critical part of some Plaintiffs' associational missions, and impede Plaintiffs' ability to associate

with individuals who seek to participate the day of an event. *Id.* Compliance will require Plaintiffs to divert resources from other programmatic areas and reduce the amount of their voter registration activities. Ott Decl. ¶ 54; Mohyuddin Decl. ¶¶ 8–10, 15; Garner Decl. ¶ 42; Lichtenstein Decl. ¶¶ 19, 21–22; Vickery Decl. ¶¶ 14, 40, 70–71.

Third, the requirement that organizational representatives sign a sworn statement affirming compliance with the Law will discourage Plaintiffs' voter registration activities due to the Law's vagueness and potential conflict with other legal provisions. Ott Decl. ¶¶ 41–43; Mohyuddin Decl. ¶ 19; Garner Decl. ¶¶ 33–34; Lichtenstein Decl. ¶ 17; Vickery Decl. ¶¶ 68–69. Because of the uncertainty about what the Law requires and the attendant risk of criminal penalties, Plaintiffs are highly reluctant to sign such an affidavit. *Id.*

Fourth, the Law's general prohibition on retaining registration applicants' information will hamper Plaintiffs' ability to ensure that all application forms it collects are complete (an alleged goal of the Incomplete Forms Provision). Mohyuddin Decl. ¶ 12; Garner Decl. ¶ 35; Vickery Decl. ¶ 53. And for those who do become registered successfully, the prohibition on retention of voters' contact information will harm Plaintiffs' ability to encourage registrants to ultimately participate in the political process and vote. Ott Decl. ¶¶ 66–68; Mohyuddin Decl. ¶ 24; Garner Decl. ¶ 24; Lichtenstein Decl. ¶ 12. The prohibition makes little sense in light of the fact that registrants' contact information is publicly available under the National Voter Registration Act ("NVRA"). *See* 52 U.S.C. § 20507(i).

  2. <u>Burdens and Harms Caused by Section 2-19-145: Compelled Statements Coupled with Criminal Penalties</u>

The Compelled Statement Provision will diminish Plaintiffs' messages to their potential voters because, despite using lawful methods of registration, the organizations will be required to state that their activities are not sanctioned by the State. Inclusion of this compelled statement

will necessarily reduce the faith registrants have in Plaintiffs' voter registration programs. *See* Ott Decl. ¶ 73; Mohyuddin Decl. ¶ 23; Garner Decl. ¶ 49; Lichtenstein Decl. ¶ 10; Vickery Decl. ¶¶ 56–57; DeWitt Decl. ¶¶ 12, 16. It is also confusing, irrational, and potentially inaccurate because Plaintiffs use state-issued voter registration forms and at times connect voters to the Secretary of State's website. *See* Ott Decl. ¶ 70; Garner Decl. ¶ 48; Lichtenstein Decl. ¶ 10; Vickery Decl. ¶ 66; DeWitt Decl. ¶¶ 12, 16.

The Compelled Statement Provision has already inflicted, and will continue to inflict, harm on Plaintiffs by curtailing the space available for their own messages on texts, social media, or other similar modes of communication and imposing significant costs in terms of the money, staff, and resources necessary to ensure compliance. Many forms of media are limited by characters or cost more per character. Thus, the mandated statement will make some forms of media ineffective by minimizing Plaintiffs' speech in the message and make others far more expensive. Further, the Compelled Statement Provision has required and will continue to require Plaintiffs to expend staff time and money to develop new materials and develop new processes prior to October 1, 2019, diverting those resources from other organizational priorities. *See* Ott Decl. ¶ 65; Mohyuddin Decl. ¶¶ 20, 25; Garner Decl. ¶ 50; Lichtenstein Decl. ¶ 19; Vickery Decl. ¶¶ 73–76; DeWitt Decl. ¶¶ 14–16. These costs have harmed and will continue to harm Plaintiffs' efforts to help voters register as each organization only has finite resources. *See, e.g.*, Ott Decl. ¶ 59; Mohyuddin Decl. ¶¶ 10, 15, 23; Lichtenstein Decl. ¶¶ 21–22.

To ensure compliance by October 1, RTV must make changes to its online voter registration tools—including those used by partners such as the League and HeadCount—well in advance of the Law's effective date. These changes include providing the required compelled statement in all 13 languages the tool supports; redesigning its user-flow and interface; updating

14

its website; and testing every change on both desktop and mobile devices—all at significant cost. DeWitt Decl. ¶¶ 11, 14. RTV must also evaluate changes to its digital voter registration communications strategy and program based on whether the communications platforms can support the compelled statement. *Id*. ¶ 12. The League must make similar changes, including to Vote411.org, and may be forced to drop its planned text messaging program due to the Compelled Statement Provision. Ott Decl. ¶¶ 69–71.

HeadCount's planning for 2020 is already underway, and it has already produced a kit for events, signage, and other materials for festivals at which voter registration is conducted. These materials are used nationally. Vickery Decl. ¶ 73. Redesigning and reprinting the materials for 2020 would be costly, and would require either a re-design of all materials or the creation and printing of Tennessee-specific materials. *Id*. ¶¶ 74–75. For its digital tools, HeadCount will have to make modifications or seek modifications from partners, such as RTV. *Id*. ¶¶ 62–64. Additionally, HeadCount will need to design new training materials and change its online voter hub. *Id*. ¶¶ 60–61. Not only will HeadCount incur significant costs, but the Law may well require it to forego registration of Tennessee residents at all but the largest national festivals. *Id*. ¶¶ 42, 71–72. Moreover, if HeadCount has to integrate the compelled statement into their in-person registration communications, the state's message and its formalized nature will diminish HeadCount's mission by harming the ability of volunteers to reach potential voters where they are by engaging them in a familiar and comfortable environment. *Id*. ¶ 57.

## III.  ARGUMENT

### A.  Standard of Review

Courts consider four factors in deciding whether to issue a preliminary injunction: whether (1) the movant has a strong likelihood of success on the merits; (2) the movant would suffer irreparable harm without the injunction; (3) issuance of the injunction would cause

substantial harms to others; and (4) the public interest would be served by issuance of the injunction. *Bonnell v. Lorenzo*, 241 F.3d 800, 809 (6th Cir. 2001). No single factor is a prerequisite to prevailing, and the Court must balance all four factors. *Performance Unlimited v. Questar Publishers, Inc.*, 52 F.3d 1373, 1381 (6th Cir. 1995). In First Amendment claims, success on the merits carries particular weight. *Liberty Coins, LLC v. Goodman*, 748 F.3d 682, 690 (6th Cir. 2014). This is so because "it is well-settled that 'loss of First Amendment freedoms . . . unquestionably constitutes irreparable injury.'" *Id.* (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

The primary purpose of a preliminary injunction is to maintain the status quo until a final decision on the merits can be reached. *Blaylock v. Cheker Oil Co.*, 547 F.2d 962, 965 (6th Cir. 1976). As the Law has not gone into effect and would dramatically change the regulation of voter registration activities in Tennessee, enjoining the Law will maintain the status quo pending the decision on the merits.

