# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **LEAGUE OF WOMEN VOTERS,** | ) | |
| **LEAGUE OF WOMEN VOTERS** | ) | |
| **TENNESSEE EDUCATION FUND,** | ) | |
| **AMERICAN MUSLIM ADVISORY** | ) | |
| **COUNCIL, MID-SOUTH PEACE &** | ) | |
| **JUSTICE CENTER, ROCK THE VOTE,** | ) | |
| **MEMPHIS CENTRAL LABOR** | ) | |
| **COUNCIL, and HEADCOUNT,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:19-cv-00385** |
| | ) | **Judge Aleta A. Trauger** |
| **TRE HARGETT, in his official capacity** | ) | |
| **as Secretary of State of Tennessee,** | ) | |
| **MARK GOINS, in his official capacity** | ) | |
| **as Coordinator of Elections for the State** | ) | |
| **of Tennessee, the STATE ELECTION** | ) | |
| **COMMISSION, and DONNA BARRETT,** | ) | |
| **JUDY BLACKBURN, GREG DUCKETT,** | ) | |
| **MIKE MCDONALD, JIMMY WALLACE,** | ) | |
| **TOM WHEELER, and KENT YOUNCE,** | ) | |
| **in their official capacities as members of** | ) | |
| **the State Election Commission,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM

The defendants have filed a Motion to Dismiss (Docket No. 39), to which the plaintiffs have filed a Response (Docket No. 44), and the defendants have filed a Reply (Docket No. 46). For the reasons set out herein, that motion will be denied.

## I. BACKGROUND AND PROCEDURAL HISTORY[1]

### A. Voting in Tennessee

Tennessee relies on popular elections to select (or, in a few cases, decide whether or not to retain) many of the state's most important state, local, and federal officials. *E.g.*, U.S. Const. art. I, § 2, cl. 1 (U.S. Representatives); U.S. Const. amend. XVII (U.S. Senators); Tenn. Const. art. II, § 7 (state legislators); Tenn. Const. art. III, § 2 (Governor); Tenn. Const. art. VI, § 3 (state appellate judges); Tenn. Const. art. VI, § 4 (circuit and chancery court judges); Tenn. Code Ann. § 2-15-101 (presidential electors); Tenn. Code Ann. § 5-6-102 (county mayors); Tenn. Code Ann. § 6-3-101(a) (aldermen); Tenn. Code Ann. § 6-20-201(a)(3) (city mayors); Tenn. Code Ann. § 6-31-101(a) (city council members); Tenn. Code Ann. § 16-18-201 (city judges); Tenn. Code Ann. § 49-2-201(a)(1) (local board of education members). Sometimes, Tennessee voters directly change state or local laws via ballot measures. *See, e.g.*, Tenn. Const. art. XI, § 3 (constitutional amendment); Tenn. Const. art. XI, § 9 (municipal home rule); Tenn. Code Ann. § 6-51-105(a) (municipal annexation); Tenn. Code Ann. § 6-51-201(a) (contraction of municipal boundaries); Tenn. Code Ann. § 6-51-403(b) (merger of municipalities); Tenn. Code Ann. § 6-52-202 (abolition of municipal charter); Tenn. Code Ann. § 7-2-106(a) (consolidation of metropolitan government); Tenn. Code Ann. § 49-2-501(a)(2) (abolition of special school district); Metro. Gov't of Nashville & Davidson Cty, Tenn., Charter § 19.01 (charter amendment). But, unfortunately, not all Tennesseans vote. Some do not vote because they choose not to, or they forget, or they do not even think about it. Some Tennesseans do not vote because they do not meet the state's requirements for "qualified voters," due to their age, their citizenship status, or their "infamy" based on a past felony conviction from which they have not

---

[1] Except where otherwise indicated, these facts are taken from the plaintiffs' Amended Complaint (Docket No. 37) and are taken as true for the purposes of Rule 12(b).

2

had their voting rights restored. *See* Tenn. Code Ann. §§ 2-2-102, 40-20-112, 40-29-202(a). In any given election, however, there are some Tennesseans who are qualified to vote and would like to do so, but who cannot, because "[o]nly qualified voters *who are registered* . . . may vote at elections in Tennessee." Tenn. Code Ann. § 2-1-105 (emphasis added).

The only way to be "registered under" the state's voter registration system is if one "applies to register" with the appropriate county election commission. Tenn. Code Ann. § 2-2-104(1); *see* Tenn. Code Ann. §§ 2-2-101(2), 2-2-303. A person applying to register must complete a form, on which she provides certain information that establishes her identity and qualifications as a voter. The Tennessee General Assembly requires that the form contain the person's name, sex, address of legal residence, mailing address if different from residential address, social security number, date and place of birth, citizenship status, prior place of voter registration, history of felony convictions, and a declaration of permanent residency. Tenn. Code Ann. § 2-2-116. The application can be completed in person at the office of the county election commission or at a number of other state and local government offices that Tennessee or the county has directed to accept applications and transmit them to the commission. Tenn. Code Ann. §§ 2-2-108(a)(1), 2-2-111(a), 2-2-201, 2-2-202. In addition to in-person registration, Tennessee has an online voter registration system, *see* Tenn. Code Ann. § 2-2-112, and allows registration by mail, *see* Tenn. Code Ann. § 2-2-115(a). Unless a prospective voter applies to register at least thirty days before an election day, the voter will not appear on the voter rolls for that election. Tenn. Code Ann. § 2-2-109(a).

A number of organizations and individuals, recognizing that a lack of registration is the only legal obstacle preventing many Tennesseans from voting, engage in activities intended to assist unregistered qualified voters in filing registration applications. Some of those efforts are

small and informal, between friends, family, neighbors, and coworkers. Other efforts to assist in voter registration are larger and directed at the broader public, such as the operation of voter registration desks at schools, community centers, concerts, and other locations frequented by unregistered prospective voters. These efforts historically have involved collecting paper registration forms, although modern technology also allows organizations to assist voters in registering electronically.

Despite those formal and informal efforts to boost registration, the number of registered voters in Tennessee still lags far behind the number of qualified voters. According to the U.S. Census Bureau's Current Population Survey, there were, as of November 2018, approximately 4,872,000 voting-aged citizens in Tennessee, but only about 3,183,000 registered voters. (Docket No. 37 ¶ 100.) Data from the U.S. Election Assistance Commission ranked Tennessee 44th out of all U.S. states and the District of Columbia in the percentage of its citizen population that was registered to vote. (*Id.*)

In the period leading up to the November 2018 general election, some organizations, including the plaintiffs in this case, intensified their Tennessee voter registration efforts. Many of their activities were specifically designed to gather voter registration applications from what the plaintiffs describe as "communities of color and other underserved populations." (*Id.* ¶ 109.) The plaintiffs' focus was consistent with broader trends involving which voters are most likely to benefit from concerted voter registration activities. According to Current Population Survey data surrounding the 2018 election cycle, 5.3% of African-American voters and 5.5% of Hispanic voters in the U.S. reported registering through a voter registration drive, with only 3.1% of white voters reporting the same. (*Id.* ¶ 101.)

After the November 2018 election, the Tennessee General Assembly considered additions to Tennessee's election laws that would more closely regulate nongovernmental voter registration activities. Representative Tim Rudd told the Elections & Campaign Finance Subcommittee of the Tennessee House of Representatives that new laws were necessary because, in 2018, "we had a lot of outsiders, contractors and other people coming in and flooding the local election commission and the state with [voter registration forms] right before the election." (*Id.* ¶ 112.) Legislators expressed concerns about incomplete or erroneous forms that threatened to overwhelm local voter registration authorities and "put legitimate registrations at risk." (*Id.*) The Speaker of Tennessee's House of Representatives posted a message on Twitter in support of new laws, complaining that "outside groups" had attempted to "flood the ballot box with fraudulent votes" in order to defeat a particular candidate for statewide national office, whom the Speaker identified by name. (*Id.* ¶ 116.) The Tennessee Secretary of State voiced similar concerns in an op-ed, writing that the changes were a necessary response to a 2018 "activist" group's having submitted a large number of registration applications. (*Id.* ¶ 113.)

On April 29, 2019, the Tennessee General Assembly passed ELECTION OFFENSES, 2019 Tenn. Laws Pub. ch. 250 (H.B. 1079) (hereinafter, the "Act"). On May 2, 2019, Governor Bill Lee signed the Act into law, and its provisions are slated to "take effect" on October 1, 2019. 2019 Tenn. Laws Pub. ch. 250, § 9.

**B. The Act[2]**

*1. Scope*

The Act leaves in place the preexisting state and local government structures for voter registration and does not purport to govern every situation in which one person helps another register to vote. The first few of its requirements, which govern how voter registration drives can be performed, mostly apply to private organizations or individuals that "attempt[] to collect voter registration applications of one hundred (100) or more people." Tenn. Code Ann. § 2-2-142(a).[3] These requirements include an exception for "individuals who are not paid to collect voter registration applications or . . . organizations that are not paid to collect voter registration applications and that use only unpaid volunteers to collect voter registration applications." Tenn. Code Ann. § 2-2-142(g). An organization is also excepted if it is the "designee" of the county election commission for the purposes of operating certain county-supervised voter registration activities. Tenn. Code Ann. § 2-2-142(a). The Act then establishes a system of potential monetary penalties for entities covered by the new requirements. Tenn. Code Ann. § 2-2-143. The State Election Commission is empowered to engage in rulemaking in furtherance of the penalty provisions, but rulemaking is permissive, rather than mandatory, and there is no language delaying the Act's requirements until rulemaking takes place. Tenn. Code Ann. § 2-2-143(f).

---

[2] Several key provisions of the Act contain ambiguities that, the plaintiffs argue, pose significant constitutional problems of their own. Those ambiguities are discussed later in this opinion. For ease of discussion, the court's summary of the Act's provisions may ignore a few ambiguities for the sake of providing a general picture of the structure of the Act.

[3] For ease of reading, the court will cite the Act using the section designations that it will have when included in the Tennessee Code Annotated.

6

The Act next sets forth several ethics and conflict-of-interest requirements related to procurement of voting systems, *see* Tenn. Code Ann. § 2-9-118, none of which are at issue in this case.

Finally, the Act imposes a number of requirements on parties that communicate to the public about voter registration, including, in particular, parties that operate websites that either facilitate voter registration or allow voters to look up individual voter registration information. These requirements, unlike some of the registration drive requirements, apply no matter how many voters, if any, the party attempts to register. *See* Tenn. Code Ann. § 2-2-145. This portion of the Act does not contain any express language empowering the State Election Commission or any other administrative body to engage in rulemaking related to its operation.

*2. Provisions at Issue in this Case.*

**a. Pre-Drive Reporting Requirements.** The Act requires prior registration, with the state's Coordinator of Elections, by private organizations and individuals planning voter registration drives intended to exceed the 100-applicant mark, if they do not qualify for one of the exceptions discussed above. Tenn. Code Ann. § 2-2-142(a). Specifically, the organization or individual must, "[p]rior to conducting"[4] the registration drive,

> (A) Provide the coordinator of elections with the name, address, and contact phone number of the person conducting the voter registration drive or the names, addresses, and contact phone numbers of the officers of the organization conducting the voter registration drive;
>
> (B) Provide the names of the county or counties in which the voter registration drives will be held; . . . [and]
>
> (D) File a sworn statement stating that the person or organization shall obey all state laws and procedures regarding the registration of voters . . . .

---

[4] The Act does not specify a particular amount of time prior to the drive by which a party must register.

7

Tenn. Code Ann. § 2-2-142(a)(1). Violation of any of those requirements, if done "intentionally or knowingly," is a Class A misdemeanor, and "each violation constitutes a separate offense." Tenn. Code Ann. § 2-2-142(f).

According to the plaintiffs, these prior reporting requirements will necessitate significant changes from the ways that they and others currently conduct voter registration drives. Voter registration efforts, even those involving small stipends or some paid staff, are often built around volunteerism, which sometimes can arise spontaneously, with little time for pre-planning. The need to register every drive ahead of time, obtain certifications from covered voter registration workers, and then, when the day of the drive arrives, use only those covered workers who pre-registered will, the plaintiffs argue, make it substantially more difficult to staff their drives. For example, the illness of a single organizer could cause an entire drive to have to be scrapped, even if a perfectly suitable replacement is available. Individuals who get involved in voter registration because they want to participate in civic life would, moreover, be likely to gravitate toward options involving less red tape and less potential legal exposure. (Docket No. 37 ¶ 180–82.) The plaintiffs, in particular, fear that many covered voter registration workers will refuse to sign the required sworn prior statement of compliance out of fear of legal consequences. (*Id.* ¶ 184.) Indeed, the plaintiffs themselves are reluctant to file any such assurances, out of fear that they cannot guarantee compliance with what they consider to be ambiguous provisions of the Act. (*Id.* ¶ 186.)

    b. **Mandatory Government-Administered Training.** Individuals and organizations subject to the reporting requirement are also required to receive voter registration training from the State of Tennessee. Before conducting the drive, the individual or organization must

    (C) Complete training, which is administered by the coordinator of elections, on
    the laws and procedures governing the voter registration process; . . . [and]

8

(E) Ensure that individuals, whether volunteer or paid, who conduct voter registration drives for an organization have completed the training administered by the coordinator of elections . . . .