### B. Plaintiffs Have Several Independent Bases for Standing.

Article III standing requires (1) an "injury in fact," *i.e.*, "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual and imminent, not conjectural or hypothetical;" (2) "a causal connection between the injury and the conduct complained of;" and (3) that it is "likely" the injury will be "redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). As detailed in the factual background and declarations, the Law has already injured Plaintiffs and will continue to do so after its effective date in several concrete ways.

First, the Law's threat of civil and criminal penalties, its vagueness, and its burdensome disclosure, pre-registration, and training requirements—both individually and in the aggregate— will chill Plaintiffs' First Amendment activities, including their voter registration efforts and

their communications about voter registration and registration status.  *See, e.g.*, Ott Decl. ¶¶ 59–60; Mohyuddin Decl. ¶¶ 13, 24; Garner Decl. ¶¶ 44–46; Lichtenstein Decl. ¶ 22; Vickery Decl. ¶¶ 42, 72; DeWitt Decl. ¶¶ 12, 16; s*ee also Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 392 (1988) (finding standing where speech-related law will force plaintiffs "to take significant and costly compliance measures or risk criminal prosecution"); *Pennell v. City of San Jose*, 485 U.S. 1, 8 (1988) ("likelihood of enforcement . . . is a sufficient threat of actual injury" for standing); *Nat'l Rifle Ass'n of Am. v. Magaw*, 132 F.3d 272, 276 (6th Cir. 1997).

Second, these same elements of the Law will also harm Plaintiffs by impeding the voter-registration activities that are central to their organizational missions, while causing them to divert time and resources to attempt to comply with the law at the expense of other organizational priorities.  *See* Ott Decl. ¶¶ 54, 65; Mohyuddin Decl. ¶¶ 8–10, 15, 20, 25; Garner Decl. ¶ 42, 50; Lichtenstein Decl. ¶¶ 19, 21–22; Vickery Decl. ¶¶ 14, 40, 70–71, 73–76; DeWitt Decl. ¶¶ 14–16; s*ee also, e.g.*, *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982); *Hous. Opps. Made Equal, Inc. v. Cincinnati Enquirer, Inc.*, 943 F.2d 644, 646 (6th Cir. 1991). Numerous Circuit Courts, including the Sixth, "have upheld the standing of voter-advocacy organizations that challenged election laws based on . . . drains on their resources."  *Common Cause Ind. v. Lawson*, No. 18-2491, slip op. at 14–15 (7th Cir. Aug. 27, 2019); *see also Ne. Ohio Coal. for the Homeless v. Husted*, 837 F.3d 612, 624 (6th Cir. 2016); *Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1040 (9th Cir. 2015); *Scott v. Schedler*, 771 F.3d 831, 836–39 (5th Cir. 2014).

Third, MCLC's members will be harmed by the Law's interference with their ability to register to vote, providing a basis for associational standing as well.  Lichtenstein Decl. ¶¶ 5, 9, 13; *see, e.g.*, *Am. Civ. Liberties Union of Ohio Found., Inc. v. Ashbrook*, 375 F.3d 484, 490 (6th

Cir. 2004) (holding that organization had associational standing where member was negatively affected by Ten Commandments display, where injury was germane to organizational purpose, and case would not require member's participation).

All of these injuries are directly traceable to the Law's challenged provisions—they are burdens and threats that Plaintiffs would not face but for its passage—and the injunction requested would remedy much of the harm Plaintiffs face by lifting the threat of criminal and civil penalties, removing the need for Plaintiffs to divert their resources, and eliminating the direct harm to their voter registration activities.

### C. Plaintiffs Have a Strong Likelihood of Success on the Merits.

1. Plaintiffs Are Likely To Succeed on Their First Amendment Speech and Association Claim.

a. *The Law restricts core First Amendment freedoms.*

Voter registration activity forms a critical part of Plaintiffs' core political speech, associational activity, and organizational missions. *See supra* Section II.A. Plaintiffs' efforts to assist others in registering to vote are themselves political statements, signaling that they value the democratic process and believe in the capacity of the popular will to shape the composition and direction of the government. Courts have consistently recognized that voter registration activity—like Plaintiffs'—is protected political expression: "The interactive nature of voter registration drives is obvious: they convey the message that participation in the political process through voting is important to a democratic society." *Project Vote v. Blackwell*, 455 F. Supp. 2d 694, 706 (N.D. Ohio 2006) (striking down similar restrictions on voter registration activity); *see also League of Women Voters of Fla. v. Browning* ("*Browning II*"), 863 F. Supp. 2d 1155, 1158–59 (N.D. Fla. 2012) (holding that the assertion that laws regulating voter registration drives "implicate no constitutional rights is plainly wrong" and that such laws regulate "core First

Amendment activity"); *League of Women Voters of Fla. v. Browning*, 575 F. Supp. 2d 1298, 1321 (S.D. Fla. 2008) ("Undoubtedly, Plaintiffs' interactions with prospective voters in connection with their solicitation of voter registration applications constitutes constitutionally protected activity."); *League of Women Voters of Fla. v. Cobb*, 447 F. Supp. 2d 1314, 1332 (S.D. Fla. 2006) (concluding that law restricting third-party voter registration activity "reduced the total quantum of speech" because "as part of their voter registration drives, [the plaintiffs] persuade others to vote, educate potential voters about upcoming political issues, communicate their political support for particular issues, and otherwise enlist like-minded citizens in promoting shared political, economic, and social positions").

As "this case involves a limitation on political expression," the challenged Law is "subject to exacting scrutiny." *Meyer v. Grant*, 486 U.S. 414, 420 (1988); *see also Buckley v. Am. Constitutional Law Found.*, 525 U.S. 182, 204 (1999). In *Meyer*, plaintiffs conducted direct outreach to fellow citizens to engage them with the political process by gathering petition signatures for inclusion of a question on the ballot. Their signature-gathering activity was burdened by a law that prohibited the payment of petition circulators. Applying "exacting scrutiny," the Supreme Court struck down those restrictions as "restrict[ing] political expression." *Meyer*, 486 U.S. at 420–22. Just as in *Meyer*, here, Plaintiffs' voter registration efforts are "core political speech" involving "interactive communication concerning political change." *Id.* at 422. Whether a voter should register and ultimately participate in an election is a "matter of societal concern that [Plaintiffs] have a right to discuss publicly without risking criminal sanctions," *id.* at 421, and is intimately intertwined with the whole of Plaintiffs' speech and associative activities. *See also Buckley*, 525 U.S. at 186–87 (striking down a similar restriction as in *Meyer* and quoting *Meyer*, 486 U.S. at 422). When Plaintiffs encourage

Tennessee citizens to register and vote, Plaintiffs necessarily engage those citizens in conversations about the importance of voting and civic engagement and the need for political reform, as well as issues of organizational importance. *See* Ott Decl. ¶ 8; Mohyuddin Decl. ¶ 4; Garner Decl. ¶¶ 13, 19–20; Lichtenstein Decl. ¶ 11; Vickery Decl. ¶¶ 23, 31.