Tenn. Code Ann. § 2-2-142(a)(1). The Coordinator of Elections is forbidden from charging a fee for the training and required to "offer the training online." Tenn. Code Ann. § 2-2-142(e). As with the reporting requirements, violation of the training requirement, if done "intentionally or knowingly," is a Class A misdemeanor, and "each violation constitutes a separate offense." Tenn. Code Ann. § 2-2-142(f).

This required training, the plaintiffs complain, will make it more difficult to recruit qualified volunteers and operate their drives with the kind of logistical flexibility necessary. (*Id.* ¶ 172.) The ability to recruit volunteers, they argue, depends, at least in part, on making limited demands on volunteers' time and accepting as many competent volunteers as are available. The plaintiffs argue that the training requirement will, for example, "make it impossible to continue to accept walk-up volunteers for Tennessee events." (*Id.* ¶ 191.) The training requirement would also pose an obstacle to grassroots efforts in areas or facilities with limited internet access. (*Id.*)

**c. 10-day Mandatory Application Turn-In**. The Act requires any person or organization that performs a voter registration drive for which registration was required to "deliver or mail completed voter registration forms within ten (10) days of the date of the voter registration drive; provided[] that if the date of the voter registration drive is within ten (10) days of the voter registration deadline, the completed forms must be delivered or mailed no later than the voter registration deadline." Tenn. Code Ann. § 2-2-142(a)(2). That requirement applies even if the person or organization knows that the application is deficient because, for example, it is missing some of the required information. The only exception is that "[a] person or organization who collects an application that only contains a name or initial is not required to file the

9

application with the election commission." Tenn. Code Ann. § 2-2-143(b). A knowing or intentional violation of this provision is a Class A misdemeanor, with "each violation constitut[ing] a separate offense." Tenn. Code Ann. § 2-2-142(f).

The plaintiffs do not dispute that they should turn in any voter registration forms they receive. To the contrary, they believe that it is already their duty to do so under Tenn. Code Ann. § 2-19-103, which makes it a crime to interfere in a person's rights under the state's election laws. (Docket No. 37 ¶ 148.) They note, however, that there may be extenuating circumstances that would justify taking more than ten days to do so. (*Id.* ¶ 174.)

**d. Monetary Penalties for Turning In Incomplete Registrations.** Pursuant to Tenn. Code Ann. § 2-2-143(a), "any person or organization" that "conducts voter registration drives under" the registration scheme is subject to a civil penalty if the person or organization, "within a calendar year, files one hundred (100) or more incomplete voter registration applications." The Act defines "incomplete voter registration application" as "any application that lacks the applicant's name, residential address, date of birth, declaration of eligibility, or signature." Tenn. Code Ann. § 2-2-143(b). This provision does not include a requirement that the violation be knowing or intentional.

County election commissions are required to "file notice with the state election commission, along with a copy of each voter registration application deemed to be incomplete and identifying information about the person or organization that filed the incomplete applications." Tenn. Code Ann. § 2-2-143(c)(2). The state election commission then "shall make a finding on the number of incomplete forms filed" and "may impose civil penalties for Class 1 and Class 2 offenses." Tenn. Code Ann. § 2-2-143(c)(3). "'Class 1 offense' means the filing of one hundred (100) to five hundred (500) incomplete voter registration applications," and such an

10

offense is "punishable by a civil penalty of one hundred fifty dollars ($150), up to a maximum of two thousand dollars ($2,000), in each county where the violation occurred." Tenn. Code Ann. § 2-2-143(c)(4)(A). "'Class 2 offense' means the filing of more than five hundred (500) incomplete voter registration applications," and such an offense is "punishable by a civil penalty of not more than ten thousand dollars ($10,000) in each county where the violation occurred." Tenn. Code Ann. § 2-2-143(c)(4)(B).

The plaintiffs note that their experiences in operating voter registration drives have shown that new citizens and individuals from low-income communities are especially likely to leave portions of their application forms blank. (*Id.* ¶¶ 142, 144.) The plaintiffs contend, moreover, that it is inevitable that a voter registration drive of any significant size, even one executed by well-trained personnel consistently with best practices, is going to produce some incomplete forms. (*Id.* ¶ 9.) That likelihood, they argue, is exacerbated by the 10-day turn-in requirement, which limits the time available to review applications and follow up with any individuals who provided incomplete information. The plaintiffs note, as well, that, depending on how the Act is interpreted, it may sometimes be impossible to determine that a form is incomplete. For example, a prospective voter could provide incomplete or inaccurate information, and it would be impossible for the operator of the registration drive to know about the error. (*Id.* ¶¶ 130–33.) In any event, the plaintiffs reiterate that they believe that it is their legal responsibility to turn in all forms that they have received that represent a good-faith effort to register to vote, meaning that it will sometimes be their legal duty to turn in incomplete forms. *See* Tenn. Code Ann. § 2-19-103.

The plaintiffs note that structures are already in place for dealing with incomplete forms, once submitted, and that even an incomplete form can be a meaningful step on a qualified voter's

11

path to becoming registered. Tennessee's Coordinator of Elections is tasked with ensuring that local election authorities are taking steps to allow "voters with deficient registrations" to be "given the opportunity to correct incorrect or omitted information." Tenn. Code Ann. § 2-2-120(c)(4). Also, federal law requires election officials to inform applicants of the disposition of their applications, 52 U.S.C. § 20507(a)(2), meaning that an individual whose application was rejected as incomplete will be informed of the fact and have another chance to register. (Docket No. 37 ¶ 148.)

**e. Consent Requirement for Retention of Voter Information.** The Act prohibits anyone operating a voter registration drive from "copying, photographing, or in any way retaining the voter information and data collected on the voter registration application, unless the applicant consents." Tenn. Code Ann. § 2-2-142(b). The Act does not specify whether the consent must be in writing. A knowing or intentional violation is a Class A misdemeanor, with "each violation constitut[ing] a separate offense." Tenn. Code Ann. § 2-2-142(f). The plaintiffs complain that it is unclear what form such consent is supposed to take. They note, moreover, that anyone who has given them a voter registration form has already voluntarily given the organization their identifying information. The plaintiffs explain that voter registration organizations often retain information for the purposes of later get-out-the-vote activities but would be prevented from doing so if forced to comply with a vague and difficult-to-document consent requirement. (Docket No. 37 ¶ 102.)

**f. Mandatory Disclaimers for Communications.** Pursuant to Tenn. Code Ann. § 2-2-145(a)(1), any "public communication regarding voter registration status made by a political committee or organization must display a disclaimer that such communication is not made in conjunction with or authorized by the secretary of state." *Id.* "The disclaimer must be clear and

conspicuous and prominently placed. A disclaimer is not clear and conspicuous if it is difficult to read or hear, or if its placement can be easily overlooked." Tenn. Code Ann. § 2-2-145(d). If a "person or organization . . . establishes a website for voter registration purposes," it must display such a disclaimer and, if the site "captures or collects the voter's information or data," it must include an additional notice "disclos[ing] on the website the person's or organization's name and the purpose for which the voter information is captured or collected." Tenn. Code Ann. § 2-2-145(b)(1)–(2). The same is true for a website created to allow users to look up registration information. Tenn. Code Ann. § 2-2-145(c)(1)–(2). "Any person who intentionally and knowingly violates" these provisions "commits a Class A misdemeanor and each violation constitutes a separate offense." Tenn. Code Ann. § 2-2-145(e).

The plaintiffs maintain that there is no evidence that Tennessee citizens are confused about whether private groups' voter registration-related communications are made in affiliation with the Secretary of State. They note that some of the media through which they communicate, such as text messages, social media posts, and billboards, have inherent limitations with regard to the amount of information that can be transmitted that would make including a disclaimer impractical. The plaintiffs also state that they use many materials that have already been printed and would need to be reprinted in order to comply with the Act. The plaintiffs further note that the broad definition of "public communications" could reach even face-to-face interactions, thereby requiring their volunteers and personnel to append spoken disclaimers to something as simple as asking a person if he is registered to vote. (Docket No. 37 ¶¶ 156–59.)

## C. The Plaintiffs

The plaintiffs are all organizations involved in voter registration activities in Tennessee. Although they employ different strategies and work with different populations, all have

expressed fear that it will be difficult or even impossible to continue their activities while complying with the Act. Accordingly, some of the plaintiffs are considering a moratorium on voter registration activities in Tennessee after the Act goes into effect on October 1, 2019. (*Id.* ¶ 192.) If individual plaintiffs do not impose a moratorium, they will, at the very least, be likely to substantially scale back their activities. (*Id.* ¶ 193.)

### 1. League of Women Voters of Tennessee

The League of Women Voters of Tennessee[5] and the League of Women Voters of Tennessee Education Fund—collectively, "the League," for short—are Tennessee-based nonprofit organizations with 775 dues-paying members. (*Id.* ¶¶ 21–23.) The League's annual budget for the last fiscal year was approximately $36,000, and its budget in recent years has never exceeded $50,000. The League oversees nine local chapters in, for example, Blount County, Tennessee and Shelby County, Tennessee. The local League chapters have their own budgets, the largest of which has been, on average, about $35,000 per year. (*Id.* ¶¶ 23–24.) In the year preceding the filing of this lawsuit, the local League chapters conducted approximately 122 voter registration events, relying on 277 volunteers to do so. (*Id.* ¶ 25.) Most of those applications were collected in counties with local League chapters, but the League does often collect registration applications in other communities as well. (*Id.* ¶ 27.) Locations at which the League has focused its efforts include public housing offices, local libraries, naturalization ceremonies, the YMCA, and local utility offices. (*Id.* ¶ 25.) The League estimates that, in 2018, it collected and submitted nearly 3,000 voter registration forms. (*Id.* ¶ 27.) The League states that

---

[5] Nationally, the League of Women Voters was founded in 1920 and has, over the course of nearly a century, established itself as a well-respected civic organization that encourages voter registration. It is active in all 50 states and has local subchapters in over 700 communities. *See* League of Women Voters, *Membership & Local Leagues* and *History*, at https://www.lwv.org/about-us/membership-local-leagues & https://www.lwv.org/about-us/history.

it has begun retaining information about the voters it registers, to use in support of its get-out-the-vote activities. (*Id.* ¶ 32.)

The League has no paid staff in Tennessee, other than two temporary consultants. (*Id.* ¶ 22.) Nevertheless, its voter registration activities do involve basic expenses. In order to support its activities, the League routinely applies for and receives grants. For example, its Chattanooga chapter recently received a "Youth Voter Grant" to encourage registration and participation in the electoral process by younger voters. That project resulted in the registration of 316 prospective voters. (*Id* ¶ 29.) Although the League has provided support for county election commissions' supplemental registration activities at high schools, it has never been granted any formal status as a "designee" under the state's registration statutes. (*Id.* ¶ 30.)

The League also runs a website, VOTE411.org, which provides information about registration and polling places, as well as a tool through which an applicant can register to vote or, if that is not possible, at least begin a voter registration application. The League retains some of the information that it receives through the site in order to contact users in the future to encourage them to vote. (*Id.* ¶ 34.) The League has advertised VOTE411.org with paper materials handed out at its registration drives. (*Id.*)

According to the League, it plans to continue and, if possible, expand upon its voter registration activities in the coming years. (*Id.* ¶ 32.) It also plans to begin a text message-based campaign to communicate with individuals about voter registration. (*Id.* ¶ 33.) The League, however, believes that that text message campaign would be costlier, and perhaps even unfeasible, under the Act, due to the difficulty of including the required disclaimers. (*Id.*) The League states that attempting to comply with the Act will require it to expend resources to

15

develop new materials and internal processes, some of which steps must be taken prior to October 1, 2019, when the Act goes into effect. (*Id.* ¶ 35.)

### 2. Memphis Central Labor Council

The Memphis Central Labor Council ("MCLC") is a Memphis-based labor council of the American Federation of Labor and Congress of Industrial Organizations, commonly referred to as the "AFL-CIO." It acts as the umbrella organization for 41 west Tennessee-based affiliate unions, including the local affiliate of the International Brotherhood of Electrical Workers and the local affiliate of the American Federation of State, County and Municipal Employees. All in all, MCLC and its affiliated unions have about 16,000 union members. (*Id.* ¶ 51.) MCLC engages in extensive canvassing, voter turnout, and voter registration activities, targeted, in particular, at union members and their families, including members of MCLC's unions and west Tennessee members of other AFL-CIO-affiliated unions. According to MCLC, there are approximately 41,000 union members or union household members in west Tennessee who are not registered to vote. MCLC hopes to set a target of registering more than 1,000 of those unregistered prospective voters in each of the next several election cycles. (*Id.* ¶ 52.)

MCLC's overall annual budget is about $200,000, and its budget for political activities is about $40,000. (*Id.* ¶ 58.) In the 2018 election cycle, MCLC hired approximately 15 paid field organizers to perform canvassing, which consisted primarily of making door-to-door visits to households identified through union membership lists. (*Id.* ¶ 52–54.) MCLC also uses "released staff" from affiliate unions in support of its canvassing work. These staff members are paid by their individual unions but detailed to MCLC's canvassing efforts. (*Id.* ¶ 55.) As part of their canvassing visits, MCLC's organizers identify which candidates MCLC has endorsed. (*Id.* ¶ 53.)