Plaintiffs' First Amendment activity—explaining the importance of voting, encouraging voter registration, and assisting fellow citizens in registering to vote—cannot be sliced and diced to avoid constitutional scrutiny. In their motion to dismiss, Defendants argue that "collecting a form and forwarding it to the proper officials is neither speech nor association." ECF No. 40 at 14. Such a cramped view of the First Amendment failed in *Meyer* and fails here as well. In *Meyer*, while defendants argued that the law "did not place any restraint on [plaintiffs'] own expression" because the plaintiffs could speak about the initiative they supported without collecting signatures to qualify it for the ballot, 486 U.S. at 418, the Court recognized that this type of interactive political speech cannot be so disaggregated: "[T]he circulation of a petition involves . . . interactive communication concerning political change," *id.* at 421–22; *see also Cobb*, 447 F. Supp. 2d at 1332 (finding restrictive third-party voter registration law "analogous to [the law] in *Meyer*"); *Am. Ass'n of People with Disabilities v. Herrera*, 690 F. Supp. 2d 1183, 1215–16 (D.N.M. 2010), *on reconsideration in part*, No. 08-cv-702, 2010 WL 3834049 (D.N.M. July 28, 2010) (finding "Plaintiffs' public endeavors to assist people with voter registration" involve protected political expression). Without the voter registration events themselves, including collecting filled-out voter registration forms and delivering them to the election officials for the public, communication about voter registration loses its force. And as the Sixth Circuit has held, the First Amendment protects Plaintiffs' "right not only to advocate their cause but also to select what they believe to be the most effective means for doing so." *Citizens for*

20

*Tax Reform v. Deters*, 518 F.3d 375, 386 (6th Cir. 2008) (quoting *Meyer*, 486 U.S. at 424).

Likewise, there is no "doubt that freedom to associate with others for the common advancement of political beliefs and ideas is a form of orderly group activity protected by the First and Fourteenth Amendments." *Kusper v. Pontikes*, 414 U.S. 51, 56–57 (1973) (internal quotation omitted). In conducting their voter registration activities, Plaintiffs associate with their volunteers, members, and other Tennessee citizens. *See, e.g.*, Ott Decl. ¶¶ 13, 32–33; Mohyuddin Decl. ¶¶ 3–4; Garner Decl. ¶¶ 10–13, 16; Lichtenstein Decl. ¶ 9; Vickery Decl. ¶¶ 4–7, 13, 23. The risk of criminal prosecution and imposition of substantial monetary civil sanctions by the Law will deter individuals from associating with Plaintiffs, *see, e.g.*, Ott Decl. ¶¶ 41–43, 57; Mohyuddin Decl. ¶ 16; Garner Decl. ¶¶ 32–33; Lichtenstein Decl. ¶¶ 12, 22; Vickery Decl. ¶¶ 41, 78, severely curtailing their orderly group activity protected by the First Amendment.

For example, interest in helping with voter registration is one of the main reasons that individuals join the League. *See* Ott Decl. ¶ 37. Engaging individuals to help with voter registration is one of the most effective ways that the League is able to recruit new members and is the main motivation driving the creation of new local Leagues in Tennessee. *Id.* Similarly, expanding members' responsibilities with running voter registration events allows the League to recruit members to take on leadership roles. *Id.* Imposing cumbersome burdens on the process of conducting voter registration events will impact the effectiveness of the outreach the League conducts and also impair its associational rights to expand and grow its membership.

The Law further impedes Plaintiffs' associational rights by limiting the audience Plaintiffs can reach. The burdens of the Law will necessarily reduce the volume and reach of Plaintiffs' voter registration activity, *see, e.g.*, Ott Decl. ¶¶ 34–35; Mohyuddin Decl. ¶¶ 10, 12, 15; Garner Decl. ¶ 27; Lichtenstein Decl. ¶ 13; Vickery Decl. ¶¶ 42, 78, thus inhibiting their

association with Tennessee citizens through voter registration outreach.  MCLC, for example, will be forced to halt their voter registration activities if the Law goes into effect on October 1. Lichtenstein Decl. ¶ 19.  Other Plaintiffs will have to limit their voter registration work targeting transitional residents, like students or those in lower-income communities, because of concerns that it will be harder to ensure collection of only complete forms from more transient populations.  *See* Ott Decl. ¶ 60; Vickery Decl. ¶ 52.  Just as in *Meyer* and *Buckley*, the Law here violates the right to "associate for political purposes" and freely engage with members of the public, because it "decreases the pool" of volunteers and staff who will engage in voter registration activity, thus "limit[ing] the number of voices who will convey" Plaintiffs' messages, and decreasing "'the size of the audience [Plaintiffs] can reach.'"  *Buckley*, 525 U.S. at 194–95 (quoting *Meyer*, 486 U.S. at 422–23); *see, e.g.*, Ott Decl. ¶¶ 34–35, 41–43; Mohyuddin Decl. ¶ 16; Garner Decl. ¶¶ 30–32; Lichtenstein Decl. ¶ 14; Vickery Decl. ¶ 41.

The onerous requirements of the Law—together with the substantial civil and criminal penalties they threaten—burden Plaintiffs' political expression, diminishing their ability to convey their message and further it by engaging more individuals in the political process.  The speech in question is "at the core of our electoral process and of the First Amendment freedoms." *Williams v. Rhodes*, 393 U.S. 23, 32 (1968).  This is "an area of public policy where protection of robust discussion is at its zenith."  *Meyer*, 486 U.S. at 425.  As such, the burden the state "must overcome to justify this criminal law is well-nigh insurmountable."  *Id.*  The Law burdens Plaintiffs' political speech, and is "accordingly 'subject to strict scrutiny, which requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest.'"  *Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 734 (2011) (quoting *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340 (2010)).

> b. *The Law is not narrowly tailored to serve any compelling government interest.*

The Law's provisions are not meaningfully designed to serve any legitimate government interest. Defendants argue that Drives Provision and the Incomplete Forms Provision somehow are necessary to avoid the disenfranchisement of voters. ECF No. 40 at 14. This argument is illogical—the opposite is true. Plaintiffs and other similar groups are *adding* to the voter registration options available for Tennessee citizens, while, by causing Plaintiffs to limit their voter registration activities, the Law will reduce the total amount of that voter registration assistance throughout the state. Tennessee posits that "the consequences can be dire" if an organization turns its forms in late or submits incomplete forms. *Id*. But the Law does not simply require submission of registration forms by the *deadline*; it requires submission within ten days of *collection* upon threat of criminal sanction—even if the forms are collected months before the deadline for submission. That unduly restricts Plaintiffs and does not protect voters.