16

MCLC also sometimes learns, in its canvassing visits, that the union membership information it has been using is out of date. MCLC has begun retaining information learned while canvassing to update its membership lists. (*Id.* ¶ 57.)

MCLC anticipates hiring about the same number of field organizers as it hired in 2018 to perform canvassing related to the 2020 election cycle. MCLC believes that it will be more difficult for it to hire field organizers if the field organizers fear civil or criminal penalties arising out of their work. (*Id.* ¶ 54.) MCLC contends that even a small fine would impose severe hardship on its ability to operate its political program. (*Id.* ¶ 58.) MCLC states that attempting to comply with the Act will require it to expend resources to develop new materials and internal processes, some of which steps must be taken prior to October 1, 2019, when the Act is scheduled to go into effect. (*Id.* ¶ 59.)

### 3. Rock the Vote

Rock the Vote is a Washington, D.C.-based 501(c)(3) organization that is "dedicated to building long-term youth political power" through voter registration and engagement. (*Id.* ¶¶ 60–61.) Rock the Vote is active nationwide and maintains an online voter registration platform that partner organizations may use for free. The tool is designed to assist a user in determining whether he is eligible to vote; if he is, the tool directs him to the appropriate state voter registration website or assists him in completing a mail-in form. Rock the Vote also offers a voter lookup tool that allows users to check their voter registrations. (*Id.* ¶ 61.) Tennessee citizens who use Rock the Vote's online registration tool are directed to the state's online registration system if they have the photo identification necessary to register using that system. If the user lacks the requisite identification, Rock the Vote's tool assists him in completing a mail-in form. (*Id.* ¶ 62.) The registration tool allows users to opt into receiving election reminders,

17

which, by necessity, requires Rock the Vote to retain some user information. (*Id.* ¶ 65.) Since 1990, Rock the Vote and its partners have assisted in the registration of nearly 8 million new voters. In 2018 alone, about 830,000 people registered to vote using the Rock the Vote online platform, including over 11,000 in Tennessee. In 2016, about 1.7 million people registered using the platform, including over 31,000 in Tennessee. (*Id.* ¶ 63.)

Rock the Vote has five full-time employees and one part-time paid intern. (*Id.* ¶ 64.) It relies on various methods of electronic communication in furtherance of its efforts, including social media, email, and texting. (*Id.* ¶ 65.) Rock the Vote asserts that the Act's disclaimer requirements will impose a substantial burden on its ability to use its online tool to assist in voter registration applications. Specifically, it will need to translate its disclaimers into all 13 languages supported by the tool, redesign the user-flow and interface to ensure that the disclaimer is integrated into the user experience, update its tool for both desktop and mobile interfaces, and engage in thorough testing to confirm that the updated tool works properly. (*Id.* ¶ 66.) Rock the Vote stresses that it will need to make these expenditures prior to October 1, 2019, in order to be in compliance with the Act when its provisions take effect. (*Id.* ¶ 67.)

### *4. American Muslim Advisory Council*

The American Muslim Advisory Council ("AMAC") is a Nashville-based 501(c)(3) organization that "seeks to empower Muslims across Tennessee through civic engagement and community building in order to protect all Tennesseans from prejudice and targeted violence." (*Id.* ¶ 36.) Its efforts include voter registration drives, get-out-the-vote events, candidate forums, outreach through calls and texts, and providing rides to the polls. As part of its outreach, AMAC communicates to the public about issues including voter registration. (*Id.* ¶ 37.) In 2018, AMAC registered a "significant number" of voters at mosques in Nashville, Antioch, Murfreesboro,

Memphis, and Knoxville and at events that it co-hosted with groups like the Vanderbilt Muslim Student Association. (*Id.* ¶ 39.)

AMAC has one full-time and one part-time staff member. Its total budget for 2018 was about $120,000, with about $1,000 allocated to voter registration activities. It pays student interns by the hour for assisting in its voter registration activities. (*Id.* ¶¶ 39, 41.) AMAC has continued to engage in voter registration activities and intends to expand on those activities in 2020. (*Id.* ¶¶ 38, 41.) AMAC states that, because it is a small organization with a limited budget, even relatively minor financial penalties would result in a significant hardship to it. (*Id.* ¶ 41.) AMAC states that attempting to comply with the Act will require it to expend resources to develop new materials and internal processes, some of which steps must be taken prior to October 1, 2019, when the Act goes into effect. (*Id.* ¶ 42.)

### *5. Mid-South Peace & Justice Center*

The Mid-South Peace and Justice Center ("MSPJC") is a "multi-issue, multi-race" 501(c)(3) organization "whose mission is to engage, organize, and mobilize communities to realize social justice through nonviolent action." (*Id.* ¶ 43.) It has about 90 monthly dues-paying members but works with additional volunteers and student interns in its activities, which include advocacy, community outreach, and voter registration activities. In the past, it has received grants to conduct voter registration drives, and it anticipates that it will continue seeking and receiving such grants. It relies on both volunteers and its paid staff members to conduct its voter registration activities. MSPJC routinely retains information that it receives from its voter registration activities in order to make follow-up communications with the applicants. (*Id.* ¶¶ 43–47.) Through its registration drives and otherwise, MSPJC communicates with members of the public on civic matters, including voter registration. (*Id.* ¶ 48.)

19

MSPJC has three full-time and three part-time staff members. It has an annual budget of approximately $235,000, much of which goes to salaries. MSPJC projects that, due to its budgetary constraints, even a small fine would likely lead it to suspend all voter registration activities, at least temporarily. (*Id.* ¶ 49.) MSPJC states that attempting to comply with the Act will require it to expend resources to develop new materials and internal processes, some of which steps must be taken prior to October 1, 2019, when the Act goes into effect. (*Id.* ¶ 50.)

### *6. HeadCount*

HeadCount is a New York City-based 501(c)(3) organization that works with musicians and other media figures to promote participation in democracy. As part of its efforts, HeadCount operates voter registration drives at concerts and music festivals nationwide. (*Id.* ¶ 68.) Since 2004, HeadCount has assisted in the submission of about 500,000 voter registration applications through more than 6,000 in-person field events. In order to execute these large-scale efforts, HeadCount has cultivated a network of about 20,000 volunteers, some of whom have risen to leadership positions within the organization. (*Id.* ¶¶ 69, 72.) It receives grant money, direct donations, and sponsorships to fund its voter registration activities, including in Tennessee. (*Id.* ¶ 71.)

HeadCount has no full-time paid staff in Tennessee, but it will occasionally hire a Tennessee-based independent contractor for events. It mostly relies on volunteer team leaders to run its registration drives in the field. (*Id.* ¶¶ 72–73.) HeadCount requires each event to be staffed with at least one team leader, in order to maintain the security of the voter registration applications and ensure that they are properly collected and delivered. HeadCount currently has four team leaders in Tennessee, for 2,000 field volunteers. (*Id.* ¶¶ 73–74.) It is seeking additional Tennessee team leaders but will not approve team leaders until after they complete HeadCount

training and review. Although team leaders do not receive a wage or salary, HeadCount has, in the past, paid Tennessee team leaders a stipend, and it plans to do so in the future. (*Id.* ¶¶ 73–76.) HeadCount's other volunteers are not paid monetarily, but they do receive free access to the concerts and festivals where they volunteer. (*Id.* ¶ 77.)

HeadCount requires all of its volunteers to undergo a one-hour training before the event at which they volunteer, with occasional exceptions for volunteers who have undergone the training before. Many of HeadCount's volunteers are volunteering for the first time and, therefore, do not receive any training until the day on which they volunteer. (*Id.* ¶ 78.) HeadCount alleges that it "cannot continue to help Tennessee voters register in the field by collecting their forms and submitting them if HeadCount will be subject to financial penalties." (*Id.* ¶ 145.)

HeadCount's planning for registration activities leading up to the 2020 election is already underway. The organization produces a festival kit to be used at events as well as signage that is reused from event to event, and some expenditures have already been made on those materials. HeadCount contends that redesigning and reprinting materials to comply with the Act's disclaimer requirement would be costly. (*Id.* ¶ 79.) The disclaimer requirement and information retention requirements would also affect HeadCount's digital tools and social media efforts, which account for over 50% of its national voter registration activity. In addition to its in-person and online activities, HeadCount engages in text message-based efforts to alert individuals to voter registration opportunities, which could raise difficulties with regard to including adequate disclaimers. (*Id.* ¶¶ 80, 85, 93.)

HeadCount's concerns about the disclaimers are not limited to the expenses and technical challenges. HeadCount has expressed concern that disclaimers will lessen the effectiveness of its

efforts because the disclaimers will give the impression that a given voter registration drive is not "official," despite the fact that it is soliciting real, official voter registration applications and submitting them to the correct authorities in order for real voters to be registered. (*Id.* ¶ 90.)

HeadCount retains photocopies of the registration applications it collects, which it uses to later verify that the forms were accepted and that the voters were added to state voter rolls. This allows HeadCount to ensure that its registration efforts have been effective, and HeadCount uses that information both in direct furtherance of its mission and to demonstrate to potential donors that it is securing actual voter registrations, not merely collecting forms. (*Id.* ¶ 82.)

**D. This Litigation**

*1. The Plaintiffs' Claims*

On May 9, 2019, most of the current plaintiffs—along with one organization that is no longer associated with the case—filed their Complaint in this court. (Docket No. 1.) On June 21, 2019, the plaintiffs filed an Amended Complaint that expanded on the plaintiffs' allegations and included all of the parties currently in the case. (Docket No. 37.) The plaintiffs have pleaded five claims under 42 U.S.C. § 1983. Claim I alleges that the provisions of the Act discussed above, both individually and cumulatively, unconstitutionally burden the plaintiffs'[6] rights to freedom of speech and association under the First Amendment of the U.S. Constitution, as incorporated via the Fourteenth Amendment. (*Id.* ¶¶ 199–218.) Claim II alleges that the disclaimer requirements of Tenn. Code Ann. § 2-2-145 amount to government-compelled speech that serves no legitimate governmental function, in violation of the First Amendment. (*Id.* ¶¶ 219–28.) Claim III alleges that, insofar as the Constitution permits some legislation akin to the Act, the Act itself is unconstitutionally overbroad in violation of the First Amendment. (*Id.* ¶¶ 229–35.) Claim IV

---

[6] Unlike the other plaintiffs, Rock the Vote challenges only the Act's disclaimer requirements, not its other provisions. (Docket No. 37 at 3 n.1.) For ease of reading, the court will speak generally of "the plaintiffs," even when discussing arguments in which Rock the Vote has not joined.

alleges that the Act's requirements are unconstitutionally vague in violation of the plaintiffs' rights to due process under the Fourteenth Amendment. (*Id.* ¶¶ 236–57.) Claim V alleges that the Act unconstitutionally burdens the fundamental right to vote and to engage in speech and association related to the right to vote. (*Id.* ¶¶ 258–66.)

### 2. The Defendants

The plaintiffs have named as defendants various Tennessee officials who will play roles in administering the Act, each of whom is sued in his or her official capacity only. Tre Hargett is the Tennessee Secretary of State. (*Id.* ¶ 95.) Under the Tennessee Constitution, the Secretary of State is appointed by a joint vote of the General Assembly, whose members are elected. Tenn. Const. art. III, § 17. The Secretary of State, in turn, appoints the state's Coordinator of Elections, who serves at the pleasure of the Secretary. Tenn. Code Ann. § 2-11-201(a). Defendant Mark Goins is the Coordinator of Elections. (Docket No. 37 ¶ 96.) The Coordinator "is the chief administrative election officer of the state" and is charged with "obtain[ing] and maintain[ing] uniformity in the application, operation and interpretation of the election code." Tenn. Code Ann. § 2-11-201(b). Among the Coordinator's responsibilities under the Act is that he is the official who "administer[s]" the mandatory government training, without which individuals cannot participate in a covered voter registration drive, and he is the official with whom individuals and organizations must register. Tenn. Code Ann. § 2-2-142(a)(1).

Herbert H. Slatery III is the Attorney General and Reporter (hereinafter, "Attorney General") of Tennessee. Tennessee's Attorney General is appointed by the judges[7] of its Supreme Court, who are, under current law, appointed by the Governor and confirmed by the

---

[7] The Tennessee Constitution refers to the members of the judiciary who sit on the Tennessee Supreme Court, other than the Chief Justice, as "judges," although the court takes judicial notice that they are all commonly referred to as "justices." The court has used the term "judge" merely to reflect the constitutional text.

General Assembly, after which the judges are subject to retention elections. Tenn. Const. art. VI, §§ 3, 5. The plaintiffs maintain that the Attorney General "is authorized to investigate or prosecute violations of the election code and to request that the Coordinator conduct investigations," although the statutory subsections that the plaintiffs cite do not appear to support the entirety of that claim. (Docket No. 37 ¶ 97 (citing Tenn. Code Ann. § 2-11-202(a)(5)(A)– (C)).) In any event, the Attorney General is indeed empowered to request that the Coordinator conduct investigations. Tenn. Code Ann. § 2-11-202(a)(5)(C). The election code, however, contemplates that prosecutions will be performed by a "district attorney general," Tenn. Code Ann. § 2-11-202(a)(5)(A)—in other words, a local prosecutor, *see* Tenn. Code Ann. § 8-7-103(1).[8]

Donna Barrett, Judy Blackburn, Greg Duckett, Mike McDonald, Jimmy Wallace, Tom Wheeler, and Kent Younce are the members of the State Election Commission. (Docket No. 37 ¶ 99.) Members of the Commission are elected by a joint resolution of both houses of the General Assembly. Tenn. Code Ann. § 2-11-104(b). The Act adds a provision allowing the General Assembly to remove a member for cause or if he or she becomes unqualified. 2019 Tenn. Laws Pub. ch. 250, § 8. Under the Act, the Commission is the body to which incomplete registrations are reported and the body that "may" impose fines based on the incomplete forms. Tenn. Code Ann. § 2-2-143(c).