And the penalties for submission of incomplete forms are similarly inapt: if a *voter* fails to fill out a complete voter registration form, the voter is no worse off if she submits the forms herself or submits through a voter registration organization. But by registering through a Plaintiff group, she can at least receive guidance on voter registration requirements and benefit from Plaintiff's expertise and follow-up assistance. The Law's strict and onerous restrictions will lead to fewer opportunities for that guidance and assistance.

Moreover, it is the Law itself that creates a heightened risk of disenfranchisement for those whose voter registration forms are incomplete. Under current Tennessee law, an applicant with an incomplete form must be contacted by election officials and given notice of the deficiency. *See* Tenn. Code § 2-2-109(a). This provision protects voters who may erroneously leave out information on their applications. But the Law creates a perverse incentive for

organizations not to submit incomplete forms as they could be penalized for the voter's error.

Additionally, by treating organizations that use *any* paid individuals or that receive funding for their voter registration activities differently from those organizations that use no paid individuals and receive no such funding, the Law demonstrates it is not narrowly tailored to serve a compelling interest. The legislative record contains no evidence that the use of any paid workers or receipt of grants or other funding for voter registration activity changes the nature of an organization's work in a manner that would justify subjecting it to a host of burdensome requirements with civil and criminal penalties attached. The Supreme Court has recognized that there is nothing to support the idea that those paid to conduct such activity, "whose qualifications for similar future assignments may well depend on a reputation for competence and integrity," are more likely to make errors, intentional or otherwise, as someone conducting the work for their own personal reasons. *See Meyer*, 486 U.S. at 426. Likewise, in *Project Vote*, the district court determined that there was "no rational basis for the differentiation between compensated and uncompensated voter registration workers." 455 F. Supp. 2d at 704; *see also Cobb*, 447 F. Supp. 2d at 1336 (granting preliminary injunction against statute regulating voter registration activity in part because it covered only non-partisan groups, reasoning that "the record in this case does not include any salient difference between non-partisan groups and political parties"). The Law's unfounded distinctions among voter registration organizations illustrate its lack of tailoring.

A close appraisal of the Law's provisions only raises more questions about what legitimate government interests the Law serves. First, it is unclear what state interest is served by requiring that a person conducting a voter registration drive follow multiple steps to register each voter registration drive "prior to conducting" the drive. Tenn. Code § 2-2-142 (a)(1)(A)–

(B).  There is no provision in the Law that explains what the state would or could do with this pre-registration information.  Meanwhile, the pre-registration requirement's harm to Plaintiffs is plain.  In many cases, Plaintiffs are given little advance notice to provide assistance with voter registration and often must rely on last-minute volunteers.  *See, e.g.*, Ott Decl. ¶ 32; Mohyuddin Decl. ¶ 17; Garner Decl. ¶ 28; Vickery Decl. ¶ 77.  Requiring Plaintiffs to take multiple burdensome steps before holding voter registration events will make it virtually impossible for them to engage in voter registration activities without substantial advance notice.

Second, it is similarly unclear what state interest the Law serves by prohibiting organizations from retaining voter information from collected voter registration applications.  Tenn. Code § 2-2-142(b).  This is particularly true given that registrants' information is publicly available under the NVRA.  *See* 52 U.S.C. § 20507(i).  Once again, while the legitimate purpose of the Law is opaque, the harm of the Law is plain.  Plaintiffs collect this information for the purpose of engaging in further political speech with citizens by reaching out to them after they are registered, in order to continue conversations about the importance of voting, civic engagement, and the need for political reform.  *See* Ott Decl. ¶ 66; Mohyuddin Decl. ¶ 24; Garner Decl. ¶ 22; Lichtenstein Decl. ¶ 11.

Finally, the state's interests in the integrity of the voter registration process and voter registration records are adequately and much more directly addressed by other provisions of Tennessee law.  In Tennessee, it is a felony to: register to vote, or even attempt to register to vote, when ineligible, Tenn. Code § 2-19-107; make any false entry on a voter registration list, *id.* § 2-19-109; advise someone to vote if they are not qualified to do so, *id.* § 2-19-117; or take "any action" that has the "purpose or effect" of discouraging an eligible voter from registering to vote, *id.* § 2-2-203.  There is no evidence that these provisions are insufficient for these purposes

or that the challenged provisions are necessary or even beneficial to Defendants in protecting the integrity of the voter registration process. *See, e.g.*, *Meyer*, 486 U.S. at 426–27 (holding state failed to show that challenged procedures were necessary where pre-existing procedures were "adequate to the task of minimizing the risk of improper conduct.").

Ultimately, not only is the Law *not* narrowly tailored to serve any compelling government interest, it serves no purpose other than to make it prohibitively difficult for civic organizations to assist legitimate, qualified, eligible citizens in registering to vote. As such, Plaintiffs are likely to succeed on their First Amendment speech and association claim.[7]

> 2. Plaintiffs Are Likely To Succeed on Their First Amendment Compelled Speech Claim.

The Law's Compelled Statement Provision unconstitutionally forces Plaintiffs to add a prominent compelled statement to every communication about voter registration status that they make to Tennessee citizens—in every possible medium, including in-person. This requirement that Plaintiffs carry the state's message violates the First Amendment. The Compelled Statement Provision, *see supra* Section II.B–C, fundamentally alters Plaintiffs' political speech, without any compelling or legitimate government interest in support. *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 795 (1988); *see also* Ott Decl. ¶ 73; Mohyuddin Decl. ¶¶ 21, 23; Garner Decl. ¶ 49; Lichtenstein Decl. ¶ 10; Vickery Decl. ¶¶ 56–57; DeWitt Decl. ¶ 16. Along with the criminal penalties to which Plaintiffs are exposed, the Compelled Statement Provision impermissibly burdens political speech.

There is no evidence that Tennessee citizens are confused about the nature of

---

[7] Even if the Court were to review the Law under the *Anderson-Burdick* framework for regulations of the election process, there is little difference between the exacting scrutiny of *Meyer* and the close scrutiny applied under *Anderson-Burdick* when considering regulations on core political speech, which are necessarily severe. *Buckley v. Am. Constitutional Law Found.*, 525 U.S. 182, 208 (1999) (Thomas, J., concurring); *see id*. at 192 n.12. *See infra* Section III.C.5.

community-based voter registration activity or that Plaintiffs or similar organizations have implied that their activities carry the imprimatur of the state. Plaintiffs are community-based organizations that are intertwined with the communities they serve, who know that the Plaintiffs are not the Secretary of State's office, Ott Decl. ¶ 12; Mohyuddin Decl. ¶ 23; Garner Decl. ¶ 9; Lichtenstein Decl. ¶ 10, or are well-known national organizations with understood reputations and reach, Ott Decl. ¶ 11; Vickery Decl. ¶ 67; DeWitt Decl. ¶ 16. Given that the compelled statement can only serve to resolve confusion that does not exist, there is insufficient reason for the state to co-opt the message of civic engagement organizations.