*3. The Defendants' Motion*

---

[8] The Attorney General does have some very limited general authority to initiate criminal prosecutions of his own accord, as well as power to assist in local prosecutions, with the consent of local authorities. *See* Tenn. Code Ann. § 8-6-112(a) (allowing Attorney General to initiate prosecutions of certain officials where the district attorney general would have a conflict); Tenn. Code Ann. § 8-7-106(b)(4) (allowing a district attorney general to cross-designate the Attorney General for purposes of specific prosecutions and investigations).

On July 5, 2019, the defendants filed a Motion, under Rule 12(b)(1) and Rule 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss the plaintiffs' claims. (Docket No. 39.) Specifically, the defendants argue that the court lacks jurisdiction, either because the plaintiffs lack standing to bring their challenges or because their claims are not ripe. The defendants also argue that, if the court finds that it has jurisdiction, the court should dismiss all of the plaintiffs' claims because the plaintiffs have failed to plead plausible challenges to the constitutionality of the Act.

## II. LEGAL STANDARD

### A. Rule 12(b)(1)

"Rule 12(b)(1) motions to dismiss . . . generally come in two varieties: a facial attack or a factual attack." *Gentek Bldg. Prods., Inc. v. Sherwin-Williams Co.*, 491 F.3d 320, 330 (6th Cir. 2007) (citing *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990)). When a Rule 12(b)(1) motion contests subject matter jurisdiction factually, the court must weigh the evidence in order to determine whether it has the power to hear the case, without presuming the challenged allegations in the complaint to be true. *Id.*; *DLX, Inc. v. Kentucky*, 381 F.3d 511, 516 (6th Cir. 2004). When the facts are disputed in this way, "[t]he district court has broad discretion to consider affidavits, documents outside the complaint, and to even conduct a limited evidentiary hearing if necessary," without converting the motion into one for summary judgment. *Cooley v. United States*, 791 F. Supp. 1294, 1298 (E.D. Tenn. 1992), *aff'd sub nom. Myers v. United States*, 17 F.3d 890 (6th Cir. 1994); *see also Gentek*, 491 F.3d at 330. It is then the plaintiff's burden to show that jurisdiction is appropriate. *DLX*, 381 F.3d at 516. If a Rule 12(b)(1) motion challenges subject matter jurisdiction based on the face of the complaint, to the contrary, the plaintiff's burden is "not onerous." *Musson Theatrical Inc. v. Fed. Express Corp.*,

89 F.3d 1244, 1248 (6th Cir. 1996). A court evaluating this sort of facial attack to the assertion of subject matter jurisdiction must consider the allegations of fact in the complaint to be true. *Gentek*, 491 F.3d at 330.

## B. Rule 12(b)(6)

In deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court will "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002). The Federal Rules of Civil Procedure require only that a plaintiff provide "a short and plain statement of the claim that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957). The court must determine only whether "the claimant is entitled to offer evidence to support the claims," not whether the plaintiff can ultimately prove the facts alleged. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

The complaint's allegations, however, "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To establish the "facial plausibility" required to "unlock the doors of discovery," the plaintiff cannot rely on "legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action," but, instead, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679; *Twombly*, 550 U.S. at 556.

26

### III. JURISDICTION

#### A. Injury-in-Fact

The defendants argue that the plaintiffs lack standing to challenge the Act because it has not yet gone into effect and the plaintiffs, therefore, do not yet know how the State Election Commission, Coordinator of Elections, and local district attorneys general will use their discretion under the Act. The plaintiffs respond that the Act has been duly enacted and will, by operation of law, impose obligations in what was, when they filed their Complaint, a few short months and is now about a month. They note, moreover, that it will be impossible to comply with the Act's requirements without taking preparatory steps, including ones that they are already taking at their own expense.

Article III of the Constitution gives the federal courts jurisdiction only over "cases and controversies," of which the component of standing is an "essential and unchanging part." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992); *see also Warth v. Seldin*, 422 U.S. 490, 498 (1975). A party seeking to invoke the court's jurisdiction must establish the necessary standing to sue before the court may consider the merits of that party's cause of action. *Whitmore v. Arkansas*, 495 U.S. 149, 154 (1990). A plaintiff is required to show standing to sue at each stage in the litigation. *Lujan*, 504 U.S. at 561–62. To establish standing under the Constitution, a plaintiff must show that: (1) he has suffered an "injury in fact" that is (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by the relief requested. *Gaylor v. Hamilton Crossing CMBS*, 582 F. App'x 576, 579–80 (6th Cir. 2014) (citing *Lujan*, 504 U.S. at 560–61); *see also*

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000). These mandatory minimum constitutional requirements—commonly known as (1) injury-in-fact, (2) causation, and (3) redressability—apply in every case. The defendants' argument that the plaintiffs lack standing because the Act has not yet gone into effect or been wielded against them is a challenge to the plaintiffs' ability to meet the first requirement, an injury-in-fact that is imminent, not merely conjectural or hypothetical.

"[A]n actual arrest, prosecution, or other enforcement action is not a prerequisite to challenging" the constitutionality of a law regulating an organization's ongoing and expected future behavior. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (citing *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128–29 (2007); *Steffel v. Thompson*, 415 U.S. 452, 459 (1974)). Nor is a plaintiff required to "expose himself to liability before bringing suit." *MedImmune*, 549 U.S. at 129. A plaintiff may, for example, establish an injury-in-fact based on its "intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute." *Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 298 (1979). The defendants take that principle to suggest that, unless a plaintiff plans on violating a law, he does not have standing to challenge it.

This case presents a slightly different situation, because it is clear, from the plaintiffs' allegations, that they intend to try to comply with the Act if and when it goes into effect, even if complying means ceasing voter registration activities altogether. They therefore cannot rely on their stated intention to violate the Act in order to establish standing. Nevertheless, the plaintiffs have alleged that their intention—but for the Act—would be to behave in ways that the Act proscribes, and that intention may, in an appropriate case, itself be sufficient to confer standing. *See Clements v. Fashing*, 457 U.S. 957, 962 (1982) (finding standing where plaintiffs alleged

that, "but for the . . . provision they seek to challenge, they would engage in the very acts that would trigger the enforcement of the provision"). None of the plaintiff organizations has indicated that it would require every one of its volunteers to receive training from Tennessee's Coordinator of Elections unless forced to do so. Similarly, none of the organizations would choose to adopt the Act's disclaimers, on as wide a range of materials as the Act demands, unless required to. And, while none of the organizations has expressed a desire to violate the 10-day form turn-in requirement in any systematic way, the plaintiffs have alleged that they would, but for the Act, hold a form for longer than ten days in some situations. Moreover, the plaintiffs would, but for the Act, pursue their voter registration aggressively, despite their knowledge that those efforts will unavoidably lead to the submission of some incomplete applications. Under the Act, they cannot do so without risking fines.

The defendants' position would limit the right to challenge the Act to, at most, people or organizations who plan to defy its requirements or who, after October 1, have actually done so and have been fined or prosecuted. Article III, however, does not require a plaintiff to engage in "costly futile gestures simply to establish standing, particularly when the First Amendment is implicated." *Lac Vieux Desert Band of Lake Superior Chippewa Indians v. Mich. Gaming Control Bd.*, 172 F.3d 397, 406 (6th Cir. 1999) (citing *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 392–93 (1988); *Clements*, 457 U.S. at 962). The defendants' assumption that standing should be limited to lawbreakers and aspiring lawbreakers is based on the faulty assumption that a law can only injure the people who disobey it. Following a law, however, can sometimes harm a person just as much as breaking it. That is why the caselaw recognizes that an injury-in-fact can arise not only out of expected enforcement but also "costly, self-executing compliance burdens." *Nat'l Rifle Ass'n of Am. v. Magaw*, 132 F.3d 272, 279 (6th Cir. 1997)

(citation omitted); *accord Hyman v. City of Louisville*, 53 F. App'x 740, 743 (6th Cir. 2002); *see also Am. Booksellers*, 484 U.S. at 392 (finding standing because "plaintiffs . . . , if their interpretation of the statute is correct, will have to take significant and costly compliance measures or risk criminal prosecution") (citing *Craig v. Boren*, 429 U.S. 190, 194 (1976); *Doe v. Bolton*, 410 U.S. 179, 188 (1973)); *Ohio Coal Ass'n v. Perez*, 192 F. Supp. 3d 882, 902 (S.D. Ohio 2016) ("[A]dditional compliance burdens may serve as an injury in fact.") (citing *All. for Natural Health U.S. v. Sebelius*, 775 F. Supp. 2d 114, 120–21 (D.D.C. 2011)). A plaintiff can establish standing to challenge a law by showing that the law "is directed at [the plaintiff] in particular[,] . . . requires [the plaintiff] to make significant changes in [its] everyday . . . practices[, and] . . . expose[s the plaintiff] to the imposition of strong sanctions" for noncompliance. *Abbott Labs. v. Gardner*, 387 U.S. 136, 154 (1967), *abrogated on other grounds*, *Califano v. Sanders*, 430 U.S. 99 (1977). That is the case here.

The compliance costs that the plaintiffs have alleged are no less real simply because the Act is allowing a grace period to elapse before its requirements take effect. *See Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 539 (2012) (permitting a challenge filed three years before a provision's effective date); *New York v. United States*, 505 U.S. 144, 175 (1992) (permitting challenge filed six years before statute's effective date). The Act is not just a speculative possibility; it is the law. It "bec[a]me law," under Article II, § 18 of the Tennessee Constitution, as soon as it was signed by the Governor. *Compare* Tenn. Const. art II, § 18 (discussing timing of when a bill "becomes law") *with* Tenn. Const. art II, § 20 (discussing timing of when a bill "take[s] effect"). While the Act does not technically require anything of anyone *right now*, its soon-to-take-effect requirements are not ones that an organization can simply ignore until it opens up shop on the morning of October 1. Materials have to be printed; websites have to be

changed; internal policies have to be revised. The defendants have offered no account of how a person or organization could continue its large-scale voter registration efforts uninterrupted without beginning its compliance efforts well before the Act's effective date. To the contrary, in order to continue their activities, at least some of the plaintiffs are suffering actual—not merely imminent—injuries from the Act at this very moment. When an already existing entity must, in furtherance of its continuing mission, "devote resources" to "negat[ing] the impact" of a defendant's actions, then that entity has suffered an injury sufficiently actual or imminent to create standing. *Hous. Opportunities Made Equal, Inc. v. Cincinnati Enquirer, a Div. of Gannett Co.*, 943 F.2d 644, 646 (6th Cir. 1991); *see also Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) (finding standing based on a rule's creating a "drain on [an] organization's resources").

It is true that the plaintiffs do not know how the State Election Commission and others will enforce the Act or what rulemaking related to the Act might contain. But the Act's requirements are commands, and the plaintiffs wish to follow the law. Article III does not punish them for their law-abiding nature by robbing them of their chance to challenge the Act under the Constitution. *See Driehaus*, 573 U.S. at 168 (observing that a plaintiff should not be "forc[ed] . . . to choose between refraining from core political speech on the one hand, or engaging in that speech and risking costly Commission proceedings and criminal prosecution on the other"). The plaintiffs' decision to alter their behavior in order to avoid the possibility of punishment under the Act is, moreover, a wholly reasonable reaction that is independent of whether or how the threat of enforcement will ultimately be carried out. The Constitution does not stop recognizing the costs that the plaintiffs are bearing simply because there is a chance, however small, that the State of Tennessee will choose not to enforce the Act or to enforce it so

31

laxly that the plaintiffs' compliance efforts will turn out to have been a waste of time and resources.

The economic costs of compliance are not the only concrete injuries that the plaintiffs are facing. A concrete injury-in-fact can arise when a law "restrict[s] the plaintiffs' political activities within the state" and "limit[s] their ability to associate as political organizations." *Green Party of Tenn. v. Hargett*, 767 F.3d 533, 544 (6th Cir. 2014). By making it riskier and more difficult to engage in voter registration activities and communications, the Act has, for reasons that the court will discuss in more detail hereafter, imposed meaningful limitations on the plaintiff organizations' rights to engage in political speech and association related to elections. Even if one ignores the compliance efforts taking place now, that restriction on constitutional rights will occur imminently, when the law takes effect this October.

With regard to the plaintiffs' alleged First Amendment harms, it is particularly unnecessary to wait and see how the Act will be enforced. As the Supreme Court has observed, First Amendment case law recognizes "the danger in putting faith in government representations of prosecutorial restraint" where protected speech is concerned. *United States v. Stevens*, 559 U.S. 460, 480 (2010). The courts, accordingly, will "not uphold an unconstitutional statute merely because the Government promised to use it responsibly." *Id.* (citing *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 473 (2001)). Therefore, even if the Act were to go into effect and the government enforced it, at first, narrowly (or even not at all), that would be beside the point, because the plaintiffs' challenge to the law itself would still be cognizable by the courts.