The Compelled Statement Provision forces Plaintiffs to carry the state's own message, compelling Plaintiffs to speak in ways that undermine and dilute their own political speech. *See supra* Section II.C.2; Ott Decl. ¶ 73; Mohyuddin Decl. ¶¶ 21, 23; Garner Decl. ¶ 49; Lichtenstein Decl. ¶ 10; Vickery Decl. ¶¶ 56–57; DeWitt Decl. ¶ 16. Furthermore, from a practical standpoint, including the state's speech in their own communications takes vital space away from Plaintiffs' own message. Certain methods by which Plaintiffs communicate with the public, including text messages and social media, offer limited space in which to disseminate messages, which would be entirely overrun by the required compelled statements. *See, e.g.*, Ott Decl. ¶ 70; Vickery Decl. ¶ 62; DeWitt Decl. ¶ 12. For example, the League will likely be forced to drop its planned text messaging program due to the Compelled Statement Provision. Ott Decl. ¶¶ 69–70. Likewise, including this formal statement when having in-person conversations with other citizens about registering to vote will fundamentally alter the tenor and nature of that speech. *See, e.g.*, Ott Decl. ¶ 73; Mohyuddin Decl. ¶ 23; Vickery Decl. ¶ 57.

Nor are these compelled statement requirements narrowly tailored. "In contrast to the prophylactic, imprecise, and unduly burdensome rule the State has adopted to reduce its alleged

[harms], more benign and narrowly tailored options are available." *Riley*, 487 U.S. at 800. For instance, even if these disclaimers were ostensibly necessary or supported by a legitimate interest—a claim for which the state has provided no evidence—the state could speak for itself. *See Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2376 (2018). Indeed, the state controls the content on the state voter registration form used in the voter registration activity. The Secretary of State could easily disclose on the voter registration form itself that it has no association with third-party voter registration groups. Tennessee is the only state that forces voter registration organizations to carry such a message. Voter registration is required in 49 states and the District of Columbia, but Tennessee is the only state that endeavors to co-opt voter engagement organizations' speech in this way, underscoring that this Section is not appropriately tailored. Plaintiffs are thus likely to succeed on the merits of their First Amendment compelled speech challenge to the Compelled Statement Provision.

3. Plaintiffs Are Likely To Succeed on Their First Amendment Overbreadth Claim.

The Law directly restricts Plaintiffs' core political speech and associational conduct in communicating their belief in the capacity of the popular will to shape the composition and direction of the government. *See supra* Sections II.A, C; III.C.1. An overbreadth challenge is a variant of a challenge under the First Amendment, which is leveled against "imprecise" laws.[8] *See City of Chicago v. Morales*, 527 U.S. 41, 52 (1999). In addition to allowing a litigant to

---

[8] The other doctrine under which imprecise laws may be attacked is a vagueness challenge under the Due Process clause. *See City of Chicago v. Morales*, 527 U.S. 41, 52 (1999). Plaintiffs challenge the Law under both. *See infra* Section III.C.4. That the Law is vague makes it all the more overbroad. In conducting its overbreadth analysis, "a court should evaluate the ambiguous as well as the unambiguous scope of the enactment." *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495 n.6 (1982). Thus, "the vagueness of a law affects overbreadth analysis." *Id.* The Supreme Court "has long recognized that ambiguous meanings cause citizens to 'steer far wider of the unlawful zone . . . than if the boundaries of the forbidden areas were clearly marked.'" *Id.*

advance the rights of third parties, "'[o]verbreadth' . . . describe[s] a challenge to a statute that in all its applications directly restricts protected First Amendment activity and does not employ means narrowly tailored to serve a compelling governmental interest." *Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 967 n.13 (1984).

Sections 2-2-142 and 2-19-145 are unconstitutionally overbroad. First, both provisions regulate a substantial amount of constitutionally protected expression. *See United States v. Stevens*, 559 U.S. 460, 473 (2010). Second, "all [] applications" of both provisions "directly restrict[] protected First Amendment activity," but are not "narrowly tailored to serve a compelling governmental interest." *Munson Co.*, 467 U.S. at 967 n.13; *see supra* Section III.C.3.

Laws that govern expression and expose speakers to criminal penalties, like Sections 2-2-142 and 2-19-145, inhibit the exercise of First Amendment rights. This is because "of the risk that 'enforcement of an overbroad law' may 'deter people from engaging in constitutionally protected speech' and may 'inhibit the free exchange of ideas.'" *Carey v. Wolnitzek*, 614 F.3d 189, 201 (6th Cir. 2010) (internal citations omitted). "[A]ny law imposing restrictions so broad that it chills speech outside the purview of its legitimate regulatory purpose will be struck down." *Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cty.*, 274 F.3d 377, 387 (6th Cir. 2001).

Here, the Law reaches activity that plainly falls outside any "legitimate regulatory purpose," by deterring Plaintiffs from communicating civic and political messages, and from engaging in associational activity important to advancing their missions and beliefs, providing the public with less information about how to participate in the democratic process, fewer options to register to vote, and fewer opportunities to associate with Plaintiffs in meaningful

29

civic activities.  *See, e.g.*, Ott Decl. ¶¶ 34–35, 41–43, 54, 57, 59, 66–68; Mohyuddin Decl. ¶¶ 8–

10, 12, 15, 24; Garner Decl. ¶¶ 20, 24, 33, 42–43; Lichtenstein Decl. ¶¶ 12–13, 15, 19–22;

Vickery Decl. ¶¶ 41–42, 71–72, 80.  There is, for example, no legitimate regulatory purpose in

treating paid and unpaid individuals differently in the manner that the Law does.  Plaintiffs are

not challenging the subsections of Section 2-2-142 that prohibit payment per form or the setting

of minimum quotas.  Legitimate reasons exist to govern the method of payment, such as

discouraging the submission of false or duplicate forms by field workers simply to increase the

number of forms collected, and thus the payment received by the worker.  But the use of paid

staff or reliance on grant funding does not justify treating any organization differently in such a

wide range of regulatory respects.  And there is no legitimate regulatory interest in preventing

organizations from collecting information during voter registration events for the purpose of

engaging in further political speech when the information is publicly available.  Plaintiffs thus

are likely to succeed on their overbreadth claim.

> 4.  <u>Plaintiffs Are Likely To Succeed on Their Due Process Vagueness Claim.</u>

The Law is unconstitutionally vague because it "fails to provide people of ordinary

intelligence a reasonable opportunity to understand what conduct it prohibits" and "authorizes or

even encourages arbitrary and discriminatory enforcement."  *Johnson v. United States*, 135 S. Ct.

2551, 2566 (2015).

First, the Law fails to provide "people of ordinary intelligence" clarity as to what

activities over what timeframe constitute a "voter registration drive," what it means to conduct

such a drive, and what it means to "attempt to collect" over 100 voter registration applications.