In short, the plaintiffs have alleged both economic harms and harms to their fundamental rights, all of which are either already occurring or will occur imminently by operation of law.

The plaintiffs have, therefore, satisfied the constitutional requirements of standing on the basis of the face of their complaint. The court will not dismiss the plaintiffs' claims on that ground.

## B. Ripeness

The defendants also argue that the plaintiffs' claims are not ripe, citing essentially the same facts and reasoning on which they rely to argue that the plaintiffs lack standing. "A claim is not ripe for adjudication if it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Texas v. United States*, 523 U.S. 296, 300 (1998) (quoting *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580–81 (1985)). The ripeness requirement exists, in part, in order to "prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Abbott Labs.*, 387 U.S. at 148. The Supreme Court has suggested that the analysis of whether a case is ripe for review is best conducted "in a twofold aspect, requiring the Court 'to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.'" *Magaw*, 132 F.3d at 285 (quoting *Abbott Labs.*, 387 U.S. at 149).

"The ripeness doctrine," as it has traditionally been understood, "is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction." *Beech v. City of Franklin, Tenn.*, 687 F. App'x 454, 457 (6th Cir. 2017) (quoting *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003)). Recent cases have raised some doubt with regard to whether the latter, purely prudential aspects of ripeness continue to provide an independent basis for dismissing a case. *See Miller v. City of Wickliffe, Ohio*, 852 F.3d 497, 503 n.2 (6th Cir. 2017) (discussing questionable vitality of prudential ripeness in the wake of *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 125–28 (2014)); *see also Driehaus*, 573 U.S. at 167 (same); *Clark v. City of Seattle*, 899 F.3d 802, 809 n.4 (9th

33

Cir. 2018) (same); *but see Wyoming v. Zinke*, 871 F.3d 1133, 1141 (10th Cir. 2017) (treating prudential ripeness as an exception to *Lexmark*). For the time being, however, prudential ripeness has never been wholly repudiated by either the Supreme Court or the Sixth Circuit, so the court will use the doctrine's traditional contours here.

As the Sixth Circuit has observed, "[t]he line between Article III standing and ripeness in preenforcement First Amendment challenges" is so slim that it has, in effect, "evaporated." *Winter v. Wolnitzek*, 834 F.3d 681, 687 (6th Cir. 2016) (citing *Driehaus*, 573 U.S. at 165–67). Indeed, the defendants' own arguments are a testament to that principal, with the non-prudential aspects of their ripeness argument serving as little more than a restatement of their standing analysis. In terms of what the Constitution requires, if the plaintiffs' injuries, in a case such as this, are actual or imminent enough to confer standing, then the plaintiffs' claims are also sufficiently ripe, at least as a constitutional matter.

The only potential obstacle to ripeness, then, is the possibility of some non-constitutional, prudential ripeness issue that would prevent the court's consideration of the plaintiffs' claims. Even if one assumes the continuing validity of prudential ripeness as a doctrine, however, the court sees no grounds for dismissal here. The defendants have provided no persuasive basis for concluding that litigating the Act now, rather than later, would result in an undue hardship to them. Waiting, on the other hand, would be likely to cause significant hardship for the plaintiffs. There is also no reason to doubt that the record necessary to evaluate the plaintiffs' claims can be developed here. The plaintiffs are not challenging how the Act's requirements are going to be enforced; they are challenging what those requirements are. *See Hill v. Snyder*, 878 F.3d 193, 213–14 (6th Cir. 2017) (observing that the Supreme Court has held that "claims are fit for review if they present 'purely legal' issues that 'will not be clarified by further factual development'")

(quoting *Thomas*, 473 U.S. at 581). The record necessary to support such a challenge can be assembled now, whether or not any enforcement or rulemaking has taken place. The plaintiffs' claims, therefore, are ripe, and the court will turn to the merits of those claims.

## IV. MERITS

### A. Claims I & V

Claim I and Claim V both allege that the Act burdens the plaintiffs' First Amendment rights of speech and association, with the primary difference being that the claims rely on different bodies of caselaw for setting forth the appropriate standard for evaluating the plaintiffs' challenge.[9] Because the question of what the standard of review should be is inseparable from the merits of either claim, the court will consider Claims I and V together.

#### *1. Governing Standard*

As a preliminary matter, the defendants dispute the plaintiffs' premise that the Act implicates the First Amendment rights of speech and association, arguing that the Act "does not prohibit or burden political expression or organization—because collecting a form and forwarding it to the proper officials is neither speech nor association." (Docket No. 40 at 14.) As the plaintiffs point out, however, a voter registration drive involves more than just accepting and delivering a form like some sort of silent courier. A voter registration drive, as described by the

---

[9] The defendants also raise one issue specific to Count V—namely, that the plaintiffs are allegedly seeking to assert the individual right to vote, for which they, as organizations, would not have standing to assert on their own behalf. The plaintiffs respond that, with one exception, they are not seeking to vindicate any individual right to vote, but rather their own organizational rights to engage in "speech and association activities in conducting voter registration drives and making communications regarding voter registration status," which "plainly implicate the right to vote." (Docket No. 44 at 22.) There is no dispute that the organizations have standing to assert their own rights. The one remaining contested issue with regard to organizational standing is that MCLC maintains that, insofar as it is necessary to do so, it has associational standing to assert the voting rights of its members. *See Waskul v. Washtenaw Cty. Cmty. Mental Health*, 900 F.3d 250, 254–55 (6th Cir. 2018) (setting forth requirements for associational standing). Even then, however, neither party has identified any reason why the legal outcome of MCLC's claims would depend on whether it was asserting those claims solely on its own behalf or also on behalf of its members. There is, therefore, no need to rule on MCLC's associational standing, at least at this stage.

plaintiffs and as the term is ordinarily used, involves "encourag[ing] . . . citizens to register to vote." *Project Vote v. Blackwell*, 455 F. Supp. 2d 694, 698 (N.D. Ohio 2006). (*See also* Docket No. 37 ¶ 103 ("Plaintiffs' voter registration staff and volunteers educate non-voters not only about how political participation can lead to social change and make democratic institutions more responsive to community needs, but also how the act of registering to vote helps underrepresented persons and communities establish their political worth, standing, and right to speak at the polls.").) "[E]ncouraging others to register to vote" is "pure speech," and, because that speech is political in nature, it is a "core First Amendment activity." *League of Women Voters of Fla. v. Browning*, 863 F. Supp. 2d 1155, 1158 (N.D. Fla. 2012); *see also League of Women Voters of Fla. v. Cobb*, 447 F. Supp. 2d 1314, 1334 (S.D. Fla. 2006) ("Because the collection and submission of [applications gathered during] voter registration drives is intertwined with speech and association, the question is not whether Plaintiffs' conduct comes within the protections of the First Amendment, but whether Defendants have regulated such conduct in a permissible way."); *cf. Driehaus*, 814 F.3d at 473 ("Political speech is at the core of First Amendment protections.") (citations omitted).

Organizing between individuals in support of such registration efforts, moreover, involves political association that is, itself, protected under the First Amendment. *See Hernandez v. Woodard*, 714 F. Supp. 963, 973 (N.D. Ill. 1989) ("Where groups, formal or informal, seek to advance their goals through the electoral process, regulations preventing their members from [participating in voter registration] impair their ability effectively to organize and make their voices heard.") (citing *R.I. Minority Caucus, Inc. v. Baronian*, 590 F.2d 372, 376–77 (1st Cir. 1979)). Finally, the disclaimer requirement specifically governs "communications"—giving lie to any plausible suggestion that speech is not the subject of the Act. The defendants' contention

that there is *no* protectable First Amendment activity touched on by the Act, therefore, does not stand up to scrutiny.

The mere fact that First Amendment interests are touched on by the Act, however, does not necessarily render the Act unconstitutional. Courts have often struggled with the unique difficulties posed by First Amendment challenges to election laws. In most areas of the law, the government can avoid the First Amendment just by taking the Amendment's advice and "mak[ing] no law" that bears on a potentially protected subject matter. U.S. Const. amend. I. On the topic of elections, however, making no law is not an option. "[T]here must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." *Storer v. Brown*, 415 U.S. 724, 730 (1974). For that reason, the Supreme Court has held that First Amendment challenges to "election code provisions governing the voting process itself" require a specialized inquiry beyond a simple "'litmus-paper test' that will separate valid from invalid restrictions." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 345 (1995) (citation omitted). In such cases, the Supreme Court has "pursued an analytical process" that considers "the relative interests of the State and the injured voters, and . . . evaluate[s] the extent to which the State's interests necessitated the contested restrictions." *Id.* (citation omitted).

The "flexible balancing approach" endorsed by the Supreme Court—known generally as the *Anderson-Burdick* framework, after *Burdick v. Takushi*, 504 U.S. 428 (1992), and *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1982)—can sometimes make it hard to fit First Amendment challenges to election laws into ordinary constitutional categories. *Ohio Democratic Party v. Husted*, 834 F.3d 620, 627 (6th Cir. 2016). When a state's law "'severely' burdens the fundamental right to vote, as with poll taxes, strict scrutiny is the appropriate standard." *Obama*

*for Am. v. Husted*, 697 F.3d 423, 429 (6th Cir. 2012) (quoting *Burdick*, 504 U.S. at 534). In cases

with no actual burden on a right to vote or other constitutional right, "a straightforward rational

basis standard of review should be used." *Id.* (citing *McDonald v. Bd. of Election Comm'rs*, 394

U.S. 802, 807–09 (1969); *Biener v. Calio*, 361 F.3d 206, 214–15 (3d Cir. 2004)). "The

distinction between 'severe burdens' and 'lesser' ones," however, "is often murky," *Citizens in

Charge, Inc. v. Husted*, 810 F.3d 437, 443 (6th Cir. 2016) (citation omitted), and "most cases fall

in between these two extremes." *Obama for Am.*, 697 F.3d at 429. Both sides of the *Anderson-

Burdick* balancing formula, moreover, can be fact-intensive, requiring the court to evaluate the

severity of actual burdens and the importance of actual state interests. Applying *Anderson-

Burdick* at the motion to dismiss stage, therefore, poses a challenge, to say the least.

Before a court even begins the *Anderson-Burdick* balancing process, however, it must

conduct the threshold inquiry of whether that framework actually applies—which is not

necessarily a given merely because the challenged law pertains to elections. As the Sixth Circuit

has observed, the rationale for *Anderson-Burdick* assumes that "'election cases rest at the

intersection of two competing interests,' namely, an individual's right to vote versus a state's

prerogative to regulate the right to vote." *Mich. State A. Philip Randolph Inst. v. Johnson*, 749 F.

App'x 342, 349 (6th Cir. 2018) (quoting *Ohio Democratic Party*, 834 F.3d at 626). Some

election-related laws, however, implicate more than those two sets of concerns. Specifically,

laws that govern the political process surrounding elections—and, in particular, election-related

speech and association—go beyond merely the intersection between voting rights and election

administration, veering instead into the area where "the First Amendment 'has its fullest and

most urgent application.'" *Eu v. San Francisco Cty. Democratic Cent. Comm.*, 489 U.S. 214, 223

(1989) (quoting *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 272 (1971); citing *Mills v. Alabama*,

384 U.S. 214, 218 (1966)). The Supreme Court, accordingly, has applied "exacting scrutiny"—not *Anderson-Burdick*—to cases governing election-related speech rather than "the mechanics of the electoral process*." McIntyre*, 514 U.S. at 345, 347 (reviewing law banning the circulation of anonymous literature intended to affect an election).

Left with this sometimes bewildering array of standards to choose from, it is probably best to eschew the abstract in favor of the specific, look to the details of the challenged scheme, and see how similar laws have been reviewed by the Supreme Court when challenged. Neither party has identified a Supreme Court case specifically addressing voter registration drive restrictions of the type at issue here. The plaintiffs, however, liken their challenge to those raised in two Supreme Court cases involving a different type of canvassing, the circulation of petitions in support of ballot initiatives, *Meyer v. Grant*, 486 U.S. 414 (1988), and *Buckley v. American Constitutional Law Foundation, Inc.*, 525 U.S. 182 (1999). In *Meyer*, the Supreme Court struck down Colorado's prohibition on the use of paid petition circulators. 486 U.S. at 428. In *Buckley*, the Supreme Court struck down three more Colorado restrictions on petition circulators: "(1) the requirement that initiative-petition circulators be registered voters; (2) the requirement that they wear an identification badge bearing the circulator's name; and (3) the requirement that proponents of an initiative report the names and addresses of all paid circulators and the amount paid to each circulator." 525 U.S. at 186, 205 (citations omitted).