Tenn. Code § 2-2-142.  For example, does each day of voter registration activity constitute a

"drive," or a certain number of consecutive days of activities, or all the activities that an

organization conducts before a given election?  Absent clear definition, Plaintiffs do not know

30

which of their voter registration related activities would subject them to the complex web of interrelated provisions of the Drives Provision and the Incomplete Forms Provision. *See, e.g.*, Ott Decl. ¶¶ 25, 42; Mohyuddin Decl. ¶¶ 11–12; Garner Decl. ¶¶ 21, 33, 36; Lichtenstein Decl. ¶¶ 15–16; Vickery Decl. ¶¶ 39, 81, 85–87. While Defendants have insisted that the Law is common sense and easy to understand, their motion to dismiss did not answer any of Plaintiffs' questions regarding the Law's scope or application. ECF No. 40, at 21.

The exemptions for "individuals who are not paid" and "organizations that are not paid . . . and that use only unpaid volunteers" are also vague because they fail to define what it means to be "paid" and to "use only unpaid volunteers." Testimony from the proceedings surrounding the enactment of the Law suggested that even organizations that rely exclusively on unpaid volunteers to conduct voter registration events would still be covered by the Law if salaried staff members perform work in any way related to the drives (*e.g.*, recruiting, managing, organizing, or supervising volunteers), or if they received grants to support their voter registration work. An organization might also potentially be covered by the Law if any salaried staff members conduct voter registration drives—even if they are not specifically paid to do so. As a consequence, Plaintiffs do not know if their voter registration activities are covered by the Law simply if they have paid staff members who also work on voter registration drives in some capacity or simply if they receive grants to support their voter registration work. *See, e.g.*, Ott Decl. ¶¶ 25–26; Mohyuddin Decl. ¶ 6; Garner Decl. ¶ 21.

Various other provisions of the Law also insufficiently notify Plaintiffs of the restrictions to which they are subject and when such restrictions apply. For example, the Law states that prior to conducting a voter registration drive, the organization or person must "file" a sworn statement attesting that that individual "shall obey all state laws and procedures regarding the

registration of voters." Tenn. Code § 2-2-142(a)(1)(D). This requirement is vague for multiple reasons. It does not explain with whom this statement shall be filed nor does it provide any definition of exactly what is meant by the term "registration of voters." The tension between the Law and other provisions of Tennessee law make it particularly risky to sign such an affidavit under the threat of criminal sanction. *See Browning II*, 863 F. Supp. 2d at 1164–65 (holding state had no interest in requiring a misleading sworn statement in context of voter registration). Moreover, it is completely unclear if this sworn statement must be completed by an agent of the organization or by each person participating in the voter registration drive. The Law also requires that persons complete training on the voter registration process. Tenn. Code § 2-2-142(a)(1)(C). The Law does not provide notice if a person must complete the undefined training every time they participate in a voter registration event, annually, or just once.

Likewise, the Incomplete Forms Provision does not provide sufficient guidance as to what constitutes an incomplete application. While providing a definition of incomplete as an application that "lacks an applicant's name, residential address, date of birth, declaration of eligibility, or signature," the Law is silent as to whether incorrect information in any of these categories renders an application incomplete. *Id.* § 2-2-143(b). And these required fields have multiple sub-fields: *e.g.*, first name, middle name, last name, street number, street name, apartment or suite number, city, county, zip code, month, day, and year of birth, and so forth. The Law is silent as to whether a missing subfield renders an application incomplete. This vagueness as to the scope of completeness under the Law is particularly concerning because, during the 2018 election cycle, certain election officials indicated that an application that was

missing the salutation (Mr., Mrs., Ms., etc.) was considered incomplete.[9]

Additionally, the Compelled Statement Provision does not provide sufficient guidance about what the statement must say or make clear which communications are covered.  RTV, the League, and HeadCount, for example, do not know what steps must be taken to make their websites and other media compliant with the Law's disclaimer requirements.  *See* Ott Decl. ¶ 64; Vickery Decl. ¶¶ 59–61, 63; DeWitt Decl. ¶ 10; *see also* Mohyuddin Decl. ¶¶ 11–12; Garner Decl. ¶ 48.

In context, the Law does not provide notice of what conduct it prohibits—a flaw that is significantly compounded by the Law's criminal penalties and its regulation of core First Amendment speech.  *See Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 871–72 (1997).  The "increased deterrent effect" of a criminal statute "coupled with the 'risk of discriminatory enforcement' of vague regulations, poses greater First Amendment concerns than those implicated by [a] civil regulation."  *Id.*

Finally, even if rulemaking could address the Law's fatal vagueness,[10] there are at least

---

[9] *See, e.g.*, Katherine Burgess, *Shelby Election Commission is 'chilling voting activity,' say NAACP, Black Voter Project*, Memphis Commercial Appeal, Oct. 23, 2018, https://www.commercialappeal.com/story/news/2018/10/23/lawsuit-shelby-election-commission-voting-black-voter-project/1744954002/.

[10] It is not clear if the state officials will promulgate any rules or guidance in an attempt to clarify the Law.  Section 2-2-142 only requires that the Coordinator of Elections provide an online training.  While the Section allows that the Coordinator "may" adopt policies and procedures, none are required.  Section 2-2-143(f) also merely states that the Election Commission "may" promulgate rules.  There is no requirement in the Law that the state must promulgate rules or procedures.  Plaintiffs must not be left "at the mercy" of the government's "*noblesse oblige*." *United States v. Stevens*, 559 U.S. 460, 480 (2010).  The Constitution requires more than a discretionary effort to attempt to cure a constitutionally defective statute.  Courts cannot "uphold an unconstitutional statute merely because the Government promise[s] to use it responsibly." *Id.* (citing *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 473 (2001)).  Vague promises of future action would otherwise doom Plaintiffs and other Tennessee citizens to a futile effort to conform their conduct to a law that affords them no "reasonable opportunity to understand what conduct it prohibits." *United States v. Johnson*, 135 S. Ct. 2551, 2566 (2015).

33

two reasons Defendants' promise of such rules do not change the fact that Plaintiffs are likely to succeed on the merits of their vagueness claim and need preliminary relief from this Court now. First, the Compelled Statement Provision, despite its vagueness, contains no rulemaking mechanism. *See* Tenn. Code § 2-19-145.

Second, there is not enough time remaining before the Law goes into effect for any rules to be enacted. The Law goes into effect on October 1, 2019, and the Tennessee rule-making process takes at least 90 days. Tenn. Code § 4-5-207. Emergency rule making exists, but the Law does not meet the requirements for it to apply. *Id.* § 4-5-208. To date, Defendants, Coordinator of Elections and the State Election Commission—the two entities authorized to make rules under the Law—have not developed such rules. And there is no indication that they have any plans to do so. Ott Decl. ¶ 25. But even if proposed rules were issued immediately, they would not be in effect on October 1, 2019. At this point, unless the Court issues an injunction, Plaintiffs must attempt compliance with the Law without any guidance sufficient to "understand what conduct" the Law prohibits, *see Johnson*, 135 S. Ct. at 2566.

5. Plaintiffs Are Likely To Succeed on Their First and Fourteenth
   Amendment Claims that the Law Unduly Burdens the Right To Vote.