The Supreme Court concluded that the regulation of the petition-drive activities at issue "involve[d] a limitation on political expression subject to exacting scrutiny." *Meyer*, 486 U.S. at 420 (citing *Buckley v. Valeo*, 424 U.S. 1, 45 (1976)). The Court explicitly rejected, moreover, the argument that the logistical aspects of collecting signatures could be easily separated from the regulation of speech, because "[t]he circulation of an initiative petition of necessity involves both

the expression of a desire for political change and a discussion of the merits of the proposed change." *Meyer*, 486 U.S. at 421. "[T]he First Amendment," the Court explained in *Buckley*, "requires us to be vigilant" when such activities are regulated, "to guard against undue hindrances to political conversations and the exchange of ideas." 525 U.S. at 192 (citing *Meyer*, 486 U.S. at 421). The Court held that the prohibitions were unconstitutional because they "significantly inhibit[ed] communication with voters about proposed political change, and [were] not warranted by the state interests (administrative efficiency, fraud detection, informing voters) alleged to justify those restrictions." *Id.*

The Supreme Court noted, in particular, the laws' tendency to result in "speech diminution" by "decreas[ing] the pool of potential circulators" of petitions. *Id.* at 194; *see also Bailey v. Callaghan*, 715 F.3d 956, 969 (6th Cir. 2013) (referencing *Meyer* as an example of the rule that the First Amendment applies "not only to laws that directly burden speech, but also to those that diminish the amount of speech by making it more difficult or expensive to speak") (citing *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 337 (2010); *Meyer*, 486 U.S. at 424)). The same rationale can easily be applied to the Act's restrictions on voter registration drives, particularly those involving prior registration, mandatory attendance at state-provided training, and the threat of criminal prosecution. If, therefore, *Meyer* and *Buckley* apply, they pose a substantial obstacle to the constitutionality of the Act.[10]

The Sixth Circuit has recognized that the standard set forth in *Meyer* and *Buckley* is not limited to the circulation of initiative petitions. *See Toledo Area AFL-CIO Council v. Pizza*, 154 F.3d 307, 316 (6th Cir. 1998) (applying *Meyer-Buckley* framework to law governing solicitation of political contributions). The defendants nevertheless argue that those cases should not apply

---

[10] Indeed, the defendants themselves concede that the standard of review dictated by *Meyer* and *Buckley* is "typically strict in theory, [but] fatal in fact." (Docket No. 40 at 13.)

here because voter registration drives, unlike petition drives for ballot initiatives, do not involve "communication with voters about proposed political change" and, therefore, are entitled to less First Amendment protection. *Buckley*, 525 U.S. at 192. But the creation of a new voter *is* a political change—no less so than the inauguration of a new mayor or the swearing-in of a new Senator. The often-repeated premise that voting is the "political right . . . preservative of all rights," *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886), is not just a comforting aphorism; it reflects an acknowledgment that, in the American system of governance, every decision to grant, preserve, or take away a right can be traced, in at least some partial way, back to an election. If anything, a person's decision to sign up to vote is more central to shared political life than his decision to sign an initiative petition. A petition in support of a ballot initiative might lead to a change in one law or a few laws, but a change in the composition of the electorate can lead to the change of *any* law.

A discussion of whether or not a person should register to vote, moreover, inherently "implicates political thought and expression." *Buckley*, 525 U.S. at 195.[11] Registering to vote is not a politically neutral act, and neither is declining to. A person seeking to register voters may, for example, find himself confronted with people who, based on their beliefs about politics and government, consider voting to be unimportant, a waste of time, or even a pernicious tool for lending legitimacy to an intolerable system. *See id.* (discussing reasons individuals have refused to register to vote). Even if a prospective voter does not explicitly voice those concerns, the operator of the registration drive will no doubt know that sincere reasons for refusing to vote exist and pose an obstacle to his efforts. The way that the person encouraging registration

---

[11] Although *Buckley* was not itself about restrictions on voter registration efforts, it did discuss voter registration, because the challenged law limited circulating petitions to registered voters. That discussion in *Buckley* leaves little doubt that the Supreme Court understood the political dimensions of voter registration. 525 U.S. at 194–96.

responds to or preempts the objections people have to voting will, therefore, often bear on fundamental questions at the heart of the political system. The court sees no reason that the First Amendment would treat that discussion as somehow less deserving of protection than, for example, a discussion about whether or not there should be a ballot initiative about property taxes. The court, therefore, finds *Meyer* and *Buckley* to provide the appropriate standard for considering the plaintiffs' challenges.

The Sixth Circuit's recent opinion in *Schmitt v. LaRose*, ___ F.3d ___, 2019 WL 3713886 (6th Cir. Aug. 7, 2019), provides a useful framework for distinguishing between cases in which *Anderson-Burdick* is appropriate and cases in which a more demanding First Amendment framework should apply. In *Schmitt*, the plaintiffs challenged Ohio's system of reviewing whether to allow a ballot initiative to proceed—specifically, the state's mechanism for rejecting initiatives that propose "administrative" rather than "legislative" changes. *Id.* at *1. The plaintiffs sought to proceed under ordinary First Amendment principles, but the Sixth Circuit rejected their argument on the ground that the challenged laws "regulate the process by which initiative legislation is put before the electorate, which has, at most, a second-order effect on protected speech." *Id.* at *4. The court further explained that, "although the Supreme Court has acknowledged that a person or party may express beliefs or ideas through a ballot, it has also stated that '[b]allots serve primarily to elect candidates, not as forums for political expression.'" *Id.* at *5 (citing *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 363 (1997)). Accordingly, *Anderson-Burdick* applied. *Id.*; *see also Comm. to Impose Term Limits on Ohio Supreme Court & to Preclude Special Legal Status for Members & Emps. of Ohio Gen. Assembly v. Ohio Ballot Bd.*, 885 F.3d 443, 448 (6th Cir. 2018) (applying *Anderson-Burdick* in challenge to Ohio's rule limiting initiatives to a single topic). The Sixth Circuit, in *Schmitt*,

42

expressly declined to apply *Meyer*, because the "statute in *Meyer* targeted Coloradans' ability to advocate for initiative petitions, which amounted to regulation of political speech." *Id.* at *9. This case, unlike *Schmitt*—but like *Meyer* and *Buckley*—involves more than merely the composition of a ballot or some other matter of election administration with a "second-order effect on protected speech." It involves the direct regulation of communication and political association, among private parties, "advocat[ing] for" a particular change, namely the creation of new registered voters and, by extension, a change in the composition of the electorate. Because the regulation of First Amendment-protected activity is not some downstream or incidental effect of the Act, *Meyer* and *Buckley* provide the appropriate standard.

The distance between the *Meyer-Buckley* framework and the *Anderson-Burdick* framework is not, however, necessarily far. The standard of review under *Anderson-Burdick* only recedes to its lowest level when the challenged law is "minimally burdensome" on the exercise of constitutional rights. *Ohio Democratic Party*, 834 F.3d at 627 (citation omitted). But if the burden is "severe," then *Anderson-Burdick* is just another road to strict scrutiny. *Schmitt*, 2019 WL 3713886, at *5. The plaintiffs have alleged, in great detail, the seemingly severe burdens that the Act will place on the practice of operating voter registration drives. At this stage, the court must accept those allegations as true. Therefore, even if the court were to reject the *Meyer-Buckley* framework—which it does not—it would simply end up applying the same standard or something very close to it, at least for the purposes of the pending motion.

Evaluating the constitutionality of the Act, under either exacting scrutiny or an intermediate *Anderson-Burdick* standard, requires the court to "identify and evaluate the precise interests put forward by the State as justifications for the burden imposed." *Anderson*, 460 U.S. at 789. In so doing, the court must "not only determine the legitimacy and strength of each of

43

those interests," but "also . . . consider the extent to which those interests make it necessary to burden the plaintiff's rights." *Miller v. Lorain Cty. Bd. of Elections*, 141 F.3d 252, 256 (6th Cir. 1998) (quoting *Anderson*, 460 U.S. at 789). The defendants argue that the purpose of the Act is "to ensure that voter registration is done *properly*." (Docket No. 40 at 14.) Whatever it means for a voter registration drive to have been done "properly," the state has a legitimate, and indeed probably compelling, interest in ensuring that individuals who seek to register to vote are able to do so without their efforts being thwarted by an incompetent or unscrupulous middleman. The determinative question under either *Meyer-Buckley* or *Anderson-Burdick* is whether the Act's response to that interest actually fits the specific evil that each provision is intended to address. Neither standard will tolerate a burden on the plaintiffs' First Amendment rights that is unnecessary or out of proportion to the statute's legitimate ends.

### 2. Registration and Training Requirements

As the Supreme Court has observed, election authorities "retain[] an arsenal of safeguards" through which they can encourage compliance with election laws. *Buckley*, 525 U.S. at 205. "Broad prophylactic rules in the area of free expression are suspect. Precision of regulation must be the touchstone in an area so closely touching our most precious freedoms." *NAACP v. Button*, 371 U.S. 415, 438 (1963) (citations omitted). In light of the alternatives, the court sees very little basis for concluding that the provisions of the Act governing registration and training are truly necessary. For example, even assuming that it is necessary for the operator of a voter registration drive to provide certain information to the state, it is not clear why it is necessary that the information be provided to the coordinator of elections before a drive, rather than afterwards, either as part of handing in forms or as a timely separate submission. If

44

anything, post-drive disclosures would be more likely to be accurate. Requiring the information up front and in every case simply requires more prior planning with little, if any, benefit.

Particularly without justification is the requirement that the operators of voter registration drives file sworn statements confirming that they will comply with the law. The law is the law already; no one has to swear to follow it in order for it to apply. As a practical matter, this requirement merely adds an additional regulatory hoop for the operator of a voter registration drive to jump through, while also perhaps sending her an intimidating message about the possibility of prosecution. There is simply no compelling reason to force someone to swear that she will abide by laws that already bind her regardless.

It is also difficult to see why people who have received some remuneration for their voter registration work should be subject to registration requirements that other people performing the same tasks are not. *See Project Vote*, 455 F. Supp. 2d at 705 (discussing impropriety of "assum[ing] that compensated workers would be more ill equipped to assist in filling out the registration forms than uncompensated voter registration workers" (internal quotation marks omitted)). The imposition of the registration requirement on some voter registration drives and not others, based on whether work is paid, moreover, will inevitably lead to harsher treatment for some types of organizations—specifically, those less capable, perhaps due to the nature of their mission, of summoning numerous enthusiastic volunteers. *See Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 799 (1988) (noting that a requirement targeting only paid personnel making charitable solicitations "necessarily discriminates against small or unpopular" causes and groups that must rely on paid assistance). The Act's two-tiered system both lacks justification in its own right and undermines any claim that its provisions are truly necessary.

Finally, there is, on the current record, no basis for requiring that registration workers and volunteers receive mandatory government training prior to assisting with voter registration. At least at this stage, there is no reason to believe that private training has been inadequate or that voter registration organizations would refuse to use training resources made available to them unless forced. Moreover, even if private training has sometimes fallen short, requiring a group seeking to affect political change to be a captive audience for a government-sponsored message ahead of time would plausibly have a chilling effect, particularly given that the Coordinator of Elections appears to possess broad discretion over the content of the training, including the severity of any warnings about volunteers' legal exposure as well as simply the amount of time that the training will take. Based on the facts as pleaded by the plaintiffs, there is a plausible claim that such a scheme would fail either *Meyer-Buckley* or *Anderson-Burdick*.

### 3. Penalties for Incomplete Registrations

The plaintiffs point out several aspects of the civil penalties regime related to incomplete applications that allegedly impose burdens out of proportion to their supposed benefits. Most obviously, the combination of the 10-day hand-in requirement and the penalties for incomplete forms put the plaintiffs in an unnecessary double bind. There are good reasons to require operators of voter registration drives to turn in all of their collected applications and to do so in a timely manner. But by imposing the 10-day requirement, the Act is also, by necessity, requiring people and organizations to turn in applications that they know to be incomplete. The Act, therefore, punishes a person or organization for doing too much of something that it requires them to do.

The defendants would presumably respond that the Act only punishes those whose voter registration efforts result in an unacceptable rate of error. That, though, is not how the Act is

structured. The Act does not punish anyone for the *rate* of incomplete forms he turns in. If an organization turns in 10,000 applications, 1% of which are incomplete, it is penalized, even if it made all reasonable efforts to perform its voter registration drive competently. If an organization turns in a stack of 150 applications, 66% of which are incomplete, that organization is in the clear. The result is that the Act holds an organization to an increasingly more onerous standard the more effective it is at recruiting new voters.

That penalty for effectiveness is only exacerbated by the Act's provisions imposing an additional penalty "in each county where the violation occurred." Tenn. Code Ann. § 2-2-143(c)(4)(A), *accord* Tenn. Code Ann. § 2-2-143(c)(4)(B). For example, if an organization operates across 20 counties and turns in 5 incomplete forms from each county, for a total of 100 incomplete forms, it can be fined up to $2,000. If an organization operates in one county and turns in 500 incomplete forms, it can only be fined $150. Just as the decision to punish by volume rather than rate punishes an organization for identifying more prospective voters, the county-by-county fine requirement punishes an organization for having a wider geographic scope. The unluckiest organization of all is one that seeks to register a large number of Tennesseans across a large number of counties. In other words, the Act falls hardest not on bad actors but on organizations with the most ambitious and inclusive voter registration efforts. The state's interest in drives being performed competently does not justify such a regime, under exacting scrutiny or some lesser balancing analysis.