The Law unduly burdens Plaintiffs' First and Fourteenth Amendment rights in connection with the right to vote. The Law also unduly burdens the voting rights of the MCLC's unions' members. In evaluating these claims, courts "weigh 'the character and magnitude of the asserted injury' against the 'precise interests put forward by the State . . . taking into consideration the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Obama for Am. v. Husted*, 697 F.3d 423, 433 (6th Cir. 2012) (quoting *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983))). The burdens that the Law places on access to voter registration by frustrating voter registration

activities and registration-related communications are severe and are not justified by any legitimate state interest. Likewise, around 10,000 members of MCLC's unions are not registered to vote, and the voter registration outreach that MCLC provides to them is critical. Lichtenstein Decl. ¶¶ 5, 13. The burden placed on this path to registration is severe, and not sufficiently justified by any state interest. Therefore, the Law's challenged provisions cannot survive scrutiny under *Anderson-Burdick*. While certain provisions of the Law are complete outliers,[11] other provisions are similar to laws enacted by other states that have been enjoined by federal courts. *See Project Vote*, 455 F. Supp. 2d at 698 (granting preliminary injunction against similar restrictions on voter registration activity); *Browning II*, 863 F. Supp. 2d at 1167 (same); *Cobb*, 447 F. Supp. 2d at 1339–40 (same). The rights implicated by the Law "belong to—and may be invoked by—not just the voters seeking to register, but by third parties who encourage participation in the political process through increasing voter registration rolls." *Project Vote*, 455 F. Supp. 2d at 700.

The far-reaching and interrelated provisions of the Law impose greater burdens on Plaintiffs and voters than any individual provision might impose on its own. The Sixth Circuit has held that while certain "requirements may only impose a reasonable burden on constitutional rights," the proper analysis looks at "the combination of these laws," which taken together can constitute "a severe burden." *Libertarian Party of Ohio v. Blackwell*, 462 F.3d 579, 595 (6th Cir. 2006); *see also Libertarian Party of Ohio v. Husted*, No. 2:13-cv-953, 2015 WL 12967768, at *9 (S.D. Ohio Mar. 16, 2015) (holding that the "aggregate effect" of election law requirements

---

[11] For example, no other state imposes a compelled statement requirement like that of Section 2-19-145, as noted above, and no other state penalizes organizations for "incomplete" forms, a point inexplicably touted by Defendant Goins as a feature of the Law, *see* Goins Testimony, when it should have made clear the unconstitutional burdens the Law was placing on voter engagement organizations.

"severely burdened associational rights"); *Am. Ass'n of People with Disabilities*, 690 F. Supp. 2d at 1219–20 (holding that court "must address the burdens the law poses collectively" as it cannot "parse out" the requirements that "in the aggregate impose an undue burden on the Plaintiffs' First Amendment rights"); *Summers v. Smart*, 65 F. Supp. 3d 556, 565 (N.D. Ill. 2014) (concluding that "[i]n the aggregate," the "challenged provisions are more than mere neutral ballot-administration efforts"). Taken together, the web of regulations is undoubtedly a severe burden on Plaintiffs' protected activities. For example, the interaction of the 10-day deadline and the penalty for the submission of incomplete forms severely burdens Plaintiffs' rights. The deadline hinders Plaintiffs' ability to follow-up with registrants in an effort to cure any incompleteness. *See, e.g.*, Mohyuddin Decl. ¶ 12; Garner Decl. ¶ 35.

As a restriction on core political speech, the Law "plainly impose[s] a severe burden" on Plaintiffs' First Amendment rights. *Buckley*, 525 U.S. at 192 n.12, 208. As such, there is "little difference" between the close scrutiny of *Anderson-Burdick* and strict scrutiny. *Id.* at 208 (Thomas, J., concurring). Likewise, the Law restricts Plaintiffs' and their members' associational political rights, which occupy this same core protective space. *See Eu v. San Francisco Cty. Democratic Cent. Comm.*, 489 U.S. 214, 225 (1989) (holding that law burdening "rights to free speech and free association . . . can only survive constitutional scrutiny if it serves a compelling governmental interest"). Therefore, for the reasons discussed in Section III.C.1, Plaintiffs are likely to succeed on the merits of this claim.

Even if the burdens on Plaintiffs' rights were considered "substantial" rather than "severe," the Law will still not survive this Court's review because the state's interests do not make it necessary to burden Plaintiffs' rights. *Obama for Am.*, 697 F.3d at 433. For example, the exemption for organizations and individuals who are "unpaid" shows that the Law—on its

face—advances no important state interest.  There is no evidence that organizations with paid canvassers or funding to conduct voter registration activity, such as Plaintiffs, need more training, disclosure, registration, or other procedural requirements than unpaid voter registration workers, where the regulation is unrelated to how they are paid.  If the Law's challenged restrictions served any important state interest, both paid and unpaid canvassers and organizations that receive grants and those that rely upon their own funds or unpaid volunteers, would be equally subject to their terms.  Under any applicable standard of review, Plaintiffs are likely to succeed on the merits of this claim.

### D.  Plaintiffs Will Suffer Irreparable Harm Absent an Injunction.

Plaintiffs will suffer, and already are suffering, harms to their First Amendment rights. *See supra* Section II.C.  "[A] violation of First Amendment rights, even for a short time, causes irreparable harm." *Baker v. Adams Cty./Ohio Valley Sch. Bd.*, 310 F.3d 927, 930 (6th Cir. 2002). Likewise, "'[e]ven minimal infringement upon First Amendment values constitutes irreparable injury sufficient to justify injunctive relief.'" *Chabad of S. Ohio & Congregation Lubavitch v. City of Cincinnati*, 363 F.3d 427, 436 (6th Cir. 2004) (quoting *Newsom v. Norris*, 888 F.2d 371, 378 (6th Cir. 1989)).  As there are no adequate remedies at law to cure the deprivation of First Amendment rights, *Brinkman v. Budish*, 692 F. Supp. 2d 855, 866 (S.D. Ohio 2010), Plaintiffs will suffer irreparable harm absent an injunction.

Courts have also held that lost opportunities to register voters constitutes irreparable harm, because "when a plaintiff loses an opportunity to register a voter, the opportunity is gone forever." *Browning II*, 863 F. Supp. 2d at 1167; *see also League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014); *League of Women Voters of Mo. v. Ashcroft*, 336 F. Supp. 3d 998, 1005 (W.D. Mo. 2018); *Ind. State Conf. of the NAACP v. Lawson*, 326 F. Supp. 3d 646, 662–63 (S.D. Ind. 2018); *Action NC v. Strach*, 216 F. Supp. 3d 597, 642–43

(M.D.N.C. 2016); *Project Vote, Inc. v. Kemp*, 208 F. Supp. 3d 1320, 1350 (N.D. Ga. 2016); *N.C. State Conf. of the NAACP v. N.C. State Bd. of Elections*, No. 16-cv-1274, 2016 WL 6581284, at *9 (M.D.N.C. Nov. 4, 2016).  There are nine elections in Tennessee in 2019 after the effective date of the Law, the first on November 2, 2019.[12]  And the 2020 election cycle is fast approaching, with federal offices—including President—and statewide races on the ballot in March, August, and November 2020.[13]  Without an injunction, Plaintiffs will lose opportunities to help voters register in advance of each of these elections.