### *4. Disclaimer Requirements*

The justification for the Act's disclaimer requirements is, if anything, even more difficult to discern. It is certainly not clear to the court, at this stage, that there is a problem of prospective voters mistakenly believing that, for example, Rock the Vote is a division of Tennessee's Office

47

of the Secretary of State. And even if people are mistakenly believing that it is, then what, exactly, is the harm, as long as all of the information provided is accurate and all of the registration and lookup activities are competently done? In contrast, the burdens of the disclaimer requirement are readily apparent. The requirement demands attention and resources and may, in some media, be difficult to comply with at all. Moreover, there is a plausible case that including a foreboding disclaimer that makes a voter registration drive seem somehow illegitimate will actually confuse a voter far more than help him. Voter registration drives are a perfectly legitimate component of the voter registration system, under Tennessee law and under the Constitution. A disclaimer that could be read to suggest otherwise would be a substantial burden without a corresponding benefit.

### 5. Consent Requirement for Retention of Information

The requirement, in Tenn. Code Ann. § 2-2-142(b), that the operator of a voter registration drive receive consent in order to retain information is, among the challenged provisions, probably the least burdensome to voter registration drives. At the very least, there is a way that the operator of a voter registration drive can easily comply with the provision—that is, by simply not retaining applicant information. The plaintiffs, however, wish to have the option of retaining applicant information in furtherance of their get-out-the-vote efforts, and they complain that the consent requirement will create additional paperwork requirements that will burden their voter registration drives. Although Tenn. Code Ann. § 2-2-142(b) does not state the form that the consent must take, the plaintiffs argue that, as a practical matter, it will almost certainly be necessary to obtain written consent for their records, as a way to document their compliance with the Act. That step, they argue, would introduce a new layer of difficulty and complexity to their voter registration activities, in the form of a requirement that improperly and without reason

48

targets voter registration for an extra layer of regulation that does not apply to any other interaction, political or non-political, in which an individual voluntarily gives his information to a third party.

At this stage, the plaintiffs have stated a plausible enough claim of unconstitutionality with regard to the information retention requirement. The question of how burdensome the requirement will be, as a practical matter, is a question of fact, and the court must, at this stage, accept as true the plaintiffs' claim that it will be significantly burdensome. The court, moreover, cannot assume that the record will reveal a legitimate problem sufficient to justify that burden.

### *6. Cumulative Burden and Constitutionality*

The plaintiffs have presented plausible claims that each of the challenged provisions, individually, fails the level of scrutiny set forth in *Meyer-Buckley* and will, at least if their factual assertions about the burdens of the provisions prove to be true, also fail *Anderson-Burdick* review. That claim of unconstitutionality becomes even stronger when one considers that the Act is a single regulatory scheme intended to operate as a whole. Each of the plaintiffs appears to be a substantial organization with an established history of encouraging voter registration. When it comes to personnel and budgets, though, their vulnerability is striking. The organizations, particularly those based in Tennessee, operate on limited budgets with few or no full-time staffers. The Act would attack their limited resources from all sides. The disclaimer and registration requirements produce compliance costs. The training and penalty provisions hamper the organization's ability to recruit qualified volunteers and registration workers. Then, when the voter registration drive is done, the organization's already-depleted resources may be drained by fines. For example, a single $2,000 fine would be about 5% of MCLC's entire political budget. The same fine would be 200% of AMAC's budget for voter registration.

49

Those burdens, moreover, are avoidable. If Tennessee is concerned that voter registration drives are being done incompetently, it can engage in public education efforts without relying on a complex and punitive regulatory scheme. If it is concerned that the drives are being done fraudulently—for example, by a person or organization collecting forms and never turning them in—it can punish the fraud rather than subjecting everyone else to an intrusive prophylactic scheme that true bad actors would likely evade regardless. *See Citizens for Tax Reform v. Deters*, 518 F.3d 375, 388 (6th Cir. 2008) (noting that Ohio law governing petition circulators was unnecessary, in part due to preexisting prohibition on election fraud). If the state is concerned about incomplete voter registration forms, it can devote resources to identifying them quickly and working with voters to complete them. If it is concerned that processing a large number of registration applications is too costly and difficult, it can make registration simpler. And if, after that, Tennessee is still concerned about the cost, then, as understandable as that concern may be, bearing the cost is what the Constitution requires. Having an active and engaged electorate can cost money; not having one can cost more.

"Election day—next year, and two years later, and two years after that—is what links the people to their representatives, and gives the people their sovereign power." *Rucho v. Common Cause*, 139 S. Ct. 2484, 2512 (2019) (Kagan, J., dissenting). Local election authorities, in many ways, are the custodians of that bond. No one in this case disputes that it is crucial to the functioning of our system of government that county election commissions have resources proportionate to the scale and importance of their responsibilities. But restricting voter registration drives in order to try to preserve election commission resources is like poisoning the soil in order to have an easier harvest. There is no point in taking a step to preserve resources if,

by doing so, one thoroughly compromises the reason that the resources were important in the first place.

Because of its importance to the ongoing functioning of representative government, the right "to join with others to advance political beliefs," including through encouraging and facilitating voter registration, is among "the most fundamental of . . . constitutional rights." *Id.* The plaintiffs have pleaded a plausible claim that these particular efforts to regulate the sometimes-chaotic electoral process impinge on that right more than the Constitution permits. The court, accordingly, will not dismiss Claims I or V.

**B. Claim II**

Claim II alleges that the disclaimer requirements of Tenn. Code Ann. § 2-2-145 amount to government-mandated speech that serves no compelling or legitimate governmental function, in violation of the First Amendment. The defendants argue that the disclaimer requirements should be upheld under rational-basis review, because they govern only "factual, commercial speech," and the disclaimer requirements are rationally related to the government's interest in ensuring that prospective voters are fully informed about the nature of the entities with which they are dealing. (Docket No. 40 at 15.) The plaintiffs respond that the defendants have misidentified the appropriate standard for reviewing the Act and that it should instead be evaluated pursuant to the standard for evaluating government-compelled speech on political matters.

The attempt to classify the plaintiffs' speech as commercial is certainly novel. "Commercial speech" has been "narrowly defined by the Supreme Court" as "'expression related solely to the economic interests of the speaker and its audience or 'speech proposing a commercial transaction.'" *Karhani v. Meijer*, 270 F. Supp. 2d 926, 931 (E.D. Mich. 2003)

(quoting *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 561 (1980); citing *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 762 (1976) (intermediary citations omitted)). The Act, in contrast, requires disclaimers attached to all "public communication[s] regarding voter registration status made by a political committee or organization"—that is, political, noncommercial speech on an issue of significant public concern. Tenn. Code Ann. § 2-2-145(a). The defendant's argument, as far as the court can tell, seems to be that communications about voter registration status are, in some sense, 'commercially' advertising the participation in elections, which the First Amendment should treat no differently than an advertisement for shoes or hamburgers.

It is not entirely clear that the defendants themselves even consider their "commercial speech" argument colorable, as the phrase appears nowhere in their Reply, despite the fact that the rest of their argument on Claim II is unchanged. (*See* Docket No. 46 *passim*.) In any event, political speech encouraging voter registration is not commercial speech for First Amendment purposes. The case on which the defendants chiefly rely in support of their argument, *Discount Tobacco City & Lottery, Inc. v. United States*, 674 F.3d 509 (6th Cir. 2012), is, therefore, inapposite. The Sixth Circuit in *Discount Tobacco City* expressly premised its reasoning on the conclusion that the challenged law regulated only commercial speech, leaving the plaintiffs' "ability to make 'direct comments on public issues' . . . untouched." *Id.* at 533 (quoting *San Francisco Arts & Athletics, Inc. v. U.S. Olympic Comm.*, 483 U.S. 522, 537 n.15) (1987)). *Discount Tobacco City*, therefore, does not provide the appropriate standard for considering Claim II.

"The First Amendment guarantees 'freedom of speech,' a term necessarily comprising the decision of both what to say and what *not* to say." *Riley*, 487 U.S. at 796–97. A law that

"compel[s] individuals to speak a particular message" by following a "government-drafted script" that "alte[rs] the content of [their] speech" is a "content-based regulation of speech" and, therefore, "presumptively unconstitutional." *Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2371 (2018) (quoting *Riley*, 487 U.S. at 795; *Reed v. Town of Gilbert, Ariz.*, 135 S. Ct. 2218, 2226 (2015)). Such laws "may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Id.* (citing *Reed*, 135 S. Ct. at 2226). The defendants make little, if any, argument that the Act's disclaimer requirements meet this standard, particularly for the purposes of a motion to dismiss. The defendants posit that voters may be confused about whether regulated parties are affiliated with the Tennessee Secretary of State. In order for a compelled disclosure to pass constitutional muster, however, it must "remedy a harm that is," at the very least, "'potentially real[,] not purely hypothetical.'" *Id.* at 2377 (quoting *Ibanez v. Fla. Dep't of Bus. & Prof'l Regulation*, 512 U.S. 136, 146 (1994)). If the defendants have evidence that the public is actually confused about whether private voter registration drives are performed by the Secretary of State *and* actually harmed by that confusion, then the defendants will be free to present that evidence at a later juncture. At this stage, however, the plaintiffs have pleaded a plausible claim that the disclaimer requirements are not directed at any compelling government interest.

Even if the defendants can establish that the disclaimers required by the Act are directed at a real problem, there is reason to doubt that the Act is appropriately tailored to that problem. The government's "simple interest in providing voters with additional relevant information does not justify a state requirement that a [speaker] make statements or disclosures she would otherwise omit." *McIntyre*, 514 U.S. at 348. If the state is concerned that the public is insufficiently informed or misinformed, then "more benign and narrowly tailored options are

53

available" than compelled speech. *Riley*, 487 U.S. at 800. For example, the state could "communicate the desired information to the public" itself through a public awareness campaign. *Id.* If the Tennessee Department of State is concerned that the public is confused about its role in voter registration, it is free to communicate with the public of its own accord.

Finally, even if one accepts that the government's purpose is compelling *and* that disclaimers are an appropriate tool for furthering that purpose, the plaintiffs have raised persuasive objections to the tailoring of the particular disclaimer requirements in the Act. For example, the disclaimer requirement reaches all "public communication regarding voter registration status made by a political committee or organization," not merely any particular subset of communications that is actually likely to result in public confusion. Tenn. Code Ann. § 2-19-145(a). This requirement, as written, would reach any number of wholly innocuous communications, including communications that, based on their content, present no threat of confusion whatsoever with regard to whether the government is involved.

Moreover, the requirement that the disclaimers be "conspicuous and prominently placed" in a way that is not "difficult to read or hear" and cannot "be easily overlooked," Tenn. Code Ann. § 2-19-145(d), read literally, sets an almost impossible standard. If, for example, an organization operates a website that includes multiple pages, it is unclear what form of disclaimer would be sufficiently prominent. For example, a disclaimer only on the site's main page would be missed by anyone who came to the site by a link to another page. Another option would be to place the disclaimer at the bottom of every page, like a copyright notice. That placement, however, could be "easily overlooked." The organization, lacking a good option, might force every user that accesses its site to acknowledge the disclaimer before going further. Even then, though, it is probably true, as a factual matter, that a user could "easily overlook" the

54

disclaimer, just as users routinely skip quickly past terms of service and end user license agreements to get to the information and features they want in other websites and applications. People, particularly those living in a media environment that inundates them with information, are very good at overlooking things. Requiring a disclaimer that is incapable of being "easily overlooked" is, in practice, requiring a disclaimer so intrusive that it would threaten to swallow the communication that it is attempting to clarify.[12]

The defendants, as the parties defending a policy of government-compelled speech, "ha[ve] the burden to prove that the [challenged requirement] is neither unjustified nor unduly burdensome." *Becerra*, 138 S. Ct. at 2377 (citing *Ibanez*, 512 U.S. at 146). The plaintiffs have pleaded a plausible claim that the Act's disclaimer requirements clear neither bar. The court, accordingly, will not dismiss Claim II.

## C. Claim III

Claim III alleges that, insofar as the Constitution permits some legislation akin to the Act, the Act itself is unconstitutionally overbroad in violation of the First Amendment. (*Id.* ¶¶ 229–35.) The defendants argue that the court should dismiss this claim because none of the provisions of the Act are overbroad.

A law that has been facially challenged under the First Amendment "may be invalidated as overbroad if 'a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" *Stevens*, 559 U.S. at 473 (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 n.6 (2008)). Under this test, "any law imposing restrictions so broad that it chills speech outside the purview of its legitimate regulatory purpose

---

[12] The defendants may protest that they would never suggest enforcing the disclaimer requirement so aggressively. But it is not up to them. By making a violation of the disclaimer requirement a Class A misdemeanor, Tenn. Code Ann. § 2-9-145(e), Tennessee has given any local prosecutor the power to enforce the disclaimer requirement to the full extent of its text.

will be struck down." *Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cty., Tenn.*, 274 F.3d 377, 387 (6th Cir. 2001). The defendants' argument that the plaintiffs cannot satisfy this test is closely bound up with their arguments on Claims I and II. Specifically, the defendants argue that the Act is unlikely to reach much, if any, constitutionally protected activity given that, as they argue, (1) the Act does not regulate political speech and (2) the required disclaimers trigger minimal constitutional protection and are subject only to rational basis review. As the court has discussed above, neither of those premises is supported by the relevant case law.

The viability of the plaintiffs' Claim III, therefore, largely flows from the court's analysis on Claims I and II. Insofar as the Act's restrictions on voter registration drives can be applied in a way consistent with the First Amendment—and it is not clear to the court how that would be—the unconstitutional applications are far out of proportion to the permissible ones. For example, even if it might be permissible to punish people who chronically, knowingly hand in deficient forms at a rate far in excess of what is ordinary—and the court does not rule that it would be—that is no basis for the Act's punishing conscientious voter registration workers whom it forced to hand in incomplete forms under the 10-day turn-in requirement. And while it is almost certainly permissible to offer government-provided registration drive training, that is no basis for requiring it and chilling the speech of everyone unable or unwilling to submit themselves to the Coordinator of Elections' government-sponsored message. Finally, while it is conceivable that some large, smoothly functioning organizations which limit themselves to heavily planned voter registration activities might be able to comply with the pre-registration requirement without too great a hardship, that is no basis for chilling the speech of organizations for which it would be a burden. Many of the plaintiffs are relatively large and very experienced in operating voter

56

registration drives, but even they, by their allegations, will have their speech chilled by that requirement.

Similarly, even accepting, for the sake of argument, that some disclaimer requirement would be constitutional, the indiscriminate overbreadth of the requirement, as written, far overshadows the narrow class of cases where it might be permissible. The phrase "[a] public communication regarding voter registration status made by a political committee or organization," Tenn. Code Ann. § 2-19-145(a)(1), could reach an extraordinarily wide array of communications, including ones posing no threat whatsoever of confusing any voter or prospective voter. The plaintiffs have stated a plausible argument that the challenged provisions of the Act, if not otherwise unconstitutional, are unconstitutionally overbroad. The court, accordingly, will not dismiss Claim III.

**D. Claim IV**

Claim IV alleges that various of the Act's requirements are unconstitutionally vague in violation of the plaintiffs' rights to due process under the Fourteenth Amendment. Specifically, the plaintiffs suggest that the highlighted terms in the thirteen following provisions of the Act are impermissibly vague[13]:

> 1. "A person or organization **who has not been designated by the county election commission under § 2-2-111** and who conducts **a supplemental voter registration drive** . . . ." Tenn. Code Ann. § 2-2-142(a). The plaintiffs complain that this language leaves it unclear whether a person or organization which is the county's designee for a particular supplemental voter registration drive is exempt for that drive only or all drives.
>
> 2. "A person or organization . . . who **conducts** a supplemental voter registration . . . ." *Id.* The plaintiffs complain that it is unclear what it means to "conduct" a voter

---

[13] In their briefing on this issue, the plaintiffs cite several paragraphs of their Amended Complaint that do not appear to allege an actual linguistic ambiguity. Rather, they merely highlight the arguably strange way that the Act assesses fines on a county-by-county basis. (See Docket No. 44 at (citing Docket No. 37 ¶¶ 136, 138–40).) The fact that these provisions may seem strange or unfair, however, does not make them vague. The court, therefore, will limit its analysis to provisions where the plaintiffs have identified actual linguistic ambiguity.

registration drive and who can be said to "conduct" it. Accordingly, it is impossible to know which individuals must comply with the full registration requirements.

3. "Prior to conducting a **voter registration drive** . . . ." *Id.* The plaintiffs complain that "voter registration drive" is not defined. They also complain that, on its face, the Act does not specify that it applies only to voter registration drives in Tennessee.

4. ". . . **drive in which the person or organization attempts to collect voter registration applications of one hundred (100) or more people** . . . ." *Id.* The plaintiffs complain that it is unclear what constitutes a single drive for purposes of tallying the 100-prospective-voter number. For example, it is unclear whether multiple planned activities over the course of multiple days, by the same organization and generally targeting the same population, would count as one or multiple voter registration drives. This problem is exacerbated, they argue, because the ensuing provisions use the singular and plural of "drive"/"drives" inconsistently. *Compare* Tenn. Code Ann. § 2-2-142(a)(1)(A) *with* Tenn. Code Ann. § 2-2-142(a)(1)(B).

5. ". . . drive in which the person or organization **attempts** to collect voter registration applications of one hundred (100) or more people . . . ." *Id.* The plaintiffs complain that it is unclear what it means to attempt to collect voter registration applications of one hundred or more people, given that voter registration drives do not necessarily have pre-set targets and each drive is merely attempting to obtain as many valid registrations as possible.

6. "**Prior to conducting a voter registration drive**, the person or agent of an organization **shall . . . [c]omplete training** . . . [and] **[f]ile a sworn statement** stating that the person or organization shall obey all state laws and procedures . . . ." Tenn. Code Ann. § 2-2-142(a)(1)(C). The plaintiffs complain that it is unclear how these provisions apply to individuals who complete training and file a sworn statement once and then engage in multiple voter registration drives over a period of time, specifically with regard to if and how often the person must retake the training and/or file a fresh statement.

7. ". . . individuals who are not **paid** to collect voter registration applications or to organizations that are not **paid** to collect voter registration applications . . . ." Tenn. Code Ann. § 2-2-142(g). The plaintiffs complain that it is unclear whether "paid" covers, for example, volunteers who receive stipends and organizations that receive grants of various types.

8. ". . . organizations . . . that **use only unpaid volunteers to collect** voter registration applications . . . ." *Id.* The plaintiffs complain that this language is unclear with regard to how it applies to organizations that use unpaid volunteers to collect voter registration forms but use paid staff in support roles that support the drive, such as by processing forms or providing training.

9. ". . . any application that **lacks** the applicant's name, [or other enumerated items]." Tenn. Code Ann. § 2-2-143(b). The plaintiffs complain that it is unclear whether this

provision covers applications where the enumerated information is filled in but is incorrect, illegible, or incomplete, such as, for example, a form including a residential address without a zip code.

10. "A **public** communication regarding voter registration status . . . ." Tenn. Code Ann. § 2-2-145(a)(1). The plaintiffs complain that, while the Act provides a non-exhaustive list of "public communications," the term is otherwise ambiguous. For example, it is unclear whether it would apply to one-on-one conversations in public places.

11. "A public communication **regarding voter registration status** . . . ." *Id.* The plaintiffs complain that it is unclear what qualifies as a communication regarding voter registration status, including whether it encompasses communications that touch on voter registration generally or that implicate registration only incidentally as part of a broader message about voting.

12. ". . . . **clear and conspicuous and prominently placed** . . . ." Tenn. Code Ann. § 2-19-145(d). The plaintiffs argue that this standard is wholly ambiguous, for reasons discussed at greater length herein.

13. "Any **person** who intentionally and knowingly violates [the disclaimer provisions] . . . ." Tenn. Code Ann. § 2-19-145(e). The plaintiffs complain that it is unclear whether and how this provision applies to violations committed by organizations.

The defendants argue that the plaintiffs have, at most, identified ordinary ambiguities that might create problems in a few hypothetical cases, but not ambiguities so vague that they raise constitutional concerns.

To succeed on a vagueness challenge to a statute, a plaintiff must show that the relevant terms "(1) 'fail to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits' or (2) 'authorize or even encourage arbitrary and discriminatory enforcement.'" *Platt v. Bd. of Comm'rs on Grievances & Discipline of Ohio Supreme Court*, 894 F.3d 235, 246 (6th Cir. 2018) (quoting *Hill v. Colorado*, 530 U.S. 703, 732 (2000)). "'[A] more stringent vagueness test should apply' to laws abridging the freedom of speech . . . ." *Id.* (quoting *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982)). That standard can be "relaxed somewhat" if the law at issue "imposes civil rather than criminal penalties and includes an implicit scienter requirement." *Id.* (citing *Hoffman Estates*, 455 U.S. at

59

499). Several of the challenged provisions of the Act, however, impose criminal liability, and those that do not impose criminal liability generally lack a scienter requirement.

The question of unconstitutional vagueness largely calls on the court to consider the language of a statute as a legal matter. Nevertheless, there may be factual issues that provide relevant background, particularly with regard to ordinary practices in the governed field—here, voter registration, activism, and elections. The court, therefore, must approach this issue at least somewhat tentatively. Nevertheless, the court can, at least as a preliminary matter, consider the general plausibility of the plaintiffs' linguistic arguments.

A statute is not unconstitutionally vague merely because it is "susceptible to clever hypotheticals testing its reach." *Id.* at 251. Statutory ambiguity happens; if that were not the case, the job of the courts would be considerably simpler. Many of the listed ambiguities— specifically, numbers 1, 2, 3, and 8 listed above—strike the court as most likely to present run- of-the-mill absences of clarity that would make for a difficult case if applied in the manner identified but that do not necessarily raise constitutional problems. A few other provisions are susceptible to troublingly vague readings if a particular word or phrase is construed one way but can also be fairly construed in a way likely to pass constitutional muster—namely, numbers 5, 9, and 13. A few of the provisions that the plaintiffs have identified, however, involve so much ambiguity that the plaintiffs have, without a doubt, made at least a plausible claim that individuals who wish to comply with the Act have not been given a reasonable opportunity to understand what the Act prohibits.

First, the Act offers no guidance for when a person or organization should consider its activities to consist of a single voter registration drive or multiple registration drives. For example, a group might plan a series of events at different churches, temples, or mosques, once a

60

week, for a month. In this hypothetical, the organization would know, from experience, that no single effort at a single institution would be expected to yield more than 30 registration applications. Is that a single voter registration drive covered by the Act or four voter registration drives that are not? What if, instead, a single organization held multiple events, in multiple locations and operated by entirely different teams, as part of a "Voter Registration Day," with none individually expected to exceed more than a few dozen registrations? What if the same Voter Registration Day effort was held, but rather than having been done by different teams within a single organization, it was operated by multiple organizations in loose coordination with each other? Or, finally, what if a single organization is just involved in voter registration efforts, every day or almost every day, on a rolling basis and in numerous locations? These are not outlandish hypotheticals—they are easily foreseeable possibilities that go to the heart of how the Act would work. Unless an organization has some fair warning of how to know when the Act will apply, the Act cannot constitutionally restrict the organization's First Amendment activities.

Second, and relatedly, the Act gives no guidance on how often a person must receive fresh training or file a fresh sworn statement of compliance. The Act could be read as requiring new training and a new filing with each drive that a party conducts—although that requirement would seem to be quite onerous. But even then, the Act has given no guidance about what consists of a single drive. As written, a volunteer can go to the trouble of receiving training from the Coordinator of Elections and then, within hours, be unsure of whether she needs to do it again before she can help across town. That ambiguity, as well, places too much of a burden on individuals who merely wish to exercise their First Amendment rights within the law.

Third, the scope of much of the Act is defined in terms of whether organizations or workers are "paid to collect voter registration applications," Tenn. Code Ann. § 2-2-142(g), but,

outside of a few clear-cut areas, it is entirely unclear what that term means. The provision, presumably, covers individuals paid an hourly wage to collect registrations and organizations that have entered into contracts specifically to collect registrations for an identified price. It is unclear, however, if the language applies to, for example, individuals receiving a stipend or organizations that receive grants to engage in voter registration activities generally. *See Project Vote*, 455 F. Supp. 2d at 707 (noting difficulty of determining which voter registration workers are "compensated"). Without some clarity about the type of payment contemplated by the Act, it is impossible for a person or organization to know if it is covered.

Fourth, the phrase "a public communication regarding voter registration status," Tenn. Code Ann. § 2-2-145(a)(1), is ambiguous in at least two major ways. The Act explains that "'public communication' includes communications made using newspapers or magazines, mass mailings, phone bank or text messages, electronic mail systems, or websites," Tenn. Code Ann. § 2-2-145(a)(2), but it is impossible to discern what other communications it includes. A conversation between a volunteer and a potential voter in the park, for example, is simply the equivalent of a "phone bank . . . message," without the phone, so there is no assurance, in the statute, that the conversation would be exempt from the disclaimer requirement. The Act also gives no guidance with regard to whether this provision applies to billboards or other signage— an application that might be particularly challenging, given that signage is generally intended to be legible from a distance, and it would be difficult to integrate a disclaimer that would be similarly legible. Even when one resolves the question of medium, the phrase "regarding voter registration status" could be read to reach virtually any conversation that even touches on the issue of individual voting and eligibility. A person or organization operating under the Act would

live with the possibility of arbitrary enforcement in virtually any communication in which voter registration came up, even passingly.

Finally, as the court has already discussed at length, the requirement that a disclaimer must be "clear and conspicuous and prominently placed," Tenn. Code Ann. § 2-2-145(d), does not give a person or organization sufficient warning of what one must do in order to comply with the Act. Read literally, the requirement that the disclaimer be given a "placement" that cannot "be easily overlooked," *id.*, is, at least in some instances, almost impossibly demanding. The Act, though, gives no additional guidance about how the requirement should be read.

Not every alleged instance of vagueness that the plaintiffs have cited necessarily poses a constitutional problem. Legislators are not required to anticipate every possible type of confusion or challenging situation, and the courts exist to resolve ambiguities in individual cases. At least a handful of the Act's ambiguities, however, appear likely to impair efforts by reasonable people to know when the Act will apply and, if it applies, what it requires. These provisions, moreover, are all central to the Act's functioning and scope. The resulting uncertainty is inherently likely to result in a chilling effect on organizations and individuals who wish to participate in voter registration but who cannot afford to find themselves on the wrong side of an enforcement action. The court, accordingly, will not dismiss Claim IV.

## V. CONCLUSION

For the foregoing reasons, the defendants' Motion to Dismiss (Docket No. 39) will be denied.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge

63