Furthermore, MCLC's lost opportunity to help members of its unions register to vote is clearly an irreparable harm to those members because they are at risk of being completely disenfranchised.  Courts routinely have held that granting a preliminary injunction serves the public interest when it helps permit "as many qualified voters to vote as possible."  *Obama for Am.*, 697 F.3d at 437; *see also League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016).  The risk of disenfranchisement practically defines irreparable harm.  *See Fish v. Kobach*, 840 F.3d 710, 752 (10th Cir. 2016) ("[T]he right to vote is a constitutionally protected fundamental right.  When an alleged constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." (internal quotation marks and citations omitted)); *see also Charles H. Wesley Educ. Found., Inc. v. Cox*, 324 F. Supp. 2d 1358, 1368 (N.D. Ga. 2004), *aff'd*, 408 F.3d 1349 (11th Cir. 2005) (holding that lost opportunity to register causes irreparable harm because "no monetary award can remedy" it).

Beyond the lost opportunities to register voters, Plaintiffs are also currently irreparably harmed and will be harmed further starting October 1, 2019, as they are prevented from the

---

[12] *See* 2019 Elections by Date, Tenn. Sec'y of State, https://sos-tn-gov-files.tnsosfiles.com/2019%20Local%20Elections%20by%20Date.pdf (last visited Aug. 29, 2019).

[13] *See* 2020 Election Calendar, Tenn. Sec'y of State, https://sos.tn.gov/products/elections/2020-election-calendar (last visited Aug. 29, 2019).

planning that is critical to their activities. The Law's overbreadth and vagueness, *see supra* Section III.C.3–4, make it impossible for Plaintiffs to develop plans about what voter registration activities they can or will be able to do in the future. The League has instructed all of its local Leagues and volunteers to continue with their typical voter registration activities through October 1, 2019, but has been unable to provide any guidance for what activities should proceed after that date. *See* Ott Decl. ¶ 61. HeadCount has existing events planned for 2019 in Tennessee and nationally, including after October, but does not know how to comply with the Law. Vickery Decl. ¶¶ 32, 86. With the presidential primary fast approaching on March 3, 2020, this inability to plan is impacting and will continue to impact the effectiveness of Plaintiffs' voter registration activities. Every day that Plaintiffs are faced with the uncertainty caused by the Law that prevents them from effectively planning is a day before the upcoming elections that Plaintiffs can never get back. This is an ongoing irreparable harm.

### E. Issuance of the Injunction Will Not Cause Substantial Harm to Others.

The preliminary injunction would not cause any harm to other parties. It would merely preserve the status quo pending determination on the merits. *See Blaylock*, 547 F.2d at 965. An injunction preventing implementation of the Law would not alter the qualifications to be an eligible voter in Tennessee, would not alter any of the robust statutes that already govern improper voter registration, *see, e.g.*, Tenn. Code §§ 2-19-107, 2-19-109, 2-19-117, 2-2-203, and would only prevent the imposition of these undue burdens on civic organizations. The injunction will not cause any harm, but simply preserve the current structure of Tennessee law.

Moreover, the state will suffer no harm from being enjoined from enforcement because, as the Law is likely to be found unconstitutional, *see supra* Section III.C, the state has no valid interest in enforcing an unconstitutional enactment. *Planned Parenthood Ass'n of Cincinnati, Inc. v. City of Cincinnati*, 822 F.2d 1390, 1400 (6th Cir. 1987).

### F. The Public Interest Is Served by the Issuance of an Injunction.

"[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994). As Plaintiffs are likely to succeed on their constitutional claims, *see supra* Section III.C, the public interest necessarily weighs in favor of an injunction. And allowing Plaintiffs to continue their civic work unimpeded also advances the interests of all Tennessee citizens who are eligible to vote, as "[t]he public interest . . . favors permitting as many qualified voters to vote as possible." *Obama for Am.*, 697 F.3d at 437. An injunction would not alter the existing framework for ensuring that only qualified voters are able to register, and it would leave open a critical path to voter registration. Ensuring this pathway particularly serves the public interest in Tennessee, which ranks 44th in the nation in its rate of voter registration.[14]

### IV. CONCLUSION

For the forgoing reasons, Plaintiffs respectfully request that this Court preliminarily enjoin each of the provisions challenged by Plaintiffs, and grant all such preliminary relief that this Court deems just and proper.

Dated: August 30, 2019                          Respectfully submitted,

                                               */s/ Theresa J. Lee*

Sophia Lin Lakin*                              Thomas H. Castelli, BPR#024849
Theresa J. Lee*                                Legal Director
Davin Rosborough*                              Mandy Floyd, BPR#031123
Dale E. Ho*                                    ACLU Foundation of Tennessee
American Civil Liberties Union Foundation      P.O. Box 120160
125 Broad Street, 18th Floor                   Nashville, TN 37212
New York, NY 10004                             Tel.: 615-320-7142
Tel.: (212) 549-2500                           tcastelli@aclu-tn.org
slakin@aclu.org                                mfloyd@aclu-tn.org

---

[14] U.S. Election Assistance Comm'n, The Election Admin. & Voting Surv.: 2016 Comprehensive Rep. at 64 (NVRA Table 1: Registration History), https://www.eac.gov/assets/ 1/6/2016_EAVS_Comprehensive_Report.pdf.

tlee@aclu.org
drosborough@aclu.org
dho@aclu.org

Sarah Brannon*, **
American Civil Liberties Union Foundation
915 15th Street, 6th Floor
Washington, DC 20005
Tel.: (202) 544-1681
sbrannon@aclu.org
** not admitted in DC; DC practice limited to federal
court only

William H. Harbison, BPR#7012
C. Dewey Branstetter, Jr. BPR#9367
Hunter C. Branstetter, BPR#32004
Sherrard Roe Voigt & Harbison
150 3rd Avenue South, Suite 1100
Nashville, TN 37301
Tel.: (615) 742-4200
bharbison@srvhlaw.com
dbranstetter@srvhlaw.com
hbranstetter@srvhlaw.com

Danielle Lang*
Molly Danahy*
Campaign Legal Center
1101 14th Street NW, Suite 400
Washington, DC 20005
Tel.: (202) 736-2200
dlang@campaignlegal.org
mdanahy@campaignlegal.org

Michelle Kanter Cohen*
Jon Sherman*
Fair Elections Center
1825 K Street NW, Suite 450
Washington, DC 20006
Tel.: (202) 331-0114
mkantercohen@fairelectionscenter.org
jsherman@fairelectionscenter.org

*Attorneys for Plaintiffs*
*admitted *pro hac vice